UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| WILLIAM C. BLOOMQUIST, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 03-276-P-S |
| | ) | |
| JUSTICE PAMELA ALBEE, et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON MOTION
FOR SUMMARY JUDGMENT**

Defendants, Portland Press Herald, Blethen Maine Newspapers, Inc., Kennebec
Journal Online Central Maine Morning Sentinel, and David Hench have filed a motion for
summary judgment apropos the claims against them brought by William Bloomquist.
(Docket No. 119.)  I recommend that the Court **GRANT** the defendants' motion in its
entirety.

*Discussion*

*Summary Judgment Standard*

The defendants are entitled to summary judgment only "if the pleadings,
depositions, answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any material fact" and that they
are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its
resolution would "affect the outcome of the suit under the governing law," Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence
is such that a reasonable jury could return a verdict for the nonmoving party," id.   I

review the record in the light most favorable to Bloomquist and I indulge all <u>reasonable</u>

inferences in his favor.  <u>See Feliciano de la Cruz v. El Conquistador Resort & Country</u>

<u>Club</u>, 218 F.3d 1, 5 (1st Cir.2000) (emphasis added).

      The fact that Bloomquist is a <u>pro se</u> plaintiff does not free him, in responding to

the defendants' motion, from the pleading burden set forth in Rule 56.  <u>See Parkinson v.</u>

<u>Goord</u>, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding <u>pro se</u> does not

otherwise relieve a litigant of the usual requirements of summary judgment, and a <u>pro se</u>

party's bald assertions, unsupported by evidence, are insufficient to overcome a motion

for summary judgment."); <u>see also Sirois</u> <u>v. Prison Health Servs</u>., 233 F.Supp.2d 52, 53-

55 (D. Me. 2002).   While Bloomquist's complaint may be held to a less stringent

pleading standard under <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972), his <u>pro se</u> status

does not shield him from Rule 56's operative provision under subsection(e) requiring the

pleader to "set forth such facts as would be admissible in evidence."

### *Defamation Claims*

### *Defamation Standard*

      Under Maine Law:

        Common law defamation consists of:
(a) a false and defamatory statement concerning another;
(b) an unprivileged publication to a third party;
(c) fault amounting at least to negligence on the part of the publisher; and
(d) either actionability of the statement irrespective of special harm or the
existence of special harm caused by the publication.

<u>Lester v. Powers</u>, 596 A.2d 65, 69 (Me.1991) (adopting Restatement (Second) of Torts §

558 (1977)); <u>accord</u> <u>Haworth v. Feigon</u>, 623 A.2d 150, 156 (Me. 1993).

A statement is not actionable if it is substantially true, that is, if a more accurate statement would not have been less damaging than the one which was published. McCullough v. Visiting Nurse Assn. of Southern Maine, 1997 ME 55, ¶ 10, 691 A.2d 1201, 1204. "It is not necessary," under Maine Law, "to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." Id. (citing Restatement (Second) of Torts § 581A cmt. f (1977)). Furthermore, "[a] defamation claim requires a statement--i.e. an assertion of fact, either explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts." Lester, 596 A.2d at 69.

### *Defendants' Statement of Material Fact*

#### **Portland Press Herald November 29, 2001, Bloomquist Story**

According to the defendants, the November 29, 2001, edition of the Portland Press Herald, a newspaper published by Blethen Maine Newspapers, included one story concerning William Bloomquist, "Arsenal Seized from Baldwin Home," by David Hench. (Defs.' SMF ¶ 1.) Bloomquist qualifies this by stating that there were two separate Portland Press Herald articles, one entitled "Arsenal Seized from Baldwin Home" in the Cumberland County edition and one entitled "Weapons Seized in Abuse Inquiry" in the York County edition. (Pl.'s Resp. Defs.' SMF ¶ 1; Pl.'s SAMF ¶ 1.) [1]

---

[1]    In a separate order I have granted Bloomquist's motion to amend his response by filing this late responsive statement of material fact.

In his responsive statement and affidavit Bloomquist has not cited to the specific articles, relying solely on his affidavit statements relaying their content. However, he has attached the articles.

All and all, because of Bloomquist's pleading shortfalls, I have had to search for materials in this case that have not been cited properly in the appropriate pleadings. In doing so I have attempted to be fair to both sides, at the same time as moving this matter to a final resolution based on what the record does and does not demonstrate.

Hench attended a press conference held by the Cumberland County Sheriff's Department on November 28, 2001. (Defs.' SMF ¶ 3.)  Hench received and reviewed a press release issued by the Cumberland County Sheriff's Department dated November 28, 2001.  The press release announced, among other things, that Bloomquist was investigated for having committed alleged homicides and for domestic abuse, the seizure of eighty-one firearms, machine guns, other weaponry, and eleven marijuana plants from his residence by the Sheriff's Department, and that the Sheriff's Department sought Bloomquist's arrest for aggravated assault and cultivation of marijuana.  (Id. ¶ 4.) Bloomquist denies this statement, arguing that the press release does not say he was investigated for homicides.  (Pl.'s Resp. Defs.' SMF ¶ 4.)  The press release in question states that the investigation of Bloomquist began when Detective Down[2] met with Katariina Pulkkinen and her attorney, "regarding a report that Katariina's husband William C. Bloomquist proclaimed involvement in several Maine homicides."  (Harkavy Aff. Ex. A at 1; Hench Aff. Ex. C at 1.) "During the subsequent interview," the release continues, "Detective Down determined that at this time, those admissions appear unfounded."  (Harkavy Aff. Ex. A at 1; Hench Aff. Ex. C at 1.)[3]

Hench's sources and reporting for the story, "Arsenal Seized from Baldwin Home," included:

(A) attendance at the Sheriff's Department press conference;

---

[2]     Bloomquist uses "Downs" rather than Down. I have used Down as that is the name used, not only by these defendants, but in the answer filed on Down's behalf.

[3]     Bloomquist also states, "nor was Plaintiff investigated for seventeen alleged homicides."  (Pl.'s Resp. Defs.' SMF ¶ 4.)  None of the stories attributed to these defendants suggest that there were a specific number of homicides attributed to Bloomquist by his wife; rather they use the term "several" as did the press release (Harkavy Aff. Ex. B; id. Ex. C; Offer Aff. Ex. A) or simply indicated that "Pulkkinen reported that her husband had bragged of killing people" (Hench Aff. Ex. A & B).  The fault is Bloomquist's for not doing a better job of record citation if I am mistaken on this score.

4

(B) in-person observation of the actual firearms, miscellaneous weaponry, and marijuana plants displayed by the Sheriff's Department at the press conference;
(C) review of the press release issued by the Sheriff's Department;
(D) follow-up questions with Sheriff Dion and Sheriff's Deputies;
(E) interview with the lawyer for Mr. Bloomquist, Robert Andrews;[4]
(F) interview with Mr. Bloomquist's wife's lawyer, Judith Wohl; and
(G) research on publicly available court records.[5]

(Defs.' SMF ¶ 5.)

Hench considered his sources to be reliable.  (Id. ¶ 6.)[6]  Hench had no reason to doubt the accuracy of the information given him by his sources.  (Id. ¶ 7.)[7]  The story is an accurate account of the information given Hench by his sources.  (Id. ¶ 8.)[8]  Hench did not know of Bloomquist prior to reporting the story.  (Id. ¶ 9.)  The Portland Press Herald never received any request for a correction or retraction of the story. (Id. ¶ 10.)[9]

---

[4]   Bloomquist denies that Hench interviewed his lawyer but has no record support to buttress this denial.

[5]   Bloomquist denies this assertion citing to Paragraph 12 of his affidavit.  That paragraph, however, is an entirely conclusory paragraph setting forth Bloomquist's belief that there was a conspiracy to make intentionally false statements about Bloomquist using the pretext of the domestic violence charge to defame him.  (Bloomquist Aff. ¶ 12.)  As I have had occasion to state many a time in this case, a subjective belief in  a conspiracy is not sufficient to get a party past summary judgment if there are not factual asseverations supported by record evidence from which the court can make an inference that a conspiracy existed.

[6]   Bloomquist denies Defendant Hench's sources were reliable, citing Paragraph 7 of h is affidavit.  (Pl.'s Resp. Defs.' SMF ¶ 6.) In his statement of additional facts Bloomquist likewise contends that Sheriff Dion is not a reliable law enforcement source as he has a well deserved reputation for making false statements on official matters, for distorting the truth to emphasize his own role, for savagely berating and punishing subordinates who dare to defy him, for encouraging his "chosen" officers to falsify evidence in criminal matters and to engage in vendettas against individual citizens that challenge him. According to Bloomquist, less than ten percent of the Cumberland County Sheriff's Department voted that they have confidence in Defendant Dion or his leadership of the Sheriff's Department. And, Bloomquist opines, Defendants Hench and Harkavy's own papers published some of these stories about Defendant Dion, giving them notice of his unreliability. (Pl.'s SAMF ¶ 7.)  Bloomquist's uncorroborated affidavit statements are not a basis for drawing a conclusion that Dion had a "well deserved" reputation for untruthfulness; it only conveys Bloomquist's unsubstantiated personal opinion.

[7]   Once again,  Bloomquist denies this paragraph by an unsupported allegation to the contrary, this time not even citing to his sworn affidavit.  (Pl.'s Resp. Defs.' SMF ¶ 7.)

[8]   Bloomquist denies this assertion citing to Paragraph 12 of his affidavit.  See supra footnote 4.

[9]   Bloomquist denies this paragraph stating that he has a good faith belief that his attorney requested equal press time but that that request was denied.  There is no record citation for this assertion and Bloomquist has not submitted the affidavit of his attorney.

**The Central Maine Newspapers November 29, 2001, Bloomquist Story.**

The Central Maine Newspapers, a division of Blethen Maine Newspapers

publishes the <u>Kennebec Journal</u> and the <u>Central Maine Morning Sentinel</u>.  (<u>Id.</u>¶ 11.)  The

Central Maine Newspapers published one story concerning Bloomquist on November 29,

2001, "Police Seize Weapons in Baldwin," by Associated Press writer Jerry Harkavy

(<u>id.</u>¶ 12) and any story that might have been published on the Central Maine Newspapers'

website did not materially differ from the version published in the newspapers.

(<u>id.</u>¶ 13).[10]  The Central Maine Newspapers does not have a Southern Maine reporter,

and, therefore, regularly picks up wire service news stories relating to southern Maine.

(<u>Id.</u>¶ 14.) The Associated Press, a wire service, is well known to the Central Maine

Newspapers as a good, reliable source, known to be accurate.  (<u>Id.</u>¶ 15.)[11]  The Central

Maine Newspapers had no reason to believe at the time the "Police Seize Weapons in

Baldwin" story was published that it was anything other than accurate.  (<u>Id.</u>¶ 16.)[12] The

Central Maine Newspapers picked up the wire story verbatim or virtually so.  (<u>Id.</u>¶ 17.)

---

[10]     Bloomquist denies these two paragraphs, asserting that "several versions were published online" and that changing the headline from "Police Seize Weapons in Baldwin" to "Police find military arsenal in booby trapped basement" is a material change.  (Pl.'s Resp. Defs.' SMF ¶¶ 12, 13).  However, the latter article submitted by Bloomquist as Exhibit 6 is from the Lewiston Sun-Journal and Bloomquist has not established that these defendants had any part in publishing this piece.
     In his statement of additional facts, Bloomquist also asserts that on November 29, 2001, the Bangor Daily News published an article entitled "Military Arsenal Found in Booby-Trapped Room," (Pl.'s SAMF ¶ 2), and that on November 29, 2001, the Lewiston Sun Journal published an article entitled "Police Find Military Arsenal in Booby-Trapped Room in Basement" by Jerry Harkavy (<u>id.</u> ¶ 3).  (<u>See</u> <u>also</u> <u>id.</u> ¶ 4.) These articles are not relevant to these defendants.
     It is worth noting here that his action was dismissed vis-à-vis Harkavy because Bloomquist did not make timely service.  (Docket No. 97.)
[11]     Bloomquist denies this statement asserting that there have been numerous high profile, libelous, plagiarized, and false stories that the wire service has picked up in the last couple of years.  (Pl.'s Resp. Defs.' SMF ¶ 15.)  However, the cited paragraph of his affidavit does not begin to support this contention. (<u>See</u> Bloomquist Aff. ¶ 7.)
[12]     Bloomquist, citing Paragraphs 7, 8, 9, and 10, of his affidavit, denies this statement asserting that "there was clear and convincing evidence that the police reports and press release were not factual or accurate."  (Pl.'s Resp. Defs' SMF ¶ 16.)  The referenced paragraphs of Bloomquist's affidavit fail to support this assertion chiefly because the contentions made in the paragraphs are not information which Bloomquist's sworn statement alone can establish.

The Associated Press writer, Jerry Harkavy, based his reporting primarily on review of a November 28, 2001, press release issued by the Cumberland County Sheriff's Department and interviews with law enforcement officials, including the Cumberland County Sheriff, Mark Dion, a senior Sheriff's Department Officer (Captain Kevin Joyce), and the spokesman for the State Department of Public Safety, Stephen McCausland. (Id.¶ 18.)

The defendants assert that the sources were known to be reliable by Harkavy (id.¶ 19), that Harkavy had no reason to doubt the veracity of the information given him by his sources (id.¶ 20), and that the Associated Press story is an accurate account of the information provided by the sources (id.¶ 21).   Bloomquist contests these representations claiming that Harkavy had evidence available to him that Dion had made prior false statements in official matters and that the nature of Bloomquist's firearms gave Harkavy clear evidence that some of the law enforcement statements --such as that they had no idea why Bloomquist had kept military weapons-- were false.  (Pl.'s Resp. Defs.' SMF ¶¶ 19-21; Pl.'s SAMF ¶ 7.)[13]  I address this 'dispute' below when I sift through each of the nineteen statements, including this one, that Bloomquist contends are false and defamatory.

---

[13]    His support for this is Paragraph 6(m) of his affidavit which reads:
m. "…investigators…had no idea why he kept military weapons." This statement is totally false. Early in the morning of November 27, 2001, Defendant Detective Downs contacted ATF who informed him that Plaintiff had a Class III Federal Dealer in Firearms License, a Federal Firearms Collectors License, that he had three machine guns and silencers registered to him as an individual pursuant to the National Firearms Act and a further nine "Assault Weapons" registered to him in Connecticut, as well as other classified information about Plaintiff.
Bloomquist Aff. ¶ 6(m).  Bloomquist has submitted no evidence that Downs contacted the ATF (let alone that Harkavy had this information available to him) and his affidavit statement that this was the case does not suffice to put this fact into dispute.

Finally, there is no dispute that neither the Central Maine Newspapers nor the Associated Press ever received any request for a correction or retraction of the "Police Seize Weapons in Baldwin" story by Harkavy. (Defs.' SMF ¶ 22.)

***Bloomquist's Statement of Additional Fact***

On December 2, 2001, Bloomquist attended a meeting in Augusta with four attorneys and others. At that meeting Bloomquist was shown for the first time copies of both of Hench's articles in the Portland Press Herald. (Pl.'s SAMF ¶ 4.)[14]

Bloomquist asserts that these articles contained a mix of information about Bloomquist, some from Defendant Sheriff Dion and some information from sources other than law enforcement, that were false. (Id. ¶ 5.) The defendants deny this statement "in so far as 'false' information in 'these articles' includes articles written by David Hench or Jerry Harkavy published by the defendants." (Defs.' Resp. Pl.'s SAMF ¶ 5.) I address the nineteen specific statements one-by-one below.

Bloomquist asserts that the media defendants-- including but not limited to Defendants Kennebec Journal Online Morning Sentinel, David Hench, Blethen Maine Newspapers, Inc., and Portland Press Herald --did not contact or attempt to contact Bloomquist for comment prior to or after publishing any of their articles or media coverage. (Pl.'s SAMF ¶ 13.) The defendants qualify this assertion by asserting that the defendants did contact and interview Bloomquist's lawyer, Robert Andrews, and they obtained a statement from Andrews. (Defs.' Resp. Pl.'s SAMF ¶ 13.) They note that

---

[14]    Defendants object to this and other statements on the grounds that it is not accompanied by a record citation. However, to the extent that the statements are mirrored in Bloomquist's companion affidavit I have considered them. If this recommended decision does not get accepted for the reasons set forth herein, it might be appropriate to consider whether the defendants' objection vis -à-vis Bloomquist's pleading deficiencies should not be given more weight.

Bloomquist surrendered to the police on November 28, 2001, and was still in custody on November 29, 2001, (id.) making him unavailable to them.

***The Specific Statements of which Bloomquist Complains***

Paragraph Six of Bloomquist's statement of additional facts identify the following nineteen statements as being objectionable to Bloomquist:

a. "Weapons Seized in Abuse Inquiry."

Bloomquist argues that the Cumberland County Sheriff's Department's own police records list "weapons offense" as the reason for police being at Bloomquist's residence, not "abuse inquiry." Bloomquist does not assert that these defendants had a copy of these police records. The press release relied on by Hench and Harkavy indicates that law enforcement went with Pulkkinen to serve the protection from abuse order, to protect her from further harm, and to assist her in her efforts to get her belongings. (Hench Ex. A at 2; Harkavy Ex. A at 2.) The articles speak both of the abuse allegations and of the presence of the weapons at the residence which Bloomquist had a legal right to possess up until the abuse inquiry. As the discussion of several of the other statements below establish, Bloomquist has not placed into genuine dispute the fact that the triggering factor for the events of that day was Pulkkinen's complaints of abuse and efforts to get a protective order. At the very least this statement is substantially true.

b. "Authorities investigating a domestic abuse complaint Tuesday night found a cache of military weapons."

Bloomquist argues that the authorities were there, according to Cumberland County Sheriff's Department's own records, for a "weapons offense." He claims that the law enforcement defendants knew, or should have known, that there was no legitimate investigation of domestic abuse against Bloomquist, recognized that Bloomquist had a

valid temporary protection order against Pulkkinen, and came to the conclusion that

Pulkkinen was the aggressor. (<u>Id.</u> ¶ 11.) [15]

Again, the press release relied on by Hench and Harkavy indicates that law

enforcement went with Pulkkinen to serve the protection from abuse order, to protect her

from further harm, and to assist her in her efforts to get her belongings.  (Hench Ex. C at

2; Harkavy Ex. A at 2.)  And while Bloomquist envisions a conspiracy and sees many

---

[15]   According to Bloomquist, Sheriff Dion, and his coconspirators knew there were no valid issues of domestic violence against Bloomquist and that his extensive surveillance system would have recorded what happened. (Bloomquist Aff. ¶ 10.)  He asserts that Dion and his coconspirators knew that Bloomquist had previously obtained a protection from abuse order against his wife six days prior, which Dion and his deputies refused to serve upon Bloomquist's wife even though they were legally bound to do so. (<u>Id.</u>) In this paragraph Bloomquist also asserts:

> Plaintiff's wife repeatedly stated to Defendant Attorney Wohl, Defendant Sheriff Dion, Defendant Downs, Defendant Berlind and his other coconspirators that she was in no way intimidated or afraid of Plaintiff, that she was the aggressor not Plaintiff, and that she repeatedly intentionally forced Plaintiff to physically defend himself by repeatedly attacking him with various weapons. Defendants Berlind, Downs, and possibly other defendant coconspirators knew that Defendant Wohl had told Pulkkinen not to put that information on her petition for temporary protection from abuse or to tell the judge and repeatedly told Pulkkinen that the only way to make Plaintiff's order against her go away was to testify against Plaintiff and obtain a final protection from abuse order against Plaintiff and that she could not say these things to the judge or put them on the criminal complaint sheet.

(<u>Id.</u>)  I agree with the defendants that Bloomquist's affidavit statement alone does not support these assertions.

Bloomquist further argues in a conclusory manner that Wohl, Dion, Berlind, Downs, and others knew that Pulkkinen was an athlete, was as tall as him, outweighed him by one hundred pounds, was ten years younger than him, and was a former member of a national sports team, and that Bloomquist was seriously disabled by the two broken vertebrae in his back caused by Defendant Floccher assaulting him in the courtroom on April 11, 2001. (<u>Id</u> ¶ 10). Bloomquist points out that his ex-wife does not speak English as her first language. Having grown up in Finland, her first and primary language is Finnish.  Bloomquist alleges in Finland "the police have a well-deserved reputation of 'making people obey.'" (<u>Id.</u>) However, his affidavit statement to this effect is not sufficient record support for this rather sweeping statement.  With respect to Pulkkinen, Bloomquist also alleges:

> She is inherently afraid of the police and other law enforcement authorities. Dion and his coconspirators knowingly used this fact to their advantage in manipulating Pulkkinen and the situation to fit their agendas against Bloomquist. Defendants Downs and Berlind and possibly other defendant coconspirators repeatedly told Pulkkinen that in order to make the protection from abuse order against her go away she must testify against Plaintiff and obtain a final protection from abuse order against Plaintiff and that she could not tell the judge or put on her criminal complaint statement that she was in no way intimidated of or afraid of Plaintiff, or that she was the aggressor not Plaintiff, and that she repeatedly forced Plaintiff to physically defend himself by repeatedly attacking him with various weapons.

(<u>Id.</u> ¶ 11.)  However, if Bloomquist wants to interject these factual assertions into the summary judgment mix he would need to at the very least provide an affidavit of Pulkkinen swearing to these assertions.

reasons from his vantage point that the law enforcement defendants should not have

taken Pulkkinen's version of the story to be true, there is simply no credible dispute that

the events upon which Hench and Harkavy reported stemmed from an investigation into

Pulkkinen's allegations of abuse.  (See Berlind Aff. Ex. B, Docket No.163; Docket No.

174 Ex. 3.)

> c. "The weapons were seized because authorities said they wanted to avoid the possibility of serious injuries."

Bloomquist contends that the weapons were seized for political and publicity

purposes, alleging without proper record support, that he has "valid reason to believe"

that Sheriff Dion, up for reelection, had an advance agreement with media defendants,

including Hench, that Dion would be given "a front page spread" if he could seize "a

whole roomful of military weapons."  Again, and again without proper record support,

Bloomquist's claims that Dion contacted the media, including Hench and Harkavy, during

the early morning of November 27, 2001, before going to Bloomquist's residence, to

schedule his press conference for the following day, November 28, 2001.[16]  At the

summary judgment stage of this game, Bloomquist needs more than his subjective

---

[16]     Bloomquist states in Paragraph 10 of his statement of additional fact:  "Dion, and his coconspirators conspired to use the false pretext of domestic violence to illegally enter Plaintiff's property and illegally seize Plaintiff's lawfully owned and possessed weapons for their own political purposes." (Pl.'s SAMF ¶ 10.)  Likewise in Paragraph 12 Bloomquist waxes:

> Defendant Sheriff Dion and his defendant coconspirators, including but not limited to Defendants Kennebec Journal Online Morning Sentinel, David Hench, Blethen Maine Newspapers, Inc., and Portland Press Herald used the above intentional false statements and false pretext of domestic violence to defame Plaintiff, to inflame, incite, and cause fear in the law enforcement agencies and public against Plaintiff, to incite public support for Defendant Sheriff Dion and his coconspirators, and to give the false impression that the entrance onto and into Plaintiff's residence and seizure of Plaintiff's weapons collection was legal and necessary. Defendants wanted to have flashy, inflammatory headlines and stories to print in order to further Defendant Sheriff Dion and his coconspirator's political careers, anti-gun agendas, and to sell more newspapers, thus increasing Defendants Kennebec Journal Online Morning Sentinel, David Hench, Blethen Maine Newspapers, Inc. Portland Press Herald's profits.

(Id. ¶ 12.)  Bloomquist's reliance on his own affidavit in support of these conclusory allegations of conspiracy is insufficient at the summary judgment stage.  He must present concrete factual assertions backed by cognizable record support from which a conspiracy could be inferred.

hypothesis of conspiracy to create a genuine dispute that this statement was not substantially true.

      d. "Detectives with the Sheriff's department began investigating the case Monday after Pulkkinen reported that her husband had bragged of killing people."

      Bloomquist avers that he never bragged of or made any such statements to Pulkkinen, or anyone else, about committing homicide. (Pl.'s SAMF ¶ 6(d), ¶ 9; Bloomquist Aff. ¶ 6(d); 9.)[17]   However there is no dispute that the press release states that the investigation of Bloomquist began when Detective Down met with Pulkkinen and her attorney regarding Bloomquist's proclaimed involvement in several Maine homicides and that Down determined that at this time, those admissions appear unfounded. (Harkavy Aff. Ex. A at 1; Hench Aff. Ex. C at 1.)  There is also no genuine dispute that Pulkkinen, whether or not she was telling the truth, made a statement to law enforcement authorities that included an indication that Bloomquist told her that he had gone out on one occasion to kill people.  (Berlind Aff. Ex. B at 3.)

      e. "Investigation determined there was no truth to such stories, but did conclude that Pulkkinen's statements justified charges of domestic assault."

      Bloomquist, relying solely on his affidavit, claims that there was no investigation, nor any valid justification for charges of domestic assault based on Pulkkinen's statements.  (Bloomquist Aff. ¶ 6(e).)  Once again this assertion, for which Bloomquist's affidavit is not proper support, does not put into dispute the fact that the press release relied upon by theses defendants was premised on the fact that Pulkkinen made a

---

[17]     Bloomquist claims that the Cumberland County Sheriff's Department never investigated Bloomquist for having committed seventeen alleged homicides. His sole support for this assertion is his affidavit statement that in Maine the State Police retain sole authority to investigate homicides outside of Portland and Bangor and they did not investigate Plaintiff either.  He contends that standard police procedure in Maine is to turn over to the State Police Crime Investigation Division any investigation involving homicides. (Pl.'s SAMF ¶ 8; Bloomquist Aff.¶ 8.)

statement to police detailing Bloomquist's history of abuse and her fears of future abuse.

(Berlind Aff. Ex. B at 1-6.)

    f. "<u>Alerted to the presence of the guns, more than a dozen Cumberland County sheriff's detectives and deputies approached the expansive house in the Saddleback Hills at 5 p.m. Tuesday to serve the protection order on Bloomquist and to help Pulkkinen retrieve her belongings.</u>"

    Bloomquist argues that the Cumberland County Sheriff's Department – including Sheriff Dion, his detectives and deputies --  the Maine State Police, ATF, and other authorities have been aware for years prior to this event that Bloomquist had/has an extensive military weapons collection all lawfully owned and possessed so it is misleading to say they were "alerted" to the presence of the weapons.  He also reiterates his contention that such a host of law enforcement personnel would not approach his house after dark simply to serve a protection order and to help Pulkkinen retrieve her belongings.[18]  He complains that defendants Dion, Down, Joyce, and Langella knew Bloomquist was not at home to be served with a protection order as other patrol deputies had repeatedly been to the residence during the day to verify that Bloomquist was not yet home.[19]  And again Bloomquist avers in support of his conspiracy theory that he has valid reason to believe that Dion had already contacted the media, including Hench and Harkavy,  during the day of November 27, 2001, to schedule his press conference for the following day, November 28, 2001.  Bloomquist has not provided any record evidence of this phone call.  In the context of a summary judgment motion, Bloomquist needs more

[18] He also continues to complain that the sheriff department records indicate that the investigation was for a weapons offense.  I have addressed this 'dispute' above.

[19] With no proper record support Bloomquist states  that on the afternoon of November 27, 2001, Deputy Rick Marston went to Bloomquist's residence to try to serve the temporary protection from abuse order on him. When he returned to the substation to report that Bloomquist was still not home to be served, he was berated for attempting to serve the order and told by one of the Cumberland County Sheriff's Department defendants, "If he had served it on Plaintiff, it would have ruined everything."  (Bloomquist Aff. ¶ 6 ( f).)  This conversation in not something that Bloomquist's affidavit alone can establish.

than his subjective hypothesis of conspiracy to create a genuine dispute that this

statement was not substantially true.

g. "Pulkkinen does not accuse Bloomquist of using the guns in an assault, though they did contribute to her intimidation, as did his stories about having killed people, according to officials and her lawyer, Defendant Judith Wohl."

Bloomquist contends that Pulkkinen repeatedly stated to Wohl, Detective Down,

and Assistant District Attorney Berlind that she was in no way intimidated of or afraid of

Bloomquist or his weapons collection, citing Paragraph ¶ 6(g) of his affidavit and

"Pulkkinen's Affidavit #1."  Bloomquist's own description of what Pulkkinen told these

individuals is certainly hearsay.  The only thing that I could guess Bloomquist might be

referencing is an affidavit filed in response to one of the motions for judgment on the

pleading dated December 27, 2001, a month after the reporting in question, that indicates

that Pulkkinen had no objection to lifting the bail conditions against Bloomquist and that

she was not in fear of him.  (Docket No. 155 Ex. 9.)  This affidavit does not indicate that

Pulkkinen told Wohl, Down, or Berlind anything to contradict her statement to the police

prior to the preparation of the news articles in question.  If I am incorrect on this affidavit

as being the one to which Bloomquist refers it is Bloomquist's poor summary judgment

record references that are at fault.

h. "In his second year of law school, Bloomquist was offered an internship with the Cumberland County District Attorney's office, but the offer was rescinded following a background check with the Bridgton Police Department."

Bloomquist characterizes this statement as totally false and claims that it

originated from sources other than the Cumberland County Sheriff's Department. He

asserts that there was never any background check with the Bridgton Police Department,

nor if there had been one would any negative information have surfaced, relying solely on his affidavit assertion on this score.  (Bloomquist Aff. ¶ 6(h).)

First, there is no indication in this statement that Bloomquist complains about that the source was from the Cumberland County Sheriff's Department.  And, vis-à-vis this motion, Bloomquist does not cite to any record evidence for the proposition that there was no background check of any sort conducted by the Bridgton Police Department. Judging by his pleadings on the motion to strike a paragraph of his affidavit filed in support of his own motion for summary judgment, Bloomquist is relying on the fact that in 1994 (three years prior the District Attorney position at issue) the Bridgton Chief of Police was willing to certify Bloomquist's eligibility for a firearm device. (Docket Nos. 156, 167 & Attach. 1; Order Motion Strike ¶ 4 Bloomquist Aff.)  Bloomquist seems to think that the only reason that a background check could have relevance to his position with the District Attorney's Office was if he had a prior conviction that barred him from being licensed to own a firearm. [20]  Being very liberal in Bloomquist's favor with respect

---

[20]       In his own motion for summary judgment Bloomquist argued that the sole cause of the revocation of his offer of a summer position with the District Attorney's office was his academic performance at the University of Maine Law School.  Bloomquist's record support for this assertion is Paragraph 15 of Bloomquist's Statement of Additional Facts, a non-cognizable pleading, submitted in reply to the defendants' response to his motion for summary judgment.

> The sole cause of Plaintiff's non-certification in May of 1997 was academic probation due to a low grade in a single course, not that Plaintiff was found some how to be not of good moral character or competent legal ability. On May 30, 1997 Plaintiff made telephone calls to Defendant Anderson and Defendant Berlind of the Cumberland County District Attorney's Office and to Dean Zillman of the University of Maine School of Law, which all confirm that the sole issue of Plaintiff's non-certification was academic standing. Subsequent letters sent out by Defendants Anderson and Berlind, as well as Dean Zillman and Assistant Dean Guaditz all confirm that academic probation was the sole reason for Plaintiff's temporary non-certification.

(Pl.'s SAMF ¶ 15, Docket No. 175, Attach. 1.)  Bloomquist cites to his affidavit filed with that pleading and a paragraph that asserts that the sole cause of his non-certification in May of 1997 was academic probation due to a low grade in a single course and not a want of moral character or legal ability.   (Bloomquist Aff. ¶ 15)  He then cites to exhibits that he filed with yet another pleading, his motion to strike the affidavit of Ann Berlind.  (Docket No. 174.)

For their part, the defendants assert that according to the District Attorney, Bloomquist's internship offer was terminated because he was not certified as being of good character and

to his support for his disputation apropos this statement, this statement may possibly suggest some factual inaccuracy.  However, the defendants are still entitled to judgment because it is substantially true.

> i. "Guns, ammunition kept in booby-trapped cellar."

Bloomquist counters that there was no booby-trap or any device that could remotely be considered a booby-trap in his basement  and that Hench and Harkavy should have viewed the alleged booby-trap device at the press conference if such a dangerous device had in fact existed.  He contends that the fact that Dion could not produce the alleged device had put Hench and Harkavy on notice that Dion was clearly distorting the facts and stirring up unreasonable fear of Bloomquist. (Bloomquist Aff. ¶ 6(i).) Bloomquist cites to Hench's and Harkavy's affidavits in their entirety.  I could find no reference in these affidavits to a booby-trap.

While Bloomquist might not have considered his door arrangement a booby trap, he does not dispute that the door was rigged with a device that was set off by the unauthorized opening of the door.  The press release relied on by Hench and Harkavy does state that prior to entering the room in which the weapons were stored, "it was discovered that Bloomquist had set a 'booby trap' on the door.  That device was deactivated and deputies then safely entered the room."  (Hench Aff. Ex. C at 2; Harkavy Aff. Ex. A. at 2.)   I cannot draw a reasonable inference in Bloomquist's favor that this statement was false because Hench and Harkavy failed to insist on viewing a device that apparently was not on display during the press conference.  Furthermore,  Webster's New World College Dictionary's first definition of "booby trap" is "any scheme or device for

---

competent legal ability.  (Defs.' SMF ¶ 12.)  However, the defendants offer no record citation in support of this factual statement, as Bloomquist notes.  (Pl.'s Resp. Defs.' SAMF ¶ 12.)

tricking a person unawares" while the second is "a bomb or mine that is set to be exploded by some action of the intended victim, as when some seemingly harmless object is lifted." Webster's New World College Dictionary at 159 (3d. Ed. 1997).  I conclude that the statement is substantially true.  See discussion of ¶ 6(p) infra.

      j.  "The arsenal contained… a recoilless rifle."

Bloomquist, who would have knowledge of his weapons collection, asserts that there was no recoilless rifle or any weapon that could be considered a recoilless rifle. (Bloomquist Aff.  ¶ 6(j).)  Bloomquist does not explain why this statement, even if inaccurate, is defamatory and in order to be actionable the statement must be both false and defamatory.

      k.  "Bloomquist…claimed to own a security company…"

Bloomquist contends that this statement is false.  He explains that his Federal Firearms License is in the name of "MFP Security Forces" from the movie "Mad Max." (Bloomquist Aff. ¶6(k).)  Again, I fail to see how stating that someone is running a security company is defamatory.  I also cannot fathom how a statement that Bloomquist held a Federal Firearms License in the name of "MFP Security Forces" would have been less damaging than the published statement.

      l.  "…investigators knew little else about Bloomquist…."

Bloomquist describes this statement as "both false and inflammatory."  He states that he was well known to local and federal law enforcement officials: He served a nine month internship with the Maine Drug Enforcement Administration;  provided technical assistance and advice to various law enforcement officers;  gave several well attended briefings on the Colombian Cali and Medellin Cocaine Cartels; wrote a thesis on the drug

trade that received wide media exposure;  gave a number of seminars and demonstrations on terrorist weapons, devices, and tactics;  assisted teaching the International Terrorism Courses at the University of Southern Maine; and hosted numerous tactical shooting events of which some of the employees of the Cumberland County Sheriff's Department were aware, including but not limited to Defendant Down. (Bloomquist Aff. ¶ 6(l).)

Once again, I cannot see how indicating that law enforcement officers knew little more than what was set forth in the articles, which did include an indication that Bloomquist had the weapons legally, is either inflammatory or defamatory. Furthermore, at most Bloomquist's affidavit supports the fact that Down went to a tactical shooting event hosted by Bloomquist not that at the time the articles were written law enforcement officials were actually cognizant of the other activities Bloomquist lists.

m. "…investigators…had no idea why he kept military weapons."

This statement, appearing in Harkavy's account (Harkavy Ex. B),  Bloomquist describes as totally false.  Bloomquist asserts:

> Early in the morning of November 27, 2001, Defendant Detective Down contacted ATF who informed him that Plaintiff had a Class III Federal Dealer in Firearms License, a Federal Firearms Collectors License, that he had three machine guns and silencers registered to him as an individual pursuant to the National Firearms Act and a further nine "Assault Weapons" registered to him in Connecticut, as well as other classified information about Plaintiff.

(Bloomquist Aff. ¶ 6(m).) Bloomquist references his attached ATF related reports.  One is purportedly Bloomquist's FBI finger print card submission dated November 3, 1989. (Docket No. 175 Ex. Dp1&p2.)  And another is a Department of Treasury Bureau of Alcohol and Firearms Compliance Inspection Summary dated March 15, 1990.  (Id. Ex. Ep1 & Ep2.) On his cover page to these attachments Bloomquist lists an ATF letter of

recommendation for Federal Firearms License dated March 16, 1990.  None of these exhibits supports Bloomquist's assertion about Down's contact with ATF on November 21, 2001(eleven years later) nor do they support in some other meaningful way Bloomquist's challenge to this factual statement. The contents of the conversation Bloomquist alleges took place only would demonstrate that Down knew that Bloomquist lawfully possessed these weapons and had a dealers and collectors license.  The Harkavy piece in question states that investigators had determined that Bloomquist was licensed to possess the weapons. (Harkavy Ex. C at 3.)    Furthermore, I do not see how the fact that an indication by investigators, who conceded Bloomquist had the weapons legally, that they lacked information as to why Bloomquist possessed these weapons is defamatory of Bloomquist.

> n. "…the sheriff said interviews with Pulkkinen led to the issuance of a protection order arising from 'an ongoing pattern of assaults' by Bloomquist."

Bloomquist insists that there was no ongoing pattern of assaults, nor any other valid justification for issuance of a protection order.[21] According to Bloomquist when Pulkkinen was interviewed by law enforcement, she repeatedly stated to Down and Berlind that she was in no way intimated of or afraid of Bloomquist, that she was the aggressor not Bloomquist, and that she intentionally forced Bloomquist to physically

---

[21]    Bloomquist asserts that Pulkkinen consulted Attorney Wohl after finding Bloomquist's copy of a protection from abuse order he had obtained against Pulkkinen that had not yet been served on her and Wohl told Pulkkinen that the only way to make the order against her go away was to obtain one against Bloomquist before the one against her was served on her. Pulkkinen, Bloomquist contends, told Wohl she was in no way intimated of or afraid of Bloomquist, that she was the aggressor not Bloomquist, and that she intentionally forced Bloomquist to physically defend himself by repeatedly attacking him with various weapons. Wohl, Bloomquist continues, told Pulkkinen that she could not put that on her petition for temporary protection from abuse nor tell the judge that. And he notes that Pulkkinen obtained her temporary protection order against Bloomquist prior to any interviews with law enforcement.  (Bloomquist Aff. ¶6(n).)  In his statement of fact Bloomquist references a Pulkkinen affidavit that I cannot locate.  The affidavits of Pulkkinen I can find pertain to other pleadings and would not substantiate Bloomquist's recounting of the conversation between attorney and client.  (See Docket No.155 Attachs. 4 & 9.)

defend himself by repeatedly attacking him with various weapons.  (Bloomquist Aff. ¶ 6(n).)  He claims that Down and Berlind told Pulkkinen that "you can only say what he did to you not what you did to him first, otherwise we can't charge him."  (Id.)  In addition to his own affidavit, which is not proper record support for this conversation of which Bloomquist was not privy, Bloomquist cites "Pulkkinen Affidavit # 1."  However, there is no such attachment to Bloomquist's pleadings relating to this motion and the affidavits of Pulkkinen relating to other pleadings do not describe this conversation.  (Docket No. 155, Attachs. 4 & 9.)   There is no genuine dispute that Pulkkinen told police, whether truthfully or not, about the drawn-out abuse of her by Bloomquist.  (Berlind Aff. Ex. B.)

> o. "Deputies found Bloomquist's weapons…"

Bloomquist counters that deputies did not "find" the weapons because the authorities knew for years that Bloomquist lawfully owned and possessed in various residences a large collection of military weapons from around the world.  In my opinion this statement is so patently non-actionable it does not deserve discussion.

> p. "A cord on the back side of the bookcase was attached to a small device and there was a warning label aimed at intruders. Dion said that if the device had been detonated it would make "a large bang" but cause no injury."

Bloomquist argues that the device in question was not capable of detonating or being detonated and that the warning label made whatever device present not a booby-trap by definition.   "A boobytrap," Bloomquist states citing Department of the Army Field Manual FM 5-31 Boobytraps, Chapter 1, Section II (3), "is an explosive charge cunningly contrived to be fired by an unsuspecting person who disturbs an apparently harmless object or performs a presumably safe act."  Compared to the ¶ 6(i) statement

discussed above, this description of the mechanism is even more precise and substantially true; there is no genuine dispute that this device was a "scheme or device for tricking a person unawares," Webster's New World College Dictionary at 159 (3d Ed. 1997).  The warning label may have diminished its effectiveness as a booby trap but the defendants disclosed this fact in the statement.

      q. "Dion said Pulkkinen, a social worker who has been married to Bloomquist for about 10 years, was in a safe location. The couple has no children."

      Bloomquist contends that this was a statement designed to "allege covertly" that Bloomquist was a threat to his wife thus necessitating police intervention to keep her safe, and that Dion had no rational or reasonable basis to believe it was true. As indicated in my discussion of Paragraphs 6 (b),(d),(g) and (n), there is no genuine dispute that at the  time the articles were written there was an investigation into Bloomquist's abuse of Pulkkinen ongoing and that the charges were not dismissed until the following spring. (See Berlind Aff. Ex. B; Docket No. 174 Ex. 3.)

      r. "Capt. Kevin Joyce said there was a rolling gun mount on the front deck that could accommodate a .50-caliber machine gun and provide good fields of fire."

      Bloomquist states that, while technically true, this statement is defamatory if placed in context with the other prior false statements.  As I have concluded that not one of the other eighteen statements is actionable, this concededly truthful statement is certainly not actionable when put in the context of those statements.

      s. "This could have been our version of Ruby Ridge," Joyce said. "He had 20,000 rounds of ammunition. He could have been there a long time."

      Bloomquist argues that these statements are defamatory in their context with the other prior false statements. He admits that he had 20,000 rounds of ammunition linked up for his .30 caliber Browning Machine Gun and at least 100,000 rounds of different

calibers for his other weapons. But he argues that the reference to Ruby Ridge was simply intended to instill fear of Bloomquist and somehow give the impression that there was some legitimacy to this whole event on behalf of the public safety doctrine. "A defamation claim requires a statement--i.e. an assertion of fact, either explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts." Lester, 596 A.2d at 69. Publishing this opinion of Joyce which was based on disclosed facts that Bloomquist admits to be true, clearly cannot be a basis for holding these defendants liable.

### The Trespass on Privacy Count

Count Forty-One of Bloomquist's complaint describes Hench and others as having "conspired and acted with malicious specific intent to trespass on Plaintiff's property, privacy, and seclusion" and "unlawful entry upon Plaintiff's property, privacy, and seclusion" including inviting "other unknown persons who caused damage to Plaintiff's property." (Am. Compl. ¶¶ 502, 503.) There is no dispute that Hench has never been to or entered on any property of Bloomquist's in Baldwin, Maine for any purpose, including to report the story. (Def.'s SMF ¶ 2.) See Nelson v. Maine Times, 373 A.2d 1221, 1223 (Me. 1977).[22]

### Conclusion

For these reasons I recommend that the Court **GRANT** this motion for summary judgment as to all the remaining defamation counts against defendants Portland Press Herald, Blethen Maine Newspapers, Inc., Kennebec Journal Online Central Maine Morning Sentinel, and David Hench and Count Forty-One apropos Hench.

---

[22]     Nor is there a dispute that the article in question did not show any photographs of Bloomquist's home, although there was an issue about such publication vis-à-vis some of the other media defendants.

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated April 25, 2005.