UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| WILLIAM C. BLOOMQUIST, )<br>)<br>      Plaintiff    )<br>)<br>v.    )<br>)<br>JUSTICE PAMELA ALBEE, et al., )<br>)<br>      Defendants    ) | Civil No. 03-276-P-S |

**RECOMMENDED DECISION ON MOTION
FOR SUMMARY JUDGMENT**

Robert Ruffner moves for summary judgment (Docket No. 220) in this action brought by William Bloomquist. The motion seeks judgment on the remaining three counts of Bloomquist's amended complaint that pertain to Ruffner: Count 14, Count 21, and Count 22. With respect to these counts Bloomquist claims that Attorney Ruffner and Assistant District Attorney Berlind conspired with each other apropos Bloomquist's arraignment and bail hearings and in doing so violated his rights under the First, Fourth, and Eighth Amendments. Ruffner unsuccessfully attempted to have these counts dismissed in an earlier motion. The present pleadings and exhibits now make it crystal clear that Bloomquist does not have sufficient evidence to create a genuine dispute of material fact to support his claim that Ruffner conspired with state actors to violate Bloomquist's rights. Accordingly, I recommend that the Court **GRANT** Ruffner's motion.

*Discussion*

*Summary Judgment Standard*

Ruffner is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id.  I review the record in the light most favorable to Bloomquist and I indulge all reasonable inferences in his favor. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir.2000) (emphasis added).

The fact that Bloomquist is a pro se plaintiff does not free him from the pleading burden set forth in Rule 56. See Parkinson v. Goord, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); see also Sirois v. Prison Health Servs., 233 F.Supp.2d 52, 53-55 (D. Me. 2002).  While Bloomquist's complaint may be held to a less stringent pleading standard under Haines v. Kerner, 404 U.S. 519, 520 (1972), his pro se status does not shield him from Rule 56's operative provision under subsection(e) requiring the pleader to "set forth such facts as would be admissible in evidence."

This being the sixth recommended decision on motions for summary judgment in this litigation, Bloomquist by now is familiar with the local rules governing summary judgment pleadings. Subsection (c) of the District of Maine Local Rule provides:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

Subsection (e) directs:

> Statement of Facts Deemed Admitted Unless Properly Controverted;
> Specific Record of Citations Required
> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

Dist. Me. Loc. R. 56(e). Bloomquist's response to Ruffner's statement of material fact contains not a single record citation, is chiefly argumentative and I disregard it to the extent that it attempts to deny or qualify those statements. I do include in my review Bloomquist's additional statements of material fact to the extent that they are properly supported by record citation.

*Showing Necessary to Maintain this Action against Ruffner as to Counts 14, 21, and 22 on a Conspiracy Theory*

Count 14 claims that there was a conspiracy to violate Bloomquist's First Amendment rights "by intentionally and maliciously bringing fourteen unwarranted criminal charges against Plaintiff in an effort to chill his ability, willingness and credibility to continue to advocate on behalf of pro-second amendment groups. (Am. Compl. ¶ 308.) Count 21 claims that there was a conspiracy to violate Bloomquist's Fourth Amendment rights "by maliciously prosecuting [Bloomquist] when there was no probable cause to do so and their actions were objectively unreasonable." (Id. ¶ 356.) And Count 22 claims that there was a conspiracy to violate Bloomquist's Eighth Amendment rights by "setting unreasonable bail conditions." (Id. ¶ 364.)

"'An actionable section 1983 claim must allege facts sufficient to support a determination "(i) that the conduct complained of has been committed under color of state law, and (ii) that [the alleged] conduct worked a denial of rights secured by the Constitution or laws of the United States."'" Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 32 (1st Cir. 1996) (emphasis added)(quoting Rumford Pharmacy, Inc. v. City of East Providence, 970 F.2d 996, 998 (1st Cir.1992) quoting Chongris v. Board of Appeals, 811 F.2d 36, 40 (1st Cir.)).   "[P]ersons victimized by the tortious conduct of private parties must ordinarily explore other avenues of redress." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996).  Accordingly, to hold Ruffner, a non-state actor, liable on the § 1983 constitutional claims Bloomquist must demonstrate that Ruffner was acting under the "color of law" in a conspiracy with state actors. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 150-52 (1970) (holding that private parties,

4

jointly engaged with state officials in unlawful conduct, are acting under "color of law" for purposes of 42 U.S.C.§ 1983, indicating that private and public parties must act with a common understanding or "meeting of the minds").

*Material Facts*

Robert J. Ruffner is an attorney in private practice. (Def.'s SMF ¶ 1.) Scott Floccher is one of Attorney Ruffner's clients. Ruffner has represented Floccher in a variety of matters. (Id. ¶ 2.)[1]  Bloomquist was present at the Cumberland County Courthouse awaiting his scheduled arraignment November 29, 2001, from approximately 8:00 a.m. to approximately 5:00 p.m., which was scheduled for 8:30 a.m. (Pl.'s SAMF ¶ 1.)

### Charging Decision

According to Ruffner, shortly before Bloomquist's November 29, 2001, bail hearing Ruffner consulted with Floccher, advising his client that: (1) the State of Maine had filed a criminal complaint against Bloomquist; (2) the complaint included two charges of terrorizing pertinent to Floccher; and (3) a bail hearing had been set for November 29, 2001. (Def.'s SMF ¶ 9.)  Upon learning of the criminal complaint, Floccher specifically requested that Attorney Ruffner represent Floccher's interests at the bail hearing and seek a condition of no contact between Bloomquist and Floccher's two minor children – Kelsey and Kiley Floccher. (Id. ¶ 10.) Per his client's direction, Ruffner attended Bloomquist's bail hearing and specifically requested, on behalf of Floccher, that Bloomquist be prohibited from having any contact with Kelsey and Kiley Floccher. (Id.

---

[1] According to Bloomquist Ruffner did jointly represent Susan Benfield and Scott Floccher adverse to Bloomquist in Bloomquist's protection from harassment proceedings against Benfield and Floccher. (Pl.'s SAMF ¶ 3.)  Ruffner, who would have first hand knowledge of whom he was representing, counters that he was only representing Floccher.  He also points out correctly that this is immaterial to this dispute.

5

¶ 11.)  At the bail hearing, Ruffner conveyed to the Court that the basis for the request of no contact was Floccher's stated concern for the safety of his children, given: (1) the terrorizing charges then pending against Bloomquist from alleged unlawful contact with Scott Floccher; and (2) Floccher's belief that his ex-wife, Linda Gilbert, was allowing the children to be in contact with Bloomquist. (Id. ¶ 12.)

Ruffner avers that at no time did Ruffner participate in a meeting with Berlind, or any other representative from the District Attorney's office, with the purpose and agenda of jointly making a charging determination in the criminal case against Bloomquist filed by the State of Maine in November of 2001. (Id. ¶¶, 3 4.) And at no time did Ruffner ever attempt to convince and/or influence in any way Berlind, or any other representative from the District Attorney's office, regarding the State's decision to charge Bloomquist with respect to terrorizing Scott Floccher. (Id. ¶ 5.)  At no time did Berlind, or any other representative from the District Attorney's office, solicit Ruffner's recommendations and/or advice regarding the State's decision to charge Bloomquist.  (Id. ¶ 6.)   Ruffner provided no recommendations and/or input whatsoever to Berlind, or any other representative from the District Attorney's office, regarding the State's decision to charge Bloomquist.  (Id. ¶ 7.) Ruffner did not become aware of the criminal complaint against Bloomquist until after the charging decision had been made by the District Attorney's office.  (Id. ¶ 8.)

Bloomquist asserts that he was never charged with terrorizing or for unlawful contact with Floccher. (Pl.'s SAMF ¶¶ 4, 8, 9.)  Rather, Bloomquist was charged with terrorizing his then wife on September 15, 2001, and on September 21, 2001, in Baldwin, Maine for allegedly, according to his then wife, saying to her that he would kill Floccher.

6

Both complaints, Count 1 and Count 14, sworn to on November 29, 2001, by Detective Daniel Down state "Count 14, On or about November 21, 2001 in Baldwin, Cumberland County Maine, William C. Bloomquist did knowingly communicate to Katariina Pulkkinen a threat to commit or cause to be committed a crime of violence dangerous to human life, namely, to kill Scott Floccher, the natural and probable consequences of the threat being to place Katariina Pulkkinen in reasonable fear that the crime would be committed." Count 1 is identical except it substitutes the date September 15, 2001 in Baldwin. (Id. ¶ 5.)[2]   With respect to the bail conditions, according to Down's narrative, Bloomquist asserts, Benfield called the District Attorneys' Office around 8:30 a.m. on November 29, 2001, and spoke directly with Down. During this conversation Benfield made claims (which Bloomquist describes as false) that Bloomquist lived with a Linda Gilbert in Lovell, Maine and "that Kelsey and Kiley have said that Bloomquist dresses them up in fatigues and lets them hold guns in the woods." (Id. ¶ 10.)[3]

---

[2]  Bloomquist also states these terrorizing charges were brought solely based on Bloomquist's then wife's statements and that statements which she made were made under direct pressure and duress from Dan Down and Berlind. However, Bloomquist's own affidavit statement is not sufficient record support for these assertions.
    Bloomquist further states that his then wife repeatedly admitted to Berlind and Down that Bloomquist was not the aggressor, that she was the aggressor, that she gave Bloomquist no other choice other than to use reasonable force against her. In Katariina Pulkkinen's own words, "I would not stop until he hit me. I made him do it" and "I wanted it." He claims that his ex-wife directly told Bloomquist as well as Ken Booth and others that both Berlind and Down told her directly that she can only say in her statement what Bloomquist did to her, not what she did to Bloomquist to instigate him. (Id. ¶¶ 6, 7; Pl's Exs. A,B.) Once against, Bloomquist cannot rely on his own affidavit as support for these assertions vis-à-vis what was the actual content of conversation to which he was not privy.  His Exhibit A purportedly is a partial transcript of a telephone conversation.  Bloomquist does not even identify who was a party to this telephone conversation, using instead the moniker "Voice in the Background."  Furthermore, this uncertified partial transcript is unquestionably inadmissible.

[3]  Bloomquist asserts that Berlind and Down were made directly aware of Benfield's false claims during their investigative process prior to any decision on charges being made according to Down's own narrative.  (Id. ¶ 11.)  He cites to his Exhibit 5 but none of Bloomquist's exhibits are numbered; they all have letter demarcations.  Two of the exhibits are narratives by Down, but I could not identify any support for this assertion.
    Bloomquist also "states for the record that at the time these charges were made and hereafter he had never taken Kelsey and Kiley Floccher into the woods alone, he had never dressed them up in fatigues

Bloomquist's evidence of conspiracy between Berlind and Ruffner regarding charging decisions is as follows. According to Bloomquist, on the afternoon of November 29, 2001, Bloomquist was being held in a holding cell adjacent to Courtroom Number 1 in the Cumberland County Courthouse downstairs.  He was alone except for a Cambodian fellow, as he was the last person to be arraigned that day. Bloomquist alleges that he heard through the door and/or mini window, Berlind and Ruffner talking about Kelsey and Kiley. After hearing their names, Bloomquist moved closer to the door to listen in further and, although he cannot identify exactly what was said, it was clear there was a conversation that was ongoing between Ruffner and Berlind pertaining to Kelsey and Kiley Floccher prior to Bloomquist's arraignment and bail hearing. (Id. ¶ 12; Bloomquist Aff. ¶ 12.) According to Bloomquist Ruffner left shortly after Bloomquist heard  Kelsey and Kiley Floccher mentioned. (Id. ¶ 13.)[4]

Furthermore, according to Bloomquist, when he was "finally" being bailed out of the Cumberland County Jail at approximately 6:30 p.m. he was told by his attorney, Rob Andrews, that Ruffner had spent about two hours helping Berlind draw up the terrorizing charges. (Id. ¶ 14.)  Ruffner responds to this assertion by pointing to Bloomquist's deposition testimony at which time Bloomquist stated that Andrews did not tell him the basis for this representation, stated that Andrews did not tell him that he was present and

---

and he had never let them hold any firearms, real or toy, at that time." (Id. ¶ 12.)  This fact is immaterial to the resolution of the current motion.

[4]    Bloomquist goes on to assert that Berlind (who's back was to the door not realizing the extent of Bloomquist's hearing ability) continued to discuss Plaintiff's case with a court security officer who was wearing a white shirt. Berlind told the officer that "this was the wors[t]e case of her life" and then she asked him "how can anyone have so many guns like that and not be violent." The court security officer went on to explain in depth how he liked to have a large gun collection and how many people collect guns who are absolutely non-violent and aren't even into shooting them, they just like the idea of collecting them. Earlier in the day, at lunch break, that same security officer asked Bloomquist if he would sell him a couple of guns, to which Plaintiff replied, "We'll see." (Id.)  This part of this paragraph is immaterial to Ruffner's alleged liability under these three counts.

actually heard this first hand, and conceded that there was an inference or some speculation involved in Andrew's belief about the two hour meeting. (Def.'s Resp. Pl.'s SAMF Ex. 1 at 237-44.)

As further evidence of the Ruffner/Berlind collusion over charges Bloomquist states that on the evening of November 30, 2001, Floccher posted on the Internet statements in which he directly stated that his lawyer got the police department to add two counts of terrorizing on Bloomquist and that DHS was now involved. (Id. ¶ 15.)[5]

**Bail conditions**

With respect to the bail conditions, according to Ruffner he did not participate in any pre-bail hearing discussion with Berlind, or any other representative from the District Attorney's office, with the purpose and agenda of jointly determining what conditions to request that the Court impose on Bloomquist at the bail hearing (id. ¶ 13); Ruffner provided no advance notice to Berlind, or any other representative from the District Attorney's office, that he planned to request a condition of no contact with the Floccher children at the bail hearing (id. ¶ 14); neither Berlind, nor any other representative from the District Attorney's Office, provided Ruffner with any advance notice of the State's intended choice of conditions to request that the court impose on Bloomquist at the bail hearing (id. ¶ 15); at no time did Ruffner ever attempt to convince and/or influence Berlind, or any other representative from the District Attorney's office, regarding the State's choice of conditions to request that the Court impose on Bloomquist at the bail hearing (id. ¶ 16); at no time did Berlind, or any other representative from the District

---

[5]  Bloomquist does not cite to record support for this assertion, relying only on his own affidavit. However, his Exhibit H is allegedly a copy of this internet posting.
    However, I have not considered the two following statements. Paragraphs 16 and 17 deal with further alleged false reports by Floccher pertaining to Bloomquist's going to Togus Veteran's Hospital on December 6, 2001, and removing Floccher's confidential medical records.

9

Attorney's office, ever solicit Ruffner's input regarding the State's choice of conditions to request that the Court impose on Bloomquist at the bail hearing (id. ¶ 17); and Ruffner provided no recommendations and/or input whatsoever to Berlind, or any other representative from the District Attorney's office, regarding the conditions requested by the State at Bloomquist's bail hearing (id. ¶ 18).

For his part, Bloomquist asserts that the District Attorney's Office continued "to represent Ruffner condition at bail hearings."[6] On December 19, 2001, there was a bail hearing in the Bridgton Courthouse, which was then continued until December 31, 2001. Again, at the bail hearing on December 31, 2001, Bloomquist insists that Berlind continued to represent Floccher and Ruffner by putting some bizarre bail conditions on Bloomquist. These conditions were that Bloomquist was not to communicate with Kelsey and Kiley Floccher about the pending fourteen criminal charges or complaint. "This bizarre bail condition," Bloomquist argues, "was unreasonable in that it could only be enforced by violating the very condition, i.e. discussing these matters with the children. Furthermore there was no iota of evidence to suggest that Bloomquist was inclined to discuss his ongoing charges with a nine and eleven year old." (Id. ¶ 18.) And, Bloomquist contends, on January 16, 2002, the bail conditions were modified "by" Berlind on behalf of Ruffner by ordering no communication with Kelsey and Kiley Floccher about Bloomquist's pending fourteen charges. (Id. ¶ 19.)[7]

---

[6] This is Bloomquist's choice of phrasing. It is not clear what he actually means by this statement but my guess is that it is a contention that Berlind continued to press for conditions of bail that were sought by Ruffner.

[7] Ruffner rightly objects to these statements but I set them forth because they reveal how paper-thin Bloomquist's evidence of this Berlind/Ruffner conspiracy is.

10

### *Recommended Disposition*

While Counts 14, 21, and 22, survived Ruffner's motion to dismiss, see Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 62-64, 66 (1st Cir. 2004)Romero-Barcelo v. Hernandez-Agosto 75 F.3d 23, 35 (1st Cir. 1996), it is evident that given the record before the court they should not survive this motion for summary judgment. Bloomquist has now had his opportunity to lay his cards on the table and the dispute of facts he creates does not meet his summary judgment burden.

That is, based on the fact that Bloomquist overheard a brief conversation between Berlind and Ruffner in which Kelsey and Kiley Floccher were mentioned a reasonable jury could not return a verdict for Bloomquist against Ruffner as to Bloomquist's First and Fourth Amendment Conspiracy counts. The other evidence that Bloomquist relies on is Bloomquist's representation that Andrews told him that there had been a two hour meeting between Berlind and Ruffner. Even if Bloomquist could substantiate that Andrews in fact said what is, at this juncture, hearsay, it would not mean that a reasonable jury could find that there was a sufficient collusion between Berlind and Ruffner to support these claims apropos Berlind's charging decision. Floccher's specious, over-the-top web posting would not alter that equation. With respect to Bloomquist's claims of a conspiracy between Berlind and Ruffner as to setting the conditions of his release, the evidence on this score is even more ephemeral as it really boils down to Bloomquist's perception of Berlind's motive and his belief that the conditions imposed were illogical. The actual conditions were set by a judicial officer and the logic or illogic of the conditions was a determination made by that neutral party.

*Conclusion*

For these reasons I recommend that the Court **GRANT** this motion (Docket No. 220) as to Counts 14, 21, and 22, against Robert Ruffner.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

September 8, 2005.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge