UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| WILLIAM C. BLOOMQUIST, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 03-276-P-S |
| | ) | |
| JUSTICE PAMELA ALBEE, et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON STEPHANIE ANDERSON'S
MOTION FOR SUMMARY JUDGMENT [Docket No. 228]**

Stephanie Anderson, the District Attorney for Cumberland County, moves for
summary judgment (Docket No. 228) in this civil rights action filed by William
Bloomquist. I recommend that the Court grant Anderson's motion.

### *Summary Judgment Standard*

Anderson is entitled to summary judgment only "if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact" and that she is "entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution
would "affect the outcome of the suit under the governing law," Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence is such
that a reasonable jury could return a verdict for the nonmoving party," id. I review the
record in the light most favorable to Bloomquist and I indulge all reasonable inferences in
his favor. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d
1, 5 (1st Cir.2000) (emphasis added).

The fact that Bloomquist is a pro se plaintiff does not free him from the pleading burden set forth in Rule 56.  See Parkinson v. Goord, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); see also Sirois v. Prison Health Servs., 233 F.Supp.2d 52, 53-55 (D. Me. 2002).  While Bloomquist's complaint may be held to a less stringent pleading standard under Haines v. Kerner, 404 U.S. 519, 520 (1972), his pro se status does not shield him from Rule 56's operative provision under subsection(e) requiring the pleader to "set forth such facts as would be admissible in evidence."

Bloomquist has already faced multiple motions for summary judgment in this case and he is familiar with the local rules governing summary judgment pleadings. Subsection (c) of the District of Maine Local Rule provides:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

Subsection (e) directs:

> Statement of Facts Deemed Admitted Unless Properly Controverted; Specific Record of Citations Required
> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion.

> The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

Dist. Me. Loc. R. 56(e).

### Anderson's Facts[1]

According to Anderson, in November 2001 Bloomquist became involved in a domestic dispute with his wife, Katariina Pulkkinen. (Anderson SMF ¶ 1.)   Bloomquist obtained a protection from abuse order against her and Pulkkinen obtained a similar order against him. (Id. ¶ 2.)   In November 2001, the Cumberland County Sheriff's Department asked for assistance from the Bureau of Alcohol, Tobacco, and Firearms (ATF) to serve Bloomquist with the protection order Pulkkinen had obtained and to help her retrieve some of her belongings from the home. (Id.) According to Bloomquist, although the Sheriff's Department did ask for assistance the request was not for help with serving the protection order or for collecting Pulkkinen's belongings, it was for help in seizing Bloomquist's weapons and determining which were legal and which were illegal. (Bloomquist Resp. SMF ¶ 3.)  He relies on a document entitled "Referral of Information" to the ATF dated December 5, 2001; a December 10, 2001, memorandum from the ATF field office indicating that the Sheriff's Department had requested a risk assessment apropos Bloomquist; and a portion of an unidentified document that seems to indicate that ATF agents responded on November 27, 2001, to the Bloomquist residence in an

---

[1]      Attached as an appendix to this decision is the compilation of Bloomquist's statement of additional facts as admitted, qualified, or denied by Anderson.  These facts are not material to the defamation claim against Anderson, although I have carefully considered them apropos my inquiry as to whether or not Anderson is entitled to summary judgment as a matter of law on the counts that Bloomquist does not contest in responding to Anderson's motion for summary judgment.

advisory capacity and observed Sheriff Department officers discovering marijuana and firearms.  (Docket No. 284, Ex. 10.)[2]

The parties do not dispute that at the residence, Bloomquist kept more than eighty firearms, two rocket launchers, a machine gun, over 120,000 rounds of ammunition, several large axes, and various explosives.  (Anderson SMF ¶ 4; Bloomquist Resp. SMF ¶ 4.)  According to Anderson, on November 27, 2001, the Sheriff's Department (accompanied by Pulkkinen) entered the Bloomquist/Pulkkinen residence and seized many firearms and other weapons. (Anderson SMF ¶ 5.)  Bloomquist "denies" this statement asserting that it "appears" that the officers were at his residence the "entire day."  (Bloomquist Resp. SMF ¶ 5.)  The exhibit that Bloomquist relies on is a "Main Radio Log Table for an incident "01-022086" which is  - with respect to evidentiary value -- indecipherable as far as I am concerned.  (Docket No. 264, Ex. A.)   There is no dispute that the Sheriff's Department also seized several marijuana plants from Bloomquist's residence. (Anderson SMF ¶ 6; Bloomquist Resp. SMF ¶ 6.)

On November 28, 2001, the Sheriff's Department and Sheriff Dion held a press conference and issued a press release that was widely quoted in local media.  (Anderson SMF ¶ 7; Bloomquist Resp. SMF ¶ 7.)   The press conference and press release described the weapons found in the residence and the locations in the home where they had been found. (Anderson SMF ¶ 8; Bloomquist Resp. SMF ¶ 8.)

---

[2]      Bloomquist also attempts to qualify paragraphs one and two of Anderson's statement but—despite the fact that he is now well versed in the necessities of summary judgment pleadings -- his responsive statements contain no record citation.  (See Bloomquist's Resp. SMF ¶¶ 1, 2.)  Furthermore, I do not consider his qualifications material to the question of Anderson's liability.

On November 29, 2001, the State of Maine charged Bloomquist with 12 counts of assault and two counts of terrorizing. (Anderson SMF ¶ 10; Bloomquist Resp. SMF ¶ 10.) DA Anderson did not draft this criminal complaint against Bloomquist. (Anderson SMF ¶ 11; Bloomquist Resp. SMF ¶ 11.)  Anderson did not review the assault and terrorizing complaint against Bloomquist before it was filed or have any input in the decision to charge Bloomquist with these crimes. (Anderson SMF ¶ 12.)[3] Assistant District Attorney Anne Berlind had primary responsibilities for the assault and terrorizing charges against Bloomquist. (Anderson SMF ¶ 13; Bloomquist Resp. SMF ¶ 13.)

According to Anderson, neither DA Anderson nor ADA Berlind were ever made aware of any information to suggest that there was not probable cause to support the assault and terrorizing charges against Bloomquist. (Anderson SMF ¶ 14.) On April 17, 2002, the assault and terrorizing charges against Bloomquist were dismissed at the State's request due to insufficient evidence and at the victim's request.  (Id. ¶ 15.)[4]

There is no dispute as to the following.  By letter dated April 17, 2002, Berlind advised Attorney Douglas Hendrick, who was representing Bloomquist, of the dismissal with the following letter:

> The State is dismissing the pending domestic violence charges against
> William Bloomquist today, meaning that the Order issued by Judge

---

[3]    Bloomquist asserts that Anderson had supervisory responsibility over Berlind.  He also contends that the media contacted her prior to and during the investigation so it is not credible for her to assert that she did not review any part of the complaint before it was filed or have any input in the charging decision. (Bloomquist Resp. SMF ¶ 12.)  Bloomquist has no record support for this supposition.

[4]    Bloomquist responds by pointing to a tape recorded telephone conversation between Bloomquist, Pulkkinen, and a third party on December 28, 2001, in which Pulkkinen asserts that she told Berlind and Down that she was the aggressor, that Bloomquist had no choice but to hit her, and that Bloomquist only did so in self-defense when he was severely provoked.  (Bloomquist Resp. SMF ¶ 14; Docket No. 264 Exs. D & R.)  Bloomquist has no record evidence that Anderson or Berlind heard these recordings.

Bloomquist argues that the charges were dropped on April 17, 2002, only because he had tape evidence that showed that he was the victim and not the abuser and notes that Pulkkinen was told by Berlind that the only reason she was dropping the charges was because there was a New Hampshire order preventing him from having firearms. (Bloomquist Resp. SMF ¶ 15.)  Again, Bloomquist has no record support for these assertions.

> Goranites on January 24, 2002 pertaining to your possession of Mr.
> Bloomquist's firearms will no longer be in effect. However, as you are
> probably aware, the State of New Hampshire has issued a Stalking Order
> prohibiting Mr. Bloomquist from possessing firearms. I have enclosed a
> copy of that order, which requires that the firearms be relinquished to a
> peace officer. Federal law prohibits the transfer of firearms to a person
> subject to a stalking order. Accordingly, you may not return the firearms
> to Mr. Bloomquist even though the domestic violence charges are being
> dismissed.

(Anderson SMF ¶ 16; Bloomquist Resp. SMF ¶ 16.)  DA Anderson did not draft this

letter. (Anderson SMF ¶ 17; Bloomquist Resp. SMF ¶ 17.)

In DAs' Interrogatory No. 14, the DA Defendants asked Bloomquist to identify

"all defamatory remarks allegedly made by Stephanie Anderson, as alleged in ¶ 55 of

your Amended Complaint."  (Anderson SMF ¶ 18; Bloomquist Resp. SMF ¶ 18.) In his

Response to DAs' Interrogatory No. 14, Bloomquist asserted his "belief" that "discovery

will show all the defamatory remarks" by DA Anderson "and to whom she made them."

(Anderson SMF ¶ 19; Bloomquist Resp. SMF ¶ 19.) In his Response to DAs'

Interrogatory No. 13, Mr. Bloomquist alleged that DA Anderson stated "to the press" that

he had a "long history of domestic violence" and that she had made "other specific

statements so as to conclude that Plaintiff 'was some sort of hidden danger.'" (Anderson

SMF ¶ 20; Bloomquist Resp. SMF ¶ 20.)

Bloomquist applied for a student-attorney internship at the Cumberland County

DA's Office in the fall of 1996. (Anderson SMF ¶ 21; Bloomquist Resp. SMF ¶ 21.) At

that time, Bloomquist was a second-year law student at the University of Maine School

of Law. (Anderson SMF ¶ 22; Bloomquist Resp. SMF ¶ 22.) DA Anderson and ADA

Berlind were involved with the interview and selection process for student-attorney

internships at that time. (Anderson SMF ¶ 23; Bloomquist Resp. SMF ¶ 23.)  In October

1996, Bloomquist was offered a job as a student-attorney-intern, expected to start in May 1997. (Anderson SMF ¶ 24; Bloomquist Resp. SMF ¶ 24.)  The offer was accepted by Bloomquist in the fall of 1996. (Anderson SMF ¶ 25; Bloomquist Resp. SMF ¶ 25.) Eligibility for the student-attorney internship position was contingent upon Bloomquist's certification by his law school pursuant to Maine Rule of Civil Procedure 90(b). (Anderson SMF ¶ 26; Bloomquist Resp. SMF ¶ 26.)

After Bloomquist had applied for the student-attorney internship, during the fall or winter of 1996, ADA Christine Thibeault, who covered the Bridgton District Court at that time, told ADA Berlind that she had been approached by an officer from the Bridgton Police Department who had told her certain information about Bloomquist and suggested that someone else from the DA's Office may wish to contact him. (Anderson SMF ¶ 27; Bloomquist Resp. SMF ¶ 27.)[5]  In the fall or winter of 1996/1997, ADA Berlind had a telephone conversation with that Bridgton police officer. (Anderson SMF ¶ 28; Bloomquist Resp. SMF ¶ 28.) That Bridgton police officer told ADA Berlind he was aware that Bloomquist had applied to be an intern with the DA's Office. (Anderson SMF ¶ 29; Bloomquist Resp. SMF ¶ 29.) That Bridgton police officer also told ADA Berlind that Bloomquist was very knowledgeable about the trade in illegal drugs in the Bridgton area and that Bloomquist was sharing information with the Bridgton PD on the local drug trade. (Anderson SMF ¶ 30; Bloomquist Resp. SMF ¶ 30.)[6]  Bloomquist became ineligible for the student-attorney internship position when, in May 1997, the University of Maine School of Law failed to certify him for the practice of law per Maine

---

[5]    Offering no record support, Bloomquist "qualifies" this statement by indicating that it appears to be true as written but "it is not accurate as to what this police officer, Peter Mandura, told Plaintiff." (Bloomquist Resp. SMF ¶ 27.)
[6]    Again Bloomquist attempts to qualify this assertion – indicating that the officer would have meant this as a form of praise --but has not provided any record support for the qualification.

Rule of Civil Procedure 90(b). (Anderson SMF ¶ 31; Bloomquist Resp. SMF ¶ 31.) [7]
Soon thereafter, Bloomquist was separated from his employment with the DA's Office
for failure to meet the certification requirements of his position. (Anderson SMF ¶ 32;
Bloomquist Resp. SMF ¶ 32.) [8]

On November 29, 2001, the <u>Portland Press Herald</u> published an article about the
Sheriff Department's search and seizure of Bloomquist's firearms and ammunition.
(Anderson SMF ¶ 33; Bloomquist Resp. SMF ¶ 33.)  That article by David Hench
contained the following statement: "In his second year of law school, Bloomquist was
offered an internship with the Cumberland County District Attorney's Office, but the
offer was rescinded following a background check with the Bridgton Police Department."
(Pl.'s Am. Compl. App. A-2; Anderson SMF ¶ 34; Bloomquist Resp. SMF ¶ 34.) DA
Anderson did not speak with David Hench (or anyone at the <u>Press Herald</u>) about Mr.
Bloomquist's internship at the Cumberland County District Attorney's Office. (Anderson
SMF ¶ 35; Bloomquist Resp. SMF ¶ 35.) [9]  The Cumberland County DA's Office did not
conduct a "background check" on Bloomquist in connection with his application to be a
student-attorney intern in the fall/winter of 1996-1997. (Anderson SMF ¶ 36; Bloomquist

---

[7]     Bloomquist states that the reason for his ineligibility was academic and not moral, yet he has no
record support for the qualification.

[8]     Bloomquist, yet again identifying no record support, qualifies this assertion by stating that it was a
mistake to say that he was separated solely for failing to meet the certification requirements because he
"had valid courses of appeal of his certification as he already had enough credits to be certified without that
semester being counted."  (Bloomquist Resp. SMF ¶ 32.)

[9]     Bloomquist's "qualification" for this statement not only has no record support, it seems to be a
response to a parallel statement of fact in Berlind's summary judgment pleadings and not to Anderson's
statement of fact.

Resp. SMF ¶ 36.) David Hench does not remember his source for the statement at issue

in that story. (Anderson SMF ¶ 37; Bloomquist Resp. SMF ¶ 37.)[10]

On November 28, 2001, Pulkkinen provided a detailed, written narrative to the

Sheriff's Office describing the numerous times Bloomquist had assaulted her and

terrorized her during 2001.[11] According to Pulkkinen, Bloomquist hit her with a stick, hit

her with a large yellow flashlight, pulled her hair, hit her with a piece of wood (leaving

bruises), and used a stun gun on her to control her.   On their fifth wedding anniversary,

July 25, 2001, Bloomquist hit Pulkkinen several times in the head, held her head against a

tile floor, and told her what a "fuck up" she was.  On November 21, 2001, Bloomquist

told Pulkkinen that he had already killed seventeen people, and that he was planning to

kill three more people, including a man named Scott Floccher. (Anderson SMF ¶¶ 38 -41;

Berlind Aff. Ex. A.)

Bloomquist complains that Pulkkinen only stated these things verbally and was

"not allowed by the authorities to record in writing her statements that whenever Plaintiff

used 'a stick, a large yellow flashlight, a piece of wood, a stun gun' or any other object it

was only because he had no other choice to do so in self-defense."  (Bloomquist Resp.

SMF ¶ 39.)  Bloomquist states that at times Pulkkinen was armed by a knife or a loaded

firearm.  (Id.) On one occasion Pulkkinen tried to commit suicide by jumping off a porch

and Bloomquist had to grab her hair to prevent her from hanging herself and on another

occasion she held a loaded firearm to her head and Bloomquist had  to use force to

---

[10]     Bloomquist argues that it is unbelievable that Hench does not remember his source and
conjectures – without record citation -- that Hench "had great pressure on him to conceal his source
unlawfully to the detriment of Plaintiff."  (Bloomquist Resp.  SMF ¶ 37.)
[11]     Bloomquist qualifies this statement, asserting that Pulkkinen's November 26, 2001, statement to
Down did not contain allegations of physical abuse.  (Bloomquist Resp. SMF ¶ 38.)  He has not provided a
record citation.

prevent her from harming herself.  (Id.)  Apropos the July 25, 2001, incident, Bloomquist contends that Pulkkinen "neglected to say that she had stolen a gun on this date, had threatened Plaintiff with it, had threatened  and attempted to shoot herself with it" and that he told her she was a "fuck-up" for attempting suicide in such a manner.  (Id. ¶ 40.)  And as to the November 21, 2001, incident, Bloomquist contends that Pulkkinen was drinking, drugging, and out of control and Bloomquist had stated that Pulkkinen should feel sorry for the families of the seventeen people who have died, not that Bloomquist had killed them.  (Id. ¶ 41.)  However, Bloomquist does agree that Pulkkinen's November 26, 2001, statement – "I fear for my life because my husband has told me that he has already killed 17 people" – is an accurate reflection of this.  (Id.; Down Aff. Ex. 1.)  He asserts that Pulkkinen's assertion that Bloomquist threatened three more killings were simply not true. (Bloomquist Resp. SMF ¶ 41.)    Almost all of Bloomquist's qualifications and denials on this score are not supported by record citations.[12]

According to Anderson, Pulkkinen explained her allegations in person to ADA Berlind in an interview on November 29, 2001. (Anderson SMF ¶ 42.) ADA Berlind observed Pulkkinen, spoke with her, and believed her allegations of assault and terrorizing. (Id. ¶ 43.)

Bloomquist denies these assertions.  Though not a party to this conversation, Bloomquist asserts that Pulkkinen "clearly and adamantly" told Berlind and Down that she was the aggressor and Bloomquist was the victim.  (Bloomquist Resp. SMF ¶ 42.)  He states that on December 28, 2001, Pulkkinen called him directly and spoke with Major Ken Booth who had Bloomquist present in the background.  (Id.)  This

---

[12]        In his response to paragraph 39 he does cite his September 7, 2005, affidavit in toto which is not an adequate attempt to comply with the local rules.

conversation is recorded on a mini-tape that Bloomquist submits as Exhibit D to his

motion for summary judgment.  The portion of the tape conversation to which

Bloomquist draws the court's attention is transcribed by Bloomquist as follows:

> <u>Pulkkinen</u>:     They attempted the day hearing in Court, the really, when I
> wrote the statement and when I spoke with the police, I fully explained the
> context of how things happened.  Um, and I fully explained you know my
> role, I said it very clearly "William had no other option except hitting me,
> I want it because I felt so sick inside, I provoked him to the point he had
> no other option."  I, the day after they had arrested, when you had the
> hearing they attempted and attempted to have me say that you did more
> than ever happened.  I attempted to explain the context.  I said multiple
> times that you had no other option, I wanted it so badly and I would not
> stop until you did it.  And they wanted to build a case, build a case I think
> this summer, when you locked in the bathroom like remember one time
> downstairs and I kind of destroyed it, they want me to say that you kept
> me their longer and longer and longer, and ah and they really attempt I felt
> really pressure to say more than actually happened and they were not
> hearing the context of the situation.
> <u>Voice in Background</u>:       Who was saying that?
> <u>Pulkkinen</u>:     Detective Down and Anne Berlind.
> <u>Pulkkinen</u>:     ATF wanted to have lengthy discussion, as did other police,
> wanted to hear in great detail about our sex life I don't know what
> relevance this had all of this.  Showed me a blue mask asked if you ever
> used it on me.

(Docket No. 264, Ex. R; <u>see</u> <u>also</u> <u>id.</u> Ex. D.)[13]  Bloomquist contends that Berlind had an

opportunity to observe Pulkkinen's demeanor and to speak with her about her allegations.

(Bloomquist Resp. SMF ¶ 43.)  He asserts that Pulkkinen's account is "completely in

opposite of what Defendant Berlind's statement of fact is."  (<u>Id.</u>)  Bloomquist contends

that Pulkkinen "repeatedly and adamantly" told Defendants Down and Berlind that she

was the aggressor and that she left Bloomquist no choice but to hit her.  (<u>Id.</u>)  He asserts

---

[13]     This transcription does not completely align with my understanding of the tape but it is not
materially different with respect to the parts of this conversation Bloomquist focuses on.  He has omitted
some of what is on the tape, including the parts in which Bloomquist himself participates in the
conversation.

that Pulkkinen told Berlind that she would not testify and did not want Bloomquist charged with a crime.  (Id.)

There is no dispute that on or about January 16, 2002, the State of Maine charged Bloomquist with one count of cultivating marijuana. (Anderson DMF ¶ 44; Bloomquist Resp. SMF ¶ 44.)  Anderson did not draft the criminal complaint that charged Bloomquist with one count of cultivating marijuana. (Anderson DMF ¶ 45; Bloomquist Resp. SMF ¶ 45.)  Anderson did not review that marijuana cultivation complaint before it was filed or have any input in the decision to charge him with this crime. (Anderson DMF ¶ 46; Bloomquist Resp. SMF ¶ 46.)  ADA William Barry had primary responsibilities for the marijuana cultivation charge against Bloomquist. (Anderson DMF ¶ 47; Bloomquist Resp. SMF ¶ 47.)

In February 2002, defendant Susan Benfield obtained a protection from stalking order against Bloomquist that required Bloomquist to surrender his firearms to New Hampshire authorities. (Anderson SMF ¶ 9; Bloomquist Resp. SMF ¶ 9.)

Anderson did not attempt to influence any court employee regarding any matter involving Bloomquist and did not instruct anyone on her staff to attempt to influence any court employee regarding any matter involving Bloomquist. (Anderson SMF ¶ 48.)[14]

In response to DAs' Interrogatory No. 15, Bloomquist alleged that DA Anderson "did conspire with other defendants to publicly disclose 'private matters of Plaintiff' including bizarre and lurid allegations of Plaintiff's life and sexual preferences" and that DA Anderson "knowingly made false statements as to Plaintiff allegedly 'bragging about

---

[14]    Bloomquist denies this statement stating that he has evidence that Belinda Becher was told by the DA's office not to place a civil request for arrest warrant for Scott Floccher for failure to pay child support in front of the judge because Floccher did not live in Maine anymore.  (Bloomquist Resp. SMF ¶ 48.) However, the cited exhibit is not evidence of this conversation between the DA's office and Becher; it is a civil case hearing form that makes no mention of such an exchange.  (Docket No. 264, Ex. GG.)

killing seventeen people.'" (Pl.'s Resp. to DAs' Interrogs. at 14; Anderson SMF ¶ 49;

Bloomquist Resp. SMF ¶ 49.) DA Anderson did not "publicly disclose" any 'private

matters of [Mr. Bloomquist] including bizarre and lurid allegations" of his "sexual

preferences." (Anderson Aff. ¶ 17; Anderson SMF ¶ 50.)[15] DAs' Interrogatory No. 11

asked Bloomquist to 'please state with specificity all 'privileged information' that

Stephanie Anderson allegedly released to David Hench, as alleged in ¶ 428 of your

Amended Complaint." (DAs' Interrog. No. 11; Anderson SMF ¶ 51; Bloomquist Resp.

SMF ¶ 51.) In his response to DAs' Interrogatory No. 11, Bloomquist asserted a

"privilege" not to answer this question and "refused to answer this question." (Pl.'s

Resp. to DAs' Interrogs. at 14; Anderson SMF ¶ 52; Bloomquist Resp. SMF ¶ 52.)

Bloomquist sent a three-page letter dated May 13, 2002 (plus "Affidavit of

Service" dated May 16, 2002), to the Clerk of Cumberland County that purports to be a

"Notice of Claim." (Anderson SMF ¶ 53; Bloomquist Resp. SMF ¶ 53.) Bloomquist sent

a four-page letter dated May 13, 2002 (plus "Affidavit of Service" dated May 16, 2002),

to the Clerk of Cumberland County that purports to be a 'Notice of Claim." (Anderson

SMF ¶ 54; Bloomquist Resp. SMF ¶ 54.)

### *Discussion*

In a prior order I recommended that the Court grant Anderson judgment on the

pleadings as to twenty of the twenty-seven counts of Bloomquist's amended complaint

brought against Anderson (Docket No. 103) and that decision was affirmed by the Court

---

[15]     Bloomquist qualifies this statement by indicating: "Plaintiff believes that information will surface
to show that Defendant Anderson was actually involved in some of this insane and defamatory nonsense
against Plaintiff." (Bloomquist Resp. SMF ¶ 50.) A well grounded belief might be sufficient to support
complaint allegations in the early stages of a law suit, but in this case a tortured course of preliminary
motions and discovery is complete, the deadline for dispositive motions has been reached, and Bloomquist
cannot defend summary judgment by citing his unsubstantiated beliefs.

(Docket No. 112). Anderson now moves for summary judgment on the seven remaining counts of the amended complaint that still stand against her. These are that Anderson violated Bloomquist's federal statutory "right" under 18 U.S.C. § 922 to engage in the business of buying and selling federal firearms and ammunition (Count 13), his First Amendment rights (Count 14), his Fourth Amendment rights to be free from malicious prosecution (Count 21), his Fourteenth Amendment due-process rights (Count 31), as well as the state law claims which allege that Anderson defamed him (Count 48) and publicized certain private matters concerning him (Count 50). Anderson also argues that she is entitled to judgment on Bloomquist's intentional infliction of emotional distress count (Count 42) because Bloomquist abandoned that count as against Defendants Anderson, Berlind, and Barry in his pleading at Docket Number 79.

I agree with Anderson that she is entitled to judgment on Count 42 because Bloomquist has withdrawn that claim against her. Premised on the facts recited above, Anderson has made her case for why she is entitled to summary judgment on Count 13, the 18 U.S.C. § 922 count (Anderson Summ. J. Mot. at 9-10), Count 14, the 42 U.S.C. § 1983 First Amendment count (id. at 11), Count 21, the 42 U.S.C. § 1983 malicious prosecution count (id. at 11-13), Count 31, the 42 U.S.C.§ 1983 due process count (id. at 13-14), Count 48, the defamation count (id. at 14-17), and Count 50, the "publicizing private matters" count (id. at 17-19).

In opposing Anderson's motion Bloomquist states that he "objects to summary judgment for Defendant Anderson at this stage." He argues:

> Plaintiff has been denied access to discovery from the television stations
> who have refused to comply with Plaintiff's discovery requests back in the
> spring, have told Plaintiff he needs to serve subpoenas on them, which in

the past they have also refused to comply with. Plaintiff is currently reserving them through their attorneys and expects to obtain the discovery shortly, but he respectfully requests this Court stay any decision on Defendant Anderson's motion until he receives the media discovery. If there is no such statements that "[Plaintiff] has a long history of domestic violence abuse", Plaintiff will then move to dismiss all charges against Defendant Anderson with regard to the defamation issue.

Plaintiff has spoken to witnesses who are submitting affidavits indicating that they specifically saw Defendant Anderson during a televised interview making such a statement. Defendant Anderson had no good faith basis to believe the statement she made was true.

WHEREFORE, Plaintiff, for all the reasons stated above and in his motion for summary judgment and response to Cumberland County Defendants, respectfully demands this honorable Court to deny Defendant Anderson's motion for summary judgment or stay said motion until discovery reveals the truth.

(Pl.'s Opp'n Mot. Summ. J. at 1-2, Docket No 289.)

As Anderson points out, this response mentions only the defamation claim against Anderson.  Nowhere in his own statement of additional facts or in his response to Anderson's statement of facts (see appendix) has Bloomquist built an evidentiary basis for denying Anderson's motion for summary judgment on the defamation count.  Since filing his opposition to this motion on September 7, 2005, Bloomquist has made no progress in obtaining the witness affidavits or the tapes.  At this late stage of the game I decline Bloomquist's request to stay resolution of this motion.  I further conclude that Anderson has carried her burden as to all of the still contested counts against her and Bloomquist has failed to controvert her evidentiary support for her entitlement to judgment on all seven counts in any meaningful way.

### Conclusion

For the reasons explained above, I recommend that the Court **GRANT** Anderson summary judgment as to Counts 13, 14, 21, 31, 42, 48, and 50.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.


December 30, 2005

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge