UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| WILLIAM C. BLOOMQUIST, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 03-276-P-S |
| | ) | |
| JUSTICE PAMELA ALBEE, et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON ANNE BERLIND'S
MOTION  FOR SUMMARY JUDGMENT [Docket No. 230]**

Anne Berlind, an Assistant District Attorney for Cumberland County, moves for

summary judgment (Docket No. 230) in this civil rights action filed by William

Bloomquist. I recommend that the Court grant Berlind's motion.

### *Summary Judgment Standard*

Berlind is entitled to summary judgment only "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact" and that she is "entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution

would "affect the outcome of the suit under the governing law," Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party," id.   I review the

record in the light most favorable to Bloomquist and I indulge all reasonable inferences in

his favor.  See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir.2000) (emphasis added).

The fact that Bloomquist is a pro se plaintiff does not free him from the pleading burden set forth in Rule 56.  See Parkinson v. Goord, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); see also Sirois v. Prison Health Servs., 233 F.Supp.2d 52, 53-55 (D. Me. 2002).   While Bloomquist's complaint may be held to a less stringent pleading standard under Haines v. Kerner, 404 U.S. 519, 520 (1972), his pro se status does not shield him from Rule 56's operative provision under subsection(e) requiring the pleader to "set forth such facts as would be admissible in evidence."

Bloomquist has already faced multiple motions for summary judgment in this case and he is familiar with the local rules governing summary judgment pleadings.

Subsection (c) of the District of Maine Local Rule provides:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

Subsection (e) directs:

> Statement of Facts Deemed Admitted Unless Properly Controverted;
> Specific Record of Citations Required
> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed

> admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

Dist. Me. Loc. R. 56(e).

### *Counts Remaining Against Berlind*

Berlind previously moved for partial judgment on the pleadings on all counts against her except Counts 13, 14, and 21.  In that round of motions I recommended that the Court grant Berlind's motion as to all the counts she sought judgment on save Count 26, a Fourth Amendment claim of unreasonable seizure. Berlind now seeks to excise herself from this lawsuit and moves for summary judgment as to the remaining five counts against her.  She moves for judgment on: Count 13, a claim that Berlind violated Bloomquist's "right" under 18 U.S.C. § 922 to engage in the business of buying and selling federal firearms and ammunition; Count 14, a claim of a First Amendment violation; Count 21, a claim of malicious prosecution running afoul of the Fourth Amendment; and Count 26, the claim of unreasonable seizure of property violative of Fourth Amendment.

Berlind's argument apropos Count 42 – an intentional infliction of emotional distress count – is that Bloomquist made it clear that he abandoned that count as against Defendants Anderson, Berlind, and Barry in his pleading at Docket Number 79.   I agree with Berlind that she is entitled to judgment on Count 42 because Bloomquist has withdrawn that claim against her.  I now turn to the facts that are relevant to the remaining four counts.

*Berlind's Material Facts*[1]

### The Pulkkinen Investigation

According to Berlind, in November 2001, Bloomquist became involved in a domestic dispute with his wife, Katariina Pulkkinen. (Berlind SMF ¶ 1.) Bloomquist obtained a protection from abuse order against her, and Pulkkinen obtained a similar order against him. (Id. ¶ 2.) In November 2001 the Cumberland County Sheriff's Department asked for assistance from the Bureau of Alcohol, Tobacco, and Firearms (ATF) to serve Bloomquist with the protection order that his wife had obtained and to help her retrieve some of her belongings from the marital residence. (Id. ¶ 3.)

According to Bloomquist, although the Sheriff's Department did ask for assistance the request was not for help with serving the protection order or for collecting Pulkkinen's belongings, it was for help in seizing Bloomquist's weapons and determining which were legal and which were illegal. (Bloomquist Resp. SMF ¶ 3.) He relies on a document entitled "Referral of Information" to the ATF dated December 5, 2001; a December 10, 2001, memorandum from the ATF field office indicating that the Sheriff's Department had requested a risk assessment apropos Bloomquist; and a portion of an unidentified document that seems to indicate that ATF agents responded on November 27, 2001, to the Bloomquist residence in an advisory capacity and observed Sheriff Department officers discovering marijuana and firearms. (Docket No. 284, Ex. 10.)[2]

---

[1]    Attached as an appendix to this decision is the compilation of Bloomquist's statement of additional facts as admitted, qualified, or denied by Berlind. I have carefully considered these facts in determining whether or not Berlind is entitled to summary judgment as a matter of law on the counts in question.

[2]    Bloomquist also attempts to qualify paragraphs one and two of Berlind's statement but—despite the fact that he is now well versed in the necessities of summary judgment pleadings -- his responsive statements contain no record citation. (See Bloomquist's Resp. SMF ¶¶ 1, 2.) I do not consider his qualifications as material to Berlind's liability.

At the Pulkkinen/Bloomquist residence, Bloomquist kept more than 80 firearms, 2 rocket launchers, a machine gun, over 120,000 rounds of ammunition, several large axes, and various explosives. (Berlind SMF ¶ 4; Bloomquist Resp. SMF ¶ 4.)

According to Berlind, on November 27, 2001, the Sheriff's Department (accompanied by Pulkkinen) entered the Bloomquist/Pulkkinen residence and seized many firearms and other weapons. (Berlind SMF ¶ 5.)[3]

There is no dispute that on November 28, 2001, the Sheriff's Department and Sheriff Dion held a press conference and issued a press release that was widely quoted in local media. (Berlind SMF ¶ 6; Bloomquist Resp. SMF ¶ 6.)   The press conference and press release described the weapons found in the residence and the locations in the home where they had been found. (Berlind SMF ¶ 7; Bloomquist Resp. SMF ¶ 7.)

Detective Daniel Down of the Cumberland County Sheriff's Department, the parties agree, interviewed Pulkkinen on November 26, 2001, and November 27, 2001. (Berlind SMF ¶ 9; Bloomquist Resp. SMF ¶ 9.) Pulkkinen provided Detective Down with written statements, including a detailed, six-page statement that documented her physical abuse. (Berlind SMF ¶ 10; Bloomquist Resp. SMF ¶ 10.)[4]

According to Berlind, in the interviews and her written statement, Pulkkinen explained in detail the nature and extent of the physical abuse she had suffered at the hands of Bloomquist over the course of several months during 2001. (Berlind SMF ¶ 11.) Specifically, Pulkkinen stated that Bloomquist hit her with a stick, hit her with a large

---

[3]    Bloomquist "denies" this statement asserting that it "appears" that the officers were at his residence the "entire day." (Bloomquist Resp. SMF ¶ 5.) The exhibit that Bloomquist relies on is a "Main Radio Log Table for an incident "01-022086" which is  - with respect to evidentiary value -- indecipherable as far as I am concerned.  (Docket No. 264, Ex. A.)

[4]    Bloomquist attempts to qualify this statement by asserting that during the first interview Pulkkinen did not make statements that contained allegations of spousal or physical abuse.  (Bloomquist Resp. SMF ¶ 10.)  However, he cites to "Def.'s Ex. A [228]" in support of this qualification and I could not find this exhibit in the record.

yellow flashlight, pulled her hair, hit her with a piece of wood (leaving bruises), and used a stun gun on her to control her. (Id. ¶ 12.)  On their fifth wedding anniversary, which was July 25, 2001, according to Pulkkinen, Bloomquist hit her several times in the head, held her head against a tile floor, and told her what a "fuck up" she was. (Id. ¶ 13.) On November 21, 2001, according to Pulkkinen, Bloomquist told her that he had already killed seventeen people, and was planning to kill three more people, including a man named Scott Floccher, described as a member of Hells' Angels. (Id. ¶ 14.)

Bloomquist does not dispute that Pulkkinen detailed her injuries and abuse to Down. (Bloomquist Resp. SMF ¶ 11.)  I recognize that Bloomquist asserts that Pulkkinen also told "the authorities from early on" that she was the aggressor and had provoked Bloomquist by repeatedly attacking him.  It would be natural, Bloomquist asserts, for Pulkkinen to "suffer some small injuries during the course of these incidents no matter how skilled or careful" she was.  (Id.)  Bloomquist contends that "there was never any valid physical complaints based on any action of Plaintiff that was not fully and properly warranted under the facts and circumstances."  (Id.)   Bloomquist also complains that Pulkkinen only stated these things verbally and was "not allowed by the authorities to record in writing her statements that whenever Plaintiff used 'a stick, a large yellow flashlight, a piece of wood, a stun gun' or any other object it was only because he had no other choice to do so in self-defense"  (Id. ¶ 12.)  Bloomquist describes Pulkkinen as larger than Bloomquist and states that at times she was armed by a knife or a loaded firearm and that once Pulkkinen tried to commit suicide by jumping off a porch and Bloomquist had to grab her hair to prevent her from hanging herself.  (Id.)  Apropos the July 25, 2001, incident, Bloomquist contends that Pulkkinen "neglected to say that she

had stolen a gun on this date, had threatened Plaintiff with it, had threatened  and attempted to shoot herself with it" and that he told her she was a "fuck-up" for attempting suicide in such a manner.  (Id. ¶ 13.)  And as to the November 21, 2001, incident, Bloomquist contends that Pulkkinen was drinking, drugging, and out of control and Bloomquist had stated that Pulkkinen should feel sorry for the families of the seventeen people who have died, not that Bloomquist had killed them.  (Id. ¶ 14.)  Bloomquist does agree that Pulkkinen's November 26, 2001, statement – I fear for my life because my husband has told me that he has already killed 17 people" – is an accurate reflection of what he had said.  (Id.; Down Aff. Ex. 1.)  He asserts that Pulkkinen's assertion that Bloomquist threatened three more killings were simply not true. (Bloomquist Resp. SMF ¶ 14.)   Bloomquist relies principally on his own affidavit to support his description of the true nature of the relationship between Bloomquist and Pulkkinen.  (Bloomquist Aff. ¶¶ 1-4, 9.)[5]   He cites no creditable record evidence for the proposition that Pulkkinen was influenced by Down or Berlind not to detail in writing her part in provoking Bloomquist or that supports a conclusion that Berlind or Down had any inkling that what Pulkkinen told Down and wrote in her statements was not an accurate depiction of the power balance in the Pulkkinen/Bloomquist relationship.

There is no dispute that Detective Down met with ADA Berlind on November 29, 2001, and told Berlind what Pulkkinen had told him concerning her relationship with Bloomquist. (Berlind SMF ¶ 15; Bloomquist Resp. SMF ¶ 15.)  On November 29, 2001, Detective Down provided ADA Berlind with written statements made by Pulkkinen.

---

[5]      Bloomquist also cites to a tape recording of a conversation that Bloomquist asserts took place on December 28, 2001, between "Booth" and Pulkkinen and an (inadmissible) "partial transcript" of a conversation between Pulkkinen and a "VOICE IN BACKGROUND."  (Docket No. 264, Exs. D & R.)

(Berlind SMF ¶ 16; Bloomquist Resp. SMF ¶ 16.)  Berlind interviewed Pulkkinen on
November 29, 2001. (Berlind SMF ¶ 17; Bloomquist Resp. SMF ¶ 17.)

      Berlind asserts that on November 29, 2001, Pulkkinen repeated the substance of
what was in her detailed narrative and what she had already told Detective Down.
(Berlind SMF ¶ 18.)   According to Berlind, Pulkkinen explained to Berlind how
Bloomquist had physically abused her numerous times over the course of several months
during 2001. (Id. ¶ 19.)   Pulkkinen also told Berlind that, at times, Pulkkinen had been
verbally abusive to Bloomquist. (Id. ¶ 20.)  Berlind contends that she had the opportunity
to observe Pulkkinen's demeanor and to speak with her about her allegations of assault
and terrorizing, and Berlind found the allegations of assault and terrorizing committed by
Bloomquist to be credible.  (Id. ¶ 21.) Based on her training, education, and experience,
on November 29, 2001, Berlind believed there was probable cause to charge Bloomquist
with twelve counts of assault and two counts of terrorizing. (Id. ¶ 22.)

      Bloomquist responds that Pulkkinen "clearly and adamantly" told Berlind and
Down that she was the aggressor and Bloomquist was the victim.  (Bloomquist Resp.
SMF ¶¶ 18-20.)  He states that on December 28, 2001 (nearly a month after Down and
Berlind took Pulkkinen's version of the story), Pulkkinen called Bloomquist directly and
spoke with Major Ken Booth who had Bloomquist present in the background.  This
conversation is recorded on a mini-tape that Bloomquist submits as Exhibit D to his
motion for summary judgment. In his opposition memorandum he states that he recently
discovered these tapes of this phone conversation of Pulkkinen telling Bloomquist's
friend, Major Ken Booth, with Bloomquist in the background.  (Opp'n Summ. J. Mem. at

2.)  The portion of the taped conversation to which Bloomquist draws the court's attention

is transcribed by Bloomquist as follows:

> Pulkkinen:      They attempted the day hearing in Court, the really, when I
> wrote the statement and when I spoke with the police, I fully explained the
> context of how things happened.  Um, and I fully explained you know my
> role, I said it very clearly "William had no other option except hitting me,
> I want it because I felt so sick inside, I provoked him to the point he had
> no other option."  I, the day after they had arrested, when you had the
> hearing they attempted and attempted to have me say that you did more
> than ever happened.  I attempted to explain the context.  I said multiple
> times that you had no other option, I wanted it so badly and I would not
> stop until you did it.  And they wanted to build a case, build a case I think
> this summer, when you locked in the bathroom like remember one time
> downstairs and I kind of destroyed it, they want me to say that you kept
> me their longer and longer and longer, and ah and they really attempt I felt
> really pressure to say more than actually happened and they were not
> hearing the context of the situation.
> Voice in Background [Bloomquist]:  Who was saying that?
> Pulkkinen:      Detective Down and Anne Berlind.
> Pulkkinen:      ATF wanted to have lengthy discussion, as did other police,
> wanted to hear in great detail about our sex life I don't know what
> relevance this had all of this.  Showed me a blue mask asked if you ever
> used it on me.

(Docket No. 264, Ex. R; see also id. Ex. D.)[6]  Bloomquist contends that Berlind had an

opportunity to observe Pulkkinen's demeanor and to speak with her about her allegations.

(Bloomquist Resp. SMF ¶ 21.)  He asserts that Pulkkinen's account is "completely in

opposite of what Defendant Berlind's statement of fact is."  (Id.)  In Bloomquist's view,

Pulkkinen "had in effect recanted the allegations of spousal abuse by telling Defendants

Down and Berlind that she was the aggressor, she left Plaintiff no choice but to hit her,

she always instigated Plaintiff, Plaintiff never hit her, struck her, or used any force upon

her without her attacking him first."  (Id.) Bloomquist contends:  "There was no probable

---

[6]      This transcription does not completely align with my understanding of the tape but it is not
materially different with respect to the parts of this conversation Bloomquist focuses on.  He has omitted
some of what is on the tape, including the parts in which Bloomquist himself participates in the
conversation.

cause at that point."  (Id.)   However, Bloomquist has no creditable record evidence to support his contention that Berlind and Down were made aware during this time in the investigation of any level of recantation by Pulkkinen.

The parties do not dispute that on November 29, 2001, the State of Maine charged Bloomquist with twelve counts of assault and two counts of terrorizing. (Berlind SMF ¶ 23; Bloomquist Resp. SMF ¶ 23.) One of the bail conditions imposed by the court was that Bloomquist could not possess his firearms that had been seized by the Cumberland County Sheriff's Department. (Berlind SMF ¶ 24.)[7]

According to Berlind the charges in that assault and terrorizing complaint against Bloomquist were based solely on Berlind's professional judgment after reviewing the evidence and information at that time. (Berlind SMF ¶ 25.)[8]  There is no dispute that Berlind had primary responsibilities for the assault and terrorizing charges against Bloomquist. (Berlind SMF ¶ 26; Bloomquist Resp. SMF ¶ 26.)

There is no dispute that on January 24, 2002, the Maine District Court entered an order as to Bloomquist's firearms, which were at that time in the possession of the Cumberland County Sheriff's Department.  (Berlind SMF ¶ 27; Bloomquist Resp. SMF ¶ 27.)  The order stated that many of the firearms and ammunition in the possession of the

---

[7]      Bloomquist "qualifies" this statement by indicating, without record citation, that the "bail conditions were simply bizarre" as they pertained to all firearms not just those seized and he notes that the Sheriff's Department did not even try to locate the non-seized firearms even though they knew they existed. (Bloomquist Resp. SMF ¶ 24.)

[8]      In Bloomquist's opinion:
         Given the amount of media publicity, bizarrity, and incredible volume of weapons the CCSO exhibited to the public, Defendant A.D.A. Berlind's professional judgment was subject to extreme pressure, especially after Plaintiff's ex-wife effectively recanted and the fact that the CCSO had in their hand at that point Plaintiff's Protection Order against his ex-wife, which had a completely opposite story that now Plaintiff's ex-wife was now agreeing to because she knew Plaintiff had tapes that would prove that he was the victim and she was the abuser, therefore Plaintiff's ex-wife clearly admitted that she was the aggressor and that Plaintiff only acted in self-defense after being provoked.
(Bloomquist Resp. SMF ¶ 25; Docket No. 264 Ex. D & R.)

Sheriff's Office may be transferred to Attorney Douglas Hendrick, as Bloomquist's designated agent (Berlind SMF ¶ 28; Bloomquist Resp. SMF ¶ 28) and further provided that Bloomquist "may sell or transfer or otherwise lawfully dispose of any firearm through Douglas Hendrick, Esq., provided that such sale, transfer, or disposition does not violate state or federal law or any applicable regulation." (Berlind SMF ¶ 29; Bloomquist Resp. SMF ¶ 29.)

On February 7, 2002, Bloomquist and Attorney Hendrick (among others) retrieved numerous firearms, ammunition, and military equipment from the Sheriff's Office (Berlind SMF ¶ 30; Bloomquist Resp. SMF ¶ 30) although Bloomquist did not take actual possession of these items because of bail conditions which prohibited him from possessing firearms (Bloomquist Reply SMF ¶ 30). Immediately thereafter, the firearms "were stored at Plaintiff's federally licensed gun store." (Berlind SMF ¶ 31; Bloomquist Resp. SMF ¶ 31.)

By letter dated March 29, 2002, Pulkkinen told ADA Berlind that she would not testify against Bloomquist and asked the State to dismiss the criminal charges against him. (Berlind SMF ¶ 32.)[9]  In this letter to ADA Berlind, Pulkkinen said that, "[a]s I have always stated, I also had a role in the conflicts in our relationship. At times, I instigated and provoked William, leaving him with no other choice than hitting me." (Berlind SMF ¶ 33; Bloomquist Resp. SMF ¶ 33.) Pulkkinen offered ADA Berlind her "sincerest thanks to you again for all the support that you and your office have shown to me, and most of

---

[9]     Bloomquist attempts to qualify this statement asserting that Pulkkinen told Berlind on November 29, 2001, that she would not testify against Bloomquist and also asked her to dismiss the charges against Bloomquist.  (Bloomquist Resp. SMF ¶ 32.)  However the only evidence he cites in support of this assertion is a tape of a December 28, 2001, conversation between Pulkkinen and Booth and an undated (and inadmissible) "partial transcript" of a conversation that allegedly took place between a "VOICE IN BACKGROUND" and Pulkkinen. (Docket No. 264, Exs. D & R.)  In his response statement Bloomquist asserts that Pulkkinen set forth this information in a December 28, 2001, affidavit but that affidavit is not referenced.

all, thanks to you for believing me during the most challenging days of my life." (Berlind SMF ¶ 34; Bloomquist Resp. SMF ¶ 34.)

On April 17, 2002, ADA Berlind was aware of the fact that, in February 2002, Susan Benfield had obtained a protection from stalking order against Bloomquist in a New Hampshire court which required Bloomquist to surrender his firearms to New Hampshire authorities. (Berlind SMF ¶ 8.)  Bloomquist contends that this order was not valid outside of the territorial limits of New Hampshire and was not subject to recognition by the Maine courts unless recognition was applied for, a step not taken until February 2003.  (Bloomquist Resp. SMF ¶ 8; Docket No. 264, Ex. FF.)

On April 17, 2002, the assault and terrorizing charges against Bloomquist were dismissed at the State's request due to insufficient evidence and at the victim's request. (Berlind SMF ¶ 31.)[10] By letter dated April 17, 2002, ADA Berlind advised Attorney Douglas Hendrick, who was representing Bloomquist at that time, of the dismissal as follows:

> The State is dismissing the pending domestic violence charges against William Bloomquist today, meaning that the Order issued by Judge Goranites on January 24, 2002 pertaining to your possession of Mr. Bloomquist's firearms will no longer be in effect. However, as you are probably aware, the State of New Hampshire has issued a Stalking Order prohibiting Mr. Bloomquist from possessing firearms. I have enclosed a copy of that order, which requires that the firearms be relinquished to a peace officer. Federal law prohibits the transfer of firearms to a person subject to a stalking order. Accordingly, you may not return the firearms to Mr. Bloomquist even though the domestic violence charges are being dismissed.

(Berlind Aff Ex. E; Berlind SMF ¶ 36; Bloomquist Resp. SMF ¶ 36.)

---

[10]     Bloomquist offers a qualification to this statement unaccompanied by a record citation. (Bloomquist Resp. SMF ¶ 35.)

According to Berlind, on May 17, 2002, the firearms were "disbursed to numerous hidden locations" by Mr. Bloomquist. (Berlind SMF ¶ 37; Pl.'s Resp. to DAs' Interrogs. at 22.)  Bloomquist denies this assertion, contending that he ordered that the firearms be disbursed to numerous hidden locations and that he was not capable or physically able to handle or move all the firearms himself.  (Bloomquist Resp. SMF ¶ 37.)  He also asserts that it took several days to complete the disbursement.  (Id.)[11]

### *Bloomquist's Application to Be a Student-Attorney-Intern at the Cumberland County District Attorney's Office*

There is no dispute that Bloomquist applied for a student-attorney internship at the Cumberland County District Attorney's Office in the fall of 1996.  (Berlind SMF ¶ 38; Bloomquist Resp. SMF ¶ 38.)  At that time, Bloomquist was a second-year law student at the University of Maine School of Law. (Berlind SMF ¶ 39; Bloomquist Resp. SMF ¶ 39.)  ADA Berlind was involved with the interview and selection process for student-attorney internships at that time. (Berlind SMF ¶ 40; Bloomquist Resp. SMF ¶ 40.)  In October 1996, Bloomquist was offered a job as a student-attorney-intern, and was expected to start in May 1997. (Berlind SMF ¶ 41; Bloomquist Resp. SMF ¶ 41.)  The offer was accepted by Bloomquist in the fall of 1996. (Berlind SMF ¶ 42; Bloomquist Resp. SMF ¶ 42.)   Eligibility for the student-attorney internship position was contingent upon Bloomquist's certification by his law school pursuant to Maine Rule of Civil Procedure 90(b). (Berlind SMF ¶ 43; Bloomquist Resp. SMF ¶ 43.)

After Bloomquist had applied for the student-attorney internship, during the fall or winter of 1996, ADA Christine Thibeault, who covered the Bridgton District Court at

---

[11]     Bloomquist relies on Paragraph 37 of his September 7, 2005, affidavit to support this responsive statement but the affidavit filed with that date assigned only contains thirty-six paragraphs.  (See Docket No. 284 Attach. 3; Docket No. 285 Attach. 3; Docket No. 286 Attach. 3; Docket No. 292 Attach. 2.)

that time, told ADA Berlind that she was approached by an officer from the Bridgton Police Department, who told her certain information about Bloomquist and suggested that someone else from the DA's office may wish to contact him. (Berlind SMF ¶ 44; Bloomquist Resp. SMF ¶ 44.)[12] In the fall or winter of 1996/1997, ADA Berlind had a telephone conversation with this police officer. (Berlind SMF ¶ 45; Bloomquist Resp. SMF ¶ 45.) During that telephone conversation Bridgton police officer told ADA Berlind that he was aware that Bloomquist had applied to be an intern with the District Attorney's Office. (Berlind SMF ¶ 46; Bloomquist Resp. SMF ¶ 46.) The officer also informed Berlind that Bloomquist was very knowledgeable about the trade in illegal drugs in the Bridgton area and that Bloomquist was sharing information with the Bridgton Police Department on the local drug trade. (Berlind SMF ¶ 47; Bloomquist Resp. SMF ¶ 47.)[13]

Bloomquist became ineligible for the student-attorney internship position when, in May 1997, the University of Maine School of Law failed to certify him as required by Maine Rule of Civil Procedure 90(b). (Berlind SMF ¶ 48; Bloomquist Resp. SMF ¶ 48.)[14] Soon thereafter, Bloomquist was separated from his employment with the Cumberland County District Attorney's Office for failure to meet the certification requirements of his position. (Berlind SMF ¶ 49; Bloomquist Resp. SMF ¶ 49.)

On November 29, 2001, the <u>Portland Press Herald</u> published an article about the Sheriff's Department's search and seizure of Bloomquist's firearms and ammunition.

---

[12]     Bloomquist attempts to qualify this statement, indicating: "Although this statement appears to be true as written, it is not accurate as to what this police officer, Peter Madura, told Plaintiff." (Bloomquist Resp. SMF ¶ 44.) However, Bloomquist provides no record citation for this assertion.

[13]     Again Bloomquist attempts to qualify this assertion – indicating that the officer would have meant this as a form of praise --but has not provided any record support for the qualification.

[14]     Bloomquist states that the reason for his ineligibility was academic and not moral, yet he has no record support for the qualification.

14

(Berlind SMF ¶ 50; Bloomquist Resp. SMF ¶ 50.) That article, written by reporter David Hench, contained the following statement: "In his second year of law school, Bloomquist was offered an internship with the Cumberland County District Attorney's Office, but the offer was rescinded following a background check with the Bridgton Police Department." (Pl.'s Am. Compl. App. A-2; Berlind SMF ¶ 51; Bloomquist Resp. SMF ¶ 51.) ADA Berlind did not speak with David Hench in November 2001 concerning Bloomquist's student-attorney internship with the Cumberland County District Attorney's Office. (Berlind SMF ¶ 52; Bloomquist Resp. SMF ¶ 52.)[15] The Cumberland County District Attorney's Office did not conduct a "background check" on Bloomquist in connection with his application to be a student-attorney-intern in the fall/winter of 1996-1997. (Berlind SMF ¶ 53; Bloomquist Resp. SMF ¶ 53.) David Hench does not remember his source for the statement at issue in the November 29, 2001, issue of the Press Herald – "In his second year of law school, Bloomquist was offered an internship with the Cumberland County District Attorney's Office, but the offer was rescinded following a background check with the Bridgton Police Department." (Berlind SMF ¶ 54; Bloomquist Resp. SMF ¶ 54.)[16]

### Discussion

### Count 13- Violation of Bloomquist's Rights Under 18 U.S.C. § 922

Berlind argues that she is entitled to judgment on this count under 18 U.S.C. § 922 because this criminal statute does not create an individually enforceable right and,

---

[15]     Once again without record citation, Bloomquist hopes to qualify this statement by arguing that Berlind has made false affidavit statements in the past by asserting that Bloomquist's certification woes stemmed from moral issues and that therefore the court should question Berlind's affidavit apropos contact with David Hench in November 2001.

[16]     Bloomquist argues that it is unbelievable that Hench does not remember his source and conjectures – without record citation -- that Hench "had great pressure on him to conceal his source unlawfully to the detriment of Plaintiff." (Bloomquist Reply SMF ¶ 54.)

thus, Bloomquist cannot use 42 U.S.C. § 1983 as a fulcrum to redress the alleged interference with his rights as a federally licensed firearms dealer. The amended complaint does not indicated which of the (a) to (y)[17] subsections of § 922 Bloomquist believes confers this personally enforceable right.  In his opposition to Berlind's motion, Bloomquist argues that Berlind is wrong on this score but he does not identify which of the (a) through (y) subsections of § 922 he relies upon or cite any authority for the proposition that 18 U.S.C. § 922 creates an individually enforceable right. The statute is entitled "Unlawful Acts."  All but two -- subsections (t) and (y) -- of the (a) through (y) subsections contain the phrase "it shall be unlawful."  While I could locate authority addressing who had standing to bring a constitutional challenge to provisions contained in 18 U.S.C. § 922, I could locate no authority -- pro or con -- for the proposition that a licensed arms dealer could proceed with a 42 U.S.C. § 1983 action on the grounds that 18 U.S.C. § 922 creates an individually enforceable right.  Accordingly, I conclude that Berlind is entitled to summary judgment on Count 13 of Bloomquist's complaint.

### Count 14 – Violation of First Amendment Rights

In Count 14 of his amended complaint Bloomquist charges Berlind and other defendants with:

> intentionally and maliciously bringing fourteen unwarranted criminal charges against Plaintiff in an effort to chill his ability, willingness, and credibility to continue to advocate on behalf of pro-second amendment groups; to bring a lawsuit for Plaintiff's unlawful termination of employment; to bring other lawsuits then pending against Cumberland County to bring exposure to information that Plaintiff learned of Defendant Anderson's cover-ups of serious misconduct by members of her staff, including but not limited to facilitating the sale of cocaine and directly lying to the trial judge in court.

(Am. Compl. ¶ 309.)

---

[17]     There is now a subsection (z) which has not yet become effective.

In responding to Berlind's summary judgment argument pertaining to Count 14 which addresses this claim as if it were a First Amendment retaliation claim, compare Christopher v. Harbury, 536 U.S. 403 (2002), Bloomquist states only:

> Plaintiff alleges that Defendant Berlind has submitted no evidence to show that her acts in bringing fourteen criminal domestic violence and domestic violence terrorizing charges against Plaintiff without probable cause does not interfere with his Constitutionally protected right to access the courts. The summary judgment record does not show ample probable cause, it shows no probable cause based on Plaintiff's ex-wife's complete recantation on November 29, 2001. Furthermore, Defendant Berlind is biased towards Plaintiff personally as his former supervisor who had him unlawfully discharged and then made false claims under oath to this Court that Plaintiff was discharged for "moral purposes", when she knew that Plaintiff was discharged due to "academic probation" and so stated to Plaintiff's ex-wife on November 29, 2001, when all the other officers were trying to create other bizarre defamatory rumors that Plaintiff was a major drug dealer with marijuana farms from coast to coast. *Pl.'s Ex. D of his MSJ.*

(Opp'n Mem. Mot. Summ. J. at 6.)  I take it from this focus on Berlind's motive that Bloomquist is conceding that this count is a First Amendment retaliation claim.[18]

The First Circuit has indicated that a First Amendment retaliation plaintiff must allege that his speech "was in fact chilled or intimidated" by the defendant's complained-of action.  Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir. 1989).  A mere allegation of harm is not enough, id.  "Where a chilling effect is speculative, indirect or too remote, finding an abridgment of First Amendment rights is unfounded."  Id. (citing United States v. Harriss, 347 U.S. 612, 626 (1954)).[19]

---

[18]     Bloomquist has certainly produced no evidence in his summary judgment motion that he lost a litigation 'opportunity' as a consequence of Berlind's conduct, a showing necessary under Harbury.

[19]     Other circuits have adopted a three-pronged test in which a plaintiff must prove "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."  Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002) (endorsing Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir.2001), Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir.2001) and Lucas v. Monroe County, 203 F.3d 964, 973 (6th Cir.2000)); accord Bennett v. Hendrix, 423 F.3d 1247, 1250 -

Berlind argues in her motion for summary judgment that Bloomquist must "show that any protected speech was in fact 'chilled'" by something Berlind did (Berlind Mot. Summ. J. at 11-12), and, even though confronted with that necessity,  Bloomquist has generated no genuine dispute with respect to the question of whether or not his speech was actually chilled (or intimidated) by Berlind's conduct.

***Count 21- A 42 U.S.C. § 1983 Claim for Malicious Prosecution***

The United States Supreme Court has yet to determine whether or not a plaintiff can even bring a 42 U.S.C. § 1983 action for malicious prosecution premised on a Fourth Amendment violation. See Albright v. Oliver, 510 U.S. 266, 271 n.4 (1994) ("As noted by the Court of Appeals below, the extent to which a claim of malicious prosecution is actionable under § 1983 is one 'on which there is an embarrassing diversity of judicial opinion." Most of the lower courts recognize some form of malicious prosecution action under § 1983. The disagreement among the courts concerns whether malicious prosecutions, standing alone, can violate the Constitution. ") (internal citations omitted). The First Circuit is on the fence; in Nieves v. McSweeney the First Circuit reflected:

> It is an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation. As in previous cases, we will assume without deciding that malicious prosecution can, under some circumstances, embody a violation of the Fourth Amendment and thus ground a cause of action under section 1983.

241 F.3d 46, 54 (1st Cir. 2001) (internal citations omitted).[20] See also Castellano v. Fragozo, 352 F.3d 939, 953 (5th Cir.2003) (en banc) ("[C]ausing charges to be filed

---

51 (11th Cir. 2005). The Eleventh Circuit indicated in a footnote that it was not clear to it that the First Circuit had adopted a subjective "actual chill" standard in Curley.  Id. at 1251 n. 4.

[20]       Maine recognizes the tort of malicious prosecution and, therefore, there is no question that Bloomquist cannot proceed with this count premised on the Fourteenth Amendment.  Id. at 53.  It is also clear that he cannot base the claim on a substantive due process theory.  Id.

without probable cause will not without more violate the constitution. So defined, the assertion of malicious prosecution states no constitutional claim."); McCann v. Mangialardi, 337 F.3d 782, 786 (7th Cir. 2003) (observing that the existence of a state law tort remedy locks out a constitutional claim for malicious prosecution).

Given the state of First Circuit precedent on the question, I conclude that Berlind is entitled to qualified immunity on this count. See Rodriguez-Mateo v. Fuentes-Agostini, No. 02-1662. 66 Fed.Appx. 212 (2003), 213 -14 (1st Cir. May 28. 2003) (unpublished decision) ("[W]e have explicitly held, after the events that gave rise to this case, that '[i]t is an open question whether the Constitution permits the assertion of a section 1983 claim for malicious prosecution on the basis of an alleged Fourth Amendment violation.' Such uncertainty in the legal landscape entitles state actors to qualified immunity.")(internal citation omitted); see also Brosseau v. Haugen, 543 U.S. 194, 600-01 (2004) (Breyer, J, joined by Scalia, J. and Ginsburg, J., concurring) (observing that, while Saucier v. Katz, 533 U.S. 194 (2001) requires that lower courts decide the constitutional question before deciding the qualified immunity question, the Supreme Court should reconsider the issue because "a rigid 'order of battle' makes little administrative sense and can sometimes lead to a constitutional decision that is effectively insulated from review").[21]

### Count 26- 42 U.S.C. § 1983 Unreasonable Seizure of Property

The facts relevant to Bloomquist's 42 U.S.C. § 1983 unreasonable seizure claim are: On April 17, 2002, Berlind was aware of the fact that, in February 2002,

---

[21]     The extent to which Bloomquist has muddled this summary judgment record compounds the problem of deciding the question of whether or not there is a genuine dispute of material fact on the question of whether or not there has been a constitutional violation.

Susan Benfield had obtained a protection from stalking order against Bloomquist in a New Hampshire court which required Bloomquist to surrender his firearms to New Hampshire authorities; Bloomquist contends that this order was not valid outside of the territorial limits of New Hampshire and was not subject to recognition by the Maine courts unless recognition was applied for, a step not taken until February 2003; on April 17, 2002, the assault and terrorizing charges against Bloomquist were dismissed; by letter dated April 17, 2002, Berlind advised Attorney Douglas Hendrick that the State of New Hampshire has issued a stalking order prohibiting Bloomquist from possessing firearms and she enclosed a copy of that order requiring that the firearms be relinquished to a peace officer; in that letter Berlind advised that federal law prohibits the transfer of firearms to a person subject to a stalking order and that Hendrick could not return the firearms to Bloomquist even though the domestic violence charges are being dismissed.

Whether or not Berlind's advice to Bloomquist's attorney could amount to a Fourth Amendment seizure of the firearms had Hendrick complied with her counsel and denied Bloomquist access to the firearms may be debatable.[22]  However, Bloomquist concedes in his own opposition memorandum:

> [T]he fact that Plaintiff ordered others to disperse the firearms to hidden locations until these matters were resolved was prudent, reasonable, and legal for him to do. Despite the fact the firearms had been stored in the basement of Plaintiff's gun store, Attorney Hendrick did not allow Plaintiff to have unsupervised access or to remove any firearms until after the Maine bail conditions had been dropped on April 17, 2002 as per the Court's Order.

(Opp'n Mem. Mot. Summ. J. at 12.)  Based on Bloomquist's own representations he did not lose access to his firearms as a consequence of Berlind's April 17, 2002, letter.

---

[22]     If pressed I would most likely recommend that the Court grant Berlind qualified immunity on this count for reasons similar to those articulate vis-à-vis Count 21.

*Conclusion*

For the reasons explained above, I recommend that the Court **GRANT** Berlind

summary judgment as to Counts 13, 14, 21, 26, and, 42.

NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered
pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the
district court is sought, together with a supporting memorandum, and
request for oral argument before the district judge, if any is sought, within
ten (10) days of being served with a copy thereof. A responsive
memorandum and any request for oral argument before the district judge
shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to
*de novo* review by the district court and to appeal the district court's order.

December 30, 2005

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge