UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| WILLIAM C. BLOOMQUIST, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil No. 03-276-P-S |
| | ) | |
| JUSTICE PAMELA ALBEE, et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION ON COUNTY DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [Docket No. 260]**

Defendants Mark Dion, Kevin Joyce, Dan Down and Cumberland County move for summary judgment (Docket No. 260) in this civil rights action filed by William Bloomquist. I recommend that the Court grant the motion as to all the counts against these four defendants for the reasons set forth below.

*Discussion*

*Late Filed Statement of Fact and Statement of Additional Fact*

Bloomquist began filing his reply statement of fact and his statement of additional facts close to midnight of September 7, 2005, and completed the electronic transaction at two minutes past 12:00 a.m. on September 8, 2005. (Receipt, Docket No. 284.) On September 6, 2005, Bloomquist moved for an extension of his time for filing these pleadings because this Court's ECF and Pacer services were scheduled for a test conversion and would not be available between 5:00 p.m. and 12:00 a.m. on September 6, 2005, and these pleadings were to be filed by September 6, 2001. This Court entered an order giving Bloomquist an extension until noon on September 7, 2005 (Docket No.

276) – an allowance which more than compensated Bloomquist for the seven hours he perceived he was loosing due to the scheduled test-conversion.  I also note that Bloomquist was extremely tardy in filing several of his attachments with the Court, with several of these attachments being added as late as September 28, 2005.

The defendants now object to Bloomquist's statement of additional fact on the grounds that they were untimely filed and ask that the court not consider these facts. They also note that Bloomquist's response to their statement of facts was likewise untimely.  Although this approach is more fair to Bloomquist than to the defendants, I have considered Bloomquist's responsive statement of facts and have disregarded his statement of additional facts.[1]

### Summary Judgment Standard

The defendants are entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id.   I review the record in the light most favorable to Bloomquist and I indulge all reasonable inferences in his favor.  See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir.2000) (emphasis added).

---

[1]     I am familiar, however, with the content of Bloomquist's additional statement of fact as it mirrors that filed apropos the motions for summary judgment filed by the District Attorney defendants. (See Docket No. 306, App. 1; Docket No. 307, App. 1; Docket No. 308, App. 1.)

The fact that Bloomquist is a <u>pro se</u> plaintiff does not free him from the pleading burden set forth in Rule 56.  <u>See</u> <u>Parkinson v. Goord</u>, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding <u>pro se</u> does not otherwise relieve a litigant of the usual requirements of summary judgment, and a <u>pro se</u> party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); <u>see also</u> <u>Sirois v. Prison Health Servs</u>., 233 F.Supp.2d 52, 53-55 (D. Me. 2002).   While Bloomquist's complaint may be held to a less stringent pleading standard under <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972), his <u>pro se</u> status does not shield him from Rule 56's operative provision under subsection(e) requiring the pleader to "set forth such facts as would be admissible in evidence."

Bloomquist has already faced multiple motions for summary judgment in this case and he is familiar with the local rules governing summary judgment pleadings.

Subsection (c) of the District of Maine Local Rule provides:

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

Subsection (e) directs:

> Statement of Facts Deemed Admitted Unless Properly Controverted; Specific Record of Citations Required
> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific

3

> citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

Dist. Me. Loc. R. 56(e).

### *The County Defendants' Material Facts*

According to the defendants, on November 26, 2001, Katariina Pulkkinen reported assaults and bizarre behavior by her husband, William Bloomquist. (Defs.' SMF ¶ 1.) Bloomquist qualifies this assertion by indicating that it was Pulkkinen's Attorney who contacted the police department and relayed a "lurid story of seventeen murders, rooms and rooms full of guns and ammunition, etc." (Resp. SMF ¶ 1; Docket No. 284 Ex. 1.)

There is no dispute that during her interview with Detective Daniel Down, Pulkkinen reported that she and Bloomquist lived at a residence on Sunrise View Road in Baldwin, Maine, that she owned "the Baldwin residence," (Defs.' SMF ¶ 2; Down Aff. Aug. 4, 2005 Aff. ¶¶ 11,26 & Ex. 2), and that Pulkkinen was, in fact, the record title holder of the Baldwin residence (Defs.' SMF ¶ 3; Resp. SMF ¶ 3). Bloomquist adds that Pulkkinen told Down that a basement room containing various weapons and ammunition and another room were locked and only Bloomquist had access to these rooms. (Resp. SMF ¶ 2; Down Aug. 4, 2005, Aff. Ex. 2 at 7.)

There is no genuine dispute that Pulkkinen told Down that she had been hit and pushed by Bloomquist numerous times over the preceding months and Pulkkinen told Down that Bloomquist's assaults sometimes involved weapons, such as a flash light, a

stun gun, and a shower rod. (Defs.' SMF ¶¶ 4, 5; Down Aff. Aug. 4, 2005, ¶¶ 5, 11 & Ex. 2. )[2]

Pulkkinen was able to provide Down with details concerning these incidents – including when exactly they occurred and what types of weapons were used when – after she gained entrance to the Baldwin residence. (Defs.' SMF ¶ 6; Down Aug. 4, 2005, Aff. ¶ 6.)[3] Pulkkinen told Down that Bloomquist had told her that he had killed seventeen people. (Defs.'s SMF ¶ 7; Down Aug. 4, 2005, Aff. ¶¶ 5, 11 & Ex. 2.)[4] Pulkkinen also reported that Bloomquist had pointed out an obituary to her of a person named Eric Bunker and stated to her that he had killed Mr. Bunker. (Defs.'s SMF ¶ 8; Down Aug. 4, 2005, Aff. ¶¶ 5, 11 & Ex. 2.)[5] There is no genuine dispute that Pulkkinen told Down that

---

[2] Bloomquist purports to deny this statement by citing to a tape recorded conversation (and partial transcript thereof) that is allegedly between Pulkkinen and a third party, one Ken Booth, with Bloomquist in the background. (See Docket No. 264 Exs. D & R.) Bloomquist believes that this is record evidence that Pulkkinen told Down that she had been hit and pushed by Bloomquist only after she had forced Bloomquist to do so in self defense. (Resp. SMF ¶ 4.) Bloomquist would need Pulkkinen's affidavit or deposition testimony to create a genuine dispute of this ilk; this recording/partial transcript is not admissible for this purpose. Bloomquist relies on his own affidavit for the proposition that these assaults "only involved weapons used by Bloomquist's ex-wife"; he represents that he only used a flashlight, a stun gun, and a shower rod in self-defense. (Resp. SMF ¶ 5; Bloomquist Aff. ¶¶ 1,2.) However, this representation does not put into dispute the defendants' factual statement apropos what Pulkkinen reported to Down, which is what is material here.

[3] Bloomquist attempts to qualify this statement with conjecture about Pulkkinen's motivation for bestowing certain information on the authorities. (Resp. SMF ¶ 6.) However, his only record reference is to Lines 4 and 5 of Exhibit A to Down's July 13, 2005, affidavit, which is Pulkkinen's November 26, 2001, statement. The cited lines do not support Bloomquist's contention that Pulkkinen indicated that Bloomquist had threatened to have her served with a protection from abuse order. It is true, as Bloomquist points out, that this statement did not contain allegations that Bloomquist physically abused Pulkkinen but I do not see how that fact qualifies this statement by the defendants.

[4] Bloomquist denies this statement but does not provide a proper record citation. (Resp. SMF ¶ 7.)

[5] Bloomquist denies this statement by stating that he never pointed out the obituary and stated that he had killed Bunker. (Resp. SMF ¶ 8.) He relies on Paragraph 4 of his affidavit and explains why he had the obituary and details his citing of the tattooed, drug abusing Bunker on Defendant Scott Floccher's porch. This information does not controvert the defendants' well-supported assertion of what Pulkkinen told Down.

Bloomquist was a convicted felon from Connecticut. (Defs.'s SMF ¶ 9; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2; Resp. SMF ¶ 9.)[6]

There is no genuine dispute about the following.  Pulkkinen told Down that Bloomquist had failed the Maine Bar Examination ten times since graduating from law school. (Defs.' SMF ¶ 10; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2.)[7]  She also told Down that Bloomquist had a gun room in the basement of the Baldwin residence (and Pulkkinen showed Detective Down a picture of her in the gun room) and that some of the guns kept there were operational. (Defs.' SMF ¶ 11; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2.)[8]  She told Down that Bloomquist owned a tank that was being repaired in Bridgton, (Defs.' SMF ¶ 12; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2); that Bloomquist had licenses for his weapons, (Defs.' SMF ¶ 13; Down Aug. 4, 2005, Aff. ¶ 13 & Ex. 2); that the gun room is hidden behind a bookcase and that its door is locked and booby-trapped with something that will make a loud bang if the door is opened (Defs.' SMF ¶ 14; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2); that the gun room was rigged with a mechanism – one detective described as a "novelty-style dime store popper" -- that would make a loud bang if the door was opened (Defs.' SMF ¶ 15; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2; Resp. SMF ¶ 15; Docket No. 284, Ex. 3), that Bloomquist had been smoking marijuana and had been growing five marijuana plants in the basement of the Baldwin residence.  (Defs.' SMF ¶ 16; Down Aug. 4, 2005, Aff. ¶¶ 5, 11 & Ex. 2); that she had gained access to the gun

---

[6]     Bloomquist states that at approximately 10:00 a.m. on November 27, 2001, Down requested a background check on Bloomquist and that this check revealed that Bloomquist had no record.  He cites to Exhibit 2 to his statement of additional facts.  (Docket No. 264 Ex. 2.)

[7]     Without record citation, Bloomquist admits that Pulkkinen may have told Down this but urges that Down should have figured out that, Bloomquist having graduated from law school in June 1998, there had only been six opportunities for Bloomquist to sit for the bar and this should have alerted Down to the fact that Pulkkinen's representation was "an outright lie."  (Resp. SMF ¶ 10.)

[8]     Bloomquist offers a qualification to this statement bickering with Pulkkinen's representation to Down as to which of his gunrooms it was, indicating that he has gunrooms in other residences.  (Resp. SMF ¶ 11.)

room and had taken photographs (and she provided the roll of film with the photos to Detective Down). (Defs.' SMF ¶ 17; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2); that Bloomquist took numerous medications, including Zolof, Adarol and Ritalin. (Defs.' SMF ¶ 18; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2); that Bloomquist had been behaving erratically since the suicide of a friend about two years before. (Defs.' SMF ¶ 19; Down Aug. 4, 2005, Aff. ¶¶ 5, 11 & Ex. 2); that she had discovered Bloomquist cross-dressing about two months before, that he wears her clothes, and that he had been pressuring her to put make-up on him. (Defs.' SMF ¶ 20; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2); and that "she made Bloomquist hit her because she said she would report him to the police." (Defs.' SMF ¶ 21; Down Aug. 4, 2005, Aff. ¶¶ 11,12 & Ex. 2 at 8; Resp. SMF ¶ 21).

Based on his experience with victims of domestic violence, Down found Pulkkinen's comment about provoking the violence to be typical of someone who was being abused. (Defs.' SMF ¶ 22; Down Aug. 4, 2005, Aff. ¶¶ 12-13.)[9]  The parties agree that Bloomquist never reported Pulkkinen to the police for assault.  (Defs.' SMF ¶ 23; Resp. SMF ¶ 23.)

Pulkkinen provided Detective Down with seven pictures of a woman in bondage who was believed to be a local tattoo shop owner. (Defs.' SMF ¶ 24; Down Aug. 4, 2005,

---

[9]     Bloomquist attempts to deny this assertion by detailing why Down should have realized that Bloomquist was "the unfortunate victim, not the abuser."  (Resp. SMF ¶ 22.)  However, his reliance on a tape recording of a subsequent telephone conversation between Pulkkinen and Booth --someone apparently acting on Bloomquist's behalf  -- does not place the defendants' statement into dispute.

Aff. ¶ 11 & Ex. 2.)[10] Pulkkinen told Down that she was in fear for her life as to what

Bloomquist might do.  (Defs.' SMF ¶ 25; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2.)[11]

There is no genuine dispute as to the following.   Pulkkinen had gone to court on

November 26, 2001, and had obtained a protection from abuse order to be served on

Bloomquist. (Defs.' SMF ¶ 26; Down Aug. 4, 2005, Aff. ¶ 11 & Ex. 2.)  Pulkkinen stated

that she needed to gain entrance into her house to obtain personal items and wanted to be

advised as to when the protection order was served. (Defs.' SMF ¶ 27; Down Aug. 4,

2005, Aff. ¶ 11 & Ex. 2.) Down spent a considerable amount of time with Pulkkinen and

had an opportunity to assess her credibility. (Defs.' SMF ¶ 28; Down Aug. 4, 2005, Aff. ¶

7.)  Down had – at the time -- over twenty-three years of experience investigating

complaints of domestic violence. (Defs.' SMF ¶ 29; Down Aug. 4, 2005, Aff. ¶ 13.)[12]

Down found Pulkkinen to be a credible witness.  (Defs.' SMF ¶  30; Down Aug. 4, 2005,

Aff. ¶ 7.)[13]  Down also believed that Pulkkinen was in fear for her life. (Defs.' SMF ¶ 31;

[10]       Bloomquist qualifies this statement asserting that Pulkkinen told Down the woman's name and occupation "on that evening" and that Down confirmed the information with the Bridgton Police Department on November 27, 2001.   (Resp. SMF ¶ 24.)  He cites to Paragraph 4 of Page 8 of Down's narrative which was signed on November 28, 2001.  (Down Aug 4, 2005, Aff. Ex. 2 at 8.)  This citation does not establish that Pulkkinen told Down the name and occupation of the woman.

[11]       Bloomquist attempts to qualify this statement, suggesting that Pulkkinen was mentally confused, having been drinking and taking medication, and that her statement that she was in fear of her life did not stem from an actual threat made by Bloomquist.  (Resp. SMF ¶ 25.)  However, his record citation is "([249])(Def. Ex page 11, par. 4)."  It is not clear which exhibit Bloomquist is referring to; if he intended to again reference Exhibit 2 to this affidavit, the citation would be to the sentence: "Pulkkinen was still too upset to write another statement."

[12]       Bloomquist tries to qualify this assertion, indicating that there is  no evidence to support Down's claim.  (Resp. SMF ¶ 29.)  However he cites to Exhibit 4 to his statement of additional facts which is listed as being Down's personnel records.  However, Bloomquist never filed this exhibit with the court.

[13]       Bloomquist attempts to qualify this rather simple assertion with a long paragraph as to which Bloomquist believes that Down should have questioned Pulkkinen's credibility.  (Resp. SMF ¶ 30.)  The only part of this paragraph that is tied to the record citation --a tape that is purportedly of a Down dispatch discovering two PFAs against Pulkkinen, (Docket No. 284, Ex. 5)-- is Bloomquist's proposition that Down was aware prior to Pulkkinen making her allegations of spousal abuse that Bloomquist had two protection orders against Pulkkinen that were in the statewide system waiting to be served and Down knew that Pulkkinen denied to Down that she knew about the existence of these orders.  This tape does not on its own provided record support for Bloomquist's assertion.

Down Aff. Aug. 4, 2005, Aff. ¶ 9.)[14] Down had Pulkkinen prepare several written statements, copies of which are attached to Down's affidavits and the contents of which the defendants incorporate by reference. (Defs.' SMF ¶ 32; Down July 13, 2005, Aff. ¶¶ 6, 9 & Exs. A, C; Down Aug. 4, 2005, Aff. ¶ 10 & Ex. 1.)[15] Down performed background checks on Bloomquist. (Defs.' SMF ¶ 33.)  Down also contacted the Department of Alcohol, Tobacco and Firearms (ATF) concerning Bloomquist. (Defs.' SMF ¶ 34.) According to Bloomquist, the background checks indicated that there was no record of a criminal history apropos Bloomquist.   (Resp. SMF ¶ 34; Docket No. 264, Ex. V). The parties do not dispute that Down learned that Bloomquist had federal licenses to possess and sell firearms. (Defs.'s SMF ¶ 35;  Resp. SMF ¶ 35.)

Down received photocopies of machine gun license cards from ATF that reflected that Bloomquist held himself out as an attorney. (Defs.' SMF ¶ 36; Down Aug. 4, 2005, Aff. ¶ 21 & Exs.6,7; Resp. SMF ¶ 36.)   Bloomquist has acknowledged that such cards exist, that they were completed by him, and that they reflect his occupation to be "attorney." (Defs.' SMF ¶ 37; (Bloomquist Dep. at 92  & Exs. 4 & 5.)[16]

---

[14]    Bloomquist cites, once again, to a tape and partial transcript of a phone call between Pulkkinen and Booth.  (Docket No. 264, Exs. D & R.)  Assuming this would be admissible, this conversation to which Down was not privy does not place into dispute this statement of fact.  (I note that the affidavit of Kenneth Booth, the party to this tape recording indicates he was a visitor of Bloomquist's commencing December 27, 2001 (Docket No. 284, Ex. 6).)

[15]    Bloomquist cites to the affidavit of Kenneth Booth who reports he was a friend of Bloomquist and was visiting Bloomquist between December 27, 2001, and January 2, 2002.  (Docket No. 284, Ex. 6.) Booth's representations of his interactions with Pulkkinen do not provide admissible evidentiary support, let alone do anything to controvert, the proposition that Down had Pulkkinen make statements.

[16]    Denying this statement, Bloomquist contends that the photocopies of the original machine gun registrations in which he indicated he was an attorney came from the search of his residence, a search that was later held to violate the Fourth Amendment.  (Resp. SMF ¶ 37.)  He contends that Down did not receive these copies from the ATF.  (Id.)  He further maintains that, via a Freedom of Information Act request, he received copies of all information on this topic that was received from the Sheriff's Department and that these records were not included.  (Id.)  Bloomquist relies on Exhibit 7 to his additional statement of material facts (Docket No. 284) which seem to be four pages of firearm registration information.  There is no way of determining if this is accurate; Bloomquist has not cited an affidavit statement to that effect. Bloomquist also insists that to put his occupation as an attorney after recently graduating from law school and awaiting the results of the first bar exam in the occupation field of the Connecticut Machine Gun

Down met with Sergeant Donald Foss of the Cumberland County Sheriff's Office on the morning of November 27, 2001, and instructed him to serve Pulkkinen's protection order on Bloomquist. (Defs.'s SMF ¶ 38.)[17]  Detective Down had the roll of film provided by Pulkkinen developed. (Defs.'s SMF ¶ 39; Resp. SMF ¶ 38.)  That afternoon Down learned that Sergeant Foss's effort to serve Bloomquist with Pulkkinen's protection order had been unsuccessful. (Defs.'s SMF ¶ 40; Resp. SMF ¶ 41.) [18] Down reported Pulkkinen's complaint to his superior officer, Defendant Captain Kevin Joyce. (Defs.'s SMF ¶ 41; Resp. SMF ¶ 42.) Joyce relayed Down's report to Defendant Sheriff Mark Dion. (Defs.'s SMF ¶ 42; Resp. SMF ¶ 43.)

Dion was made aware of Pulkkinen's circumstances and her fear of Bloomquist. (Defs.'s SMF ¶ 43; Resp. SMF ¶ 44.)[19]  Dion is aware, based on his experience as a police officer, that one of the most dangerous periods for a spouse who is leaving an abusive partner is the time frame surrounding the spouse's initial departure from the marital residence. (Defs.' SMF ¶ 44.)[20]  Dion decided that the situation warranted concerted action on the part of the Sheriff's Office to serve Pulkkinen's protection order

---

Registration Form is not the equivalent of holding himself out as an attorney-at-law and/or a member of the bar.  (Resp. SMF ¶ 38.)

[17]	Bloomquist's qualification of this statement pertains to Paragraph 37 and not Paragraph 38.  (Resp. SMF ¶ 38.)   From here on out I have done my best to compensate for Bloomquist's miss-numbering.

[18]	In responding to Paragraph 41 of the defendants' facts Bloomquist argues that it is deceptive to suggest that Down only learned of Foss's inability to serve in the afternoon. However, Bloomquist's cited exhibits (Docket No. 284, Ex. 2 & 10) do not support Bloomquist's complaint on this score in any cognizable way.

[19]	Bloomquist states that Dion "played no role in this investigation" and that his being informed of Pulkkinen's fear "was third hand at best" as opposed to being based on personal knowledge.  (Resp. SMF ¶ 44.)  The tape recording that Bloomquist proffers in support of this qualification (Docket No. 284, Ex. 13) does not establish that Dion played no role in the investigation.

[20]	Bloomquist asserts that he was the one being abused and threatened by Pulkkinen (Resp. SMF ¶ 45) citing to tapes of Pulkkinen allegedly making threats (Docket No. 284, Ex.9).  However, there is no indication in this record that Dion was aware of these tapes or Bloomquist's version of the nature of  his relationship with Pulkkinen.

and to secure Bloomquist's weapons pending resolution of the complaint. (Defs.' SMF ¶ 45.)[21]

According to the defendants, on November 26, 2001, Pulkkinen, as owner of the Baldwin residence, had given the Sheriff's Office consent to search all parts of the residence. (Defs.' SMF ¶ 46.)  Based on his discussions with Pulkkinen, Down believed that she had the ability to authorize a search of all parts of the residence and property. (Id. ¶ 47.) Pulkkinen completed a form on November 26, 2001, that evidenced her consent to the Sheriff's Office to search all parts of the Baldwin residence. (Id. ¶ 48.) On November 27, 2001, Pulkkinen again gave the Sheriff's Office consent to search all parts of the residence. (Id. ¶ 49.) Pulkkinen completed a form on November 27, 2001, that evidenced her consent to search all parts of the Baldwin residence. (Id. ¶ 50.)

Bloomquist counters that he had exclusive access to the two rooms in the basement; Pulkkinen had no access.  (Resp. SMF ¶ 47.)  He points to the order of the state court determining that the search of those rooms fell afoul of the Fourth Amendment.  (Id.; id. ¶ 51; Docket No. 264, Ex. P.)  He stresses that in his report Down noted that Pulkkinen had told him that the room in the basement with the ammunition and weapons and another room were locked and only Bloomquist had access to these rooms. (Resp. SMF ¶ 48; Down July 13, 2005, Aff. Ex. D.)   Bloomquist asserts that Down knew at the time of Pulkkinen's consent that Bloomquist had two protection orders against

---

[21]      Bloomquist bickers with this assertion (Resp. SMF ¶ 46) citing to a police narrative by Deputy Thorpe (Docket No. 284, Ex. 3) and three pages of ATF documents (id. Ex. 10).  Bloomquist's assertion is that there was no concerted effort to serve the protection order because they knew Bloomquist was not home and that the officers were intent upon seizing the firearms even if they could not serve the protection orders.  He also asserts that there were no formal or verbal complaints of domestic violence assault, but the cited evidence does not support this claim and there is ample evidence that Pulkkinen made a detailed statement to Down about Bloomquist's physical abuse of her prior to this search.

Pulkkinen that he asserts prevented her from being on the property and having contact with Bloomquist.  (Resp. SMF ¶¶ 48, 49, 50; Docket No. 284, Ex. 5.)[22]

Numerous members of the Sheriff's Office, along with officers of the Maine State Police and the ATF, went to the Baldwin residence on the late afternoon/early evening of November 27, 2001. (Defs.' SMF ¶ 51.)[23]   They went to the Baldwin residence to serve Pulkkinen's protection order, to protect Pulkkinen from further harm, and to afford Pulkkinen safe access to her belongings. (Id. ¶ 52.)[24]   Bloomquist was not at the Baldwin residence when the officers arrived on the evening of November 27, 2001. (Id. ¶ 53.)[25]

There is no dispute that the Baldwin residence is set back from the road approximately one half-mile. (Defs.' SMF ¶ 54; Resp. SMF ¶ 55.) The land on either side of the driveway approaching the Baldwin residence has been cleared. (Defs.' SMF ¶ 55; Resp. SMF ¶ 56.) A mount for a machine gun was stationed on a deck facing the approach to the Baldwin residence. (Defs.' SMF ¶ 56; Resp. SMF ¶ 57.) The machine gun mount could accommodate a number of weapons, including a 30-caliber machine gun and a 50-caliber machine gun. (Defs.' SMF ¶ 57; Resp. SMF ¶ 58.).

---

[22]     Bloomquist inserts other assertions in his response to Paragraph 47 (Resp. SMF ¶ 48) but those assertions are not supported by the record citations.

[23]     Bloomquist attempts to qualify this statement, contending that numerous police officers went to Bloomquist's residence in the morning "first for a bizarre unknown misconduct charge then for an alleged 'Code 48 Unattended Death' and then for an alleged assistance to serve the Order on Plaintiff even though they knew he was not physically home."  (Resp. SMF ¶ 52.)  However, his record citations (Docket No. 284, Exs. 5 &10) do not support this qualification.

[24]     Bloomquist denies this statement, asserting that the officers did not go to the residence to serve the protection order and to protect Pulkkinen.  (Resp. SMF ¶ 53.)  He cites to tapes allegedly evidencing Pulkkinen's threats to him (Docket No. 284, Ex. 9) but these tapes do not establish that any of the officers knew about their content prior to the arrival at the residence.  There is no record support for the proposition that the officers knew that Bloomquist was not home.

[25]     Bloomquist's statement qualifying this statement (Resp. SMF ¶ 54) cites only to a count in his amended complaint.

Down and Officer Eric Marston found a boiler room in the basement of the Baldwin residence that was unlocked. (Defs.' SMF ¶ 59.)[26] This boiler room was the one Pulkkinen had stated that Bloomquist was using to grow marijuana. (Defs.' SMF ¶ 59; Resp. SMF ¶ 60.) Inside the boiler room, Down found twelve marijuana plants, material to grow marijuana, and apparatus to grow marijuana. (Defs.' SMF ¶ 60; Resp. SMF ¶ 61.) The twelve marijuana plants, material to grow marijuana, and apparatus to grow marijuana were cataloged by the officers and transported to the Sheriff's Office. (Defs.' SMF ¶ 61; Resp. SMF ¶ 62.)

The officers found a door behind a bookcase, as Pulkkinen had described. (Defs.' SMF ¶ 62.)[27] The door had a rope or cord attached to it on the right side of the door jamb near the top. (Defs.' SMF ¶ 63.)[28] To Down the door appeared to be booby-trapped. (Id. ¶ 64.)[29] The Maine State Police Bomb Unit disarmed the device, which turned out to be a novelty noisemaker. (Defs.' SMF ¶ 65; Resp. SMF ¶ 66.) In fact, Bloomquist had rigged the door with a mechanism that would have made some sort of noise if the door was opened. (Defs.' SMF ¶ 66; Resp. SMF ¶ 67.)

The officers found numerous firearms, rounds of ammunition and assorted weapons in the gun room. (Defs.,' SMF ¶ 67; Resp. SMF ¶ 68.) The officers cataloged

---

[26] Bloomquist denies this statement by arguing that Down had been at the residence earlier in the day and had found a way to unlock this room so as to get access to the arms room located behind the bookshelf. (Resp. SMF ¶ 59.) However, his only record support for this denial is the three pages of ATF documents that do not support Bloomquist's assertion. (Docket No. 284, Ex. 10.)

[27] Bloomquist asserts that "it appears" that the officers were unable to find the door during what Bloomquist asserts was an earlier unlawful entry so they had Down draw a map with Pulkkinen filling in details. (Resp. SMF ¶ 63.) While Bloomquist cites to an exhibit that appears to be maps of the residence (Docket No. 284, Ex. 11) these maps alone do not support his conjecture about the earlier entry.

[28] Bloomquist asserts that there was no rope or cord, but a string (Resp. SMF ¶ 63) but his record evidence only supports the conclusion that one officer described the device as "a novelty firecracker type popper" (Docket No. 284, Ex. 3.)

[29] Bloomquist denies that Down could believe this as "there was no way the door could have appeared to be booby-trapped" (Resp. SMF ¶ 65) but his record citations do not support his reasons for this contention.

numerous items from the gun room and transported those items to the Sheriff's Office. (Defs.' SMF ¶ 68; Resp. SMF ¶ 69.) The officers secured the weapons and ammunition from the gun room for safety reasons. (Defs.' SMF ¶ 69.)[30] Sheriff Dion was never advised by any officer of the Sheriff's Office that the Sheriff's Office did not have the right to secure the weapons for safety reasons. (Defs.'s SMF ¶ 70; Dion Aff. ¶ 23.) [31]

Bloomquist contacted his residence while the officers were there and spoke with Detective James Langella. (Defs.'s SMF ¶ 71; Resp. SMF ¶ 72.) Bloomquist told Detective Langella that he would secure the weapons he had with him and come to the Baldwin residence that evening. (Defs.'s SMF ¶ 72; Resp. SMF ¶ 73.) Bloomquist did not come to the residence while the officers were there on November 27, 2001. (Defs.'s SMF ¶ 73; Resp. SMF ¶ 74.) Bloomquist was not held for questioning by the officers at the Baldwin residence. (Defs.'s SMF ¶ 74; Resp. SMF ¶ 75.) The officers left the Baldwin residence in the early morning hours of November 28, 2001. (Defs.'s SMF ¶ 75; Resp. SMF ¶ 76.) As of the morning of November 28, 2001, Bloomquist had not turned himself into the Sheriff's Office. (Defs.'s SMF ¶ 76; Resp. SMF ¶ 77.)

During the morning of November 28, 2001, Sheriff Dion notified the media that he was holding a press conference later that day. (Defs.'s SMF ¶ 77.) Bloomquist qualifies this statement with the assertion that Dion, in and through Chief Fagliano, had "direct" contact with the media as early as 8 p.m. on the evening of November 27, 2001. (Resp. SMF ¶ 78; Docket No. 284, Ex. 13.) Dion did not call for a press conference

---

[30] Bloomquist offers a long denial paragraph apropos this statement (Resp. SMF ¶ 70) but his record support is an exhibit that he never filed with the court (Docket No. 284, Ex. 12) and a footnote in his amended complaint.

[31] Bloomquist denies this statement with an assertion that on February 7, 2002, in Bloomquist's presence an (unidentified) officer told Dion that he did not have authority to take the weapons and Dion replied that he did not care, he wanted the officers to take them all. (Resp. SMF ¶ 71.) However, his own affidavit statement upon which Bloomquist relies (Bloomquist Aff. ¶ 71) is not admissible for purposes that Bloomquist envisions.

before the officers went to the Baldwin residence on November 27, 2001. (Defs.'s SMF ¶ 78.)[32]   At the press conference on November 28, 2001, Dion read a prepared statement. (Id. ¶ 79; Resp. SMF ¶ 80.)   The contents of Dion's statement to the media are reflected in a printed press release attached to Dion's Affidavit as Exhibit 1, the contents of which are incorporated into this statement of fact by reference. (Defs.'s SMF ¶ 80; Dion Aff. Ex. 1.)[33]

Bloomquist voluntarily surrendered to Detective Down on the evening of November 28, 2001. (Defs.' SMF ¶ 81; Resp. SMF ¶ 82.)   His arrest was not pursuant to an arrest warrant. (Defs.' SMF ¶ 82.)   At the time he surrendered to Down, he (or his attorney) gave Down a protection from abuse order he had obtained against Pulkkinen on November 20, 2001. (Id. ¶ 83.)   The Sheriff's Office typically records all protection from abuse orders that it receives for service on the date the order is received. (Id. ¶ 84.)   The Sheriff's Office's records do not reflect that Bloomquist's protection order was received by it for service before the evening of November 28, 2001. (Id. ¶ 85.)[34] Down served Pulkkinen's protection order on Bloomquist on the evening of November 28, 2001 (Defs.' SMF ¶ 86; Resp. SMF ¶ 87) and he served Bloomquist's protection order on Pulkkinen on the evening of November 28, 2001 (Defs.' SMF ¶ 87; Resp. SMF ¶ 88).

Bloomquist was held overnight at the Cumberland County Jail from November 28, 2001 to November 29, 2001. (Defs.' SMF ¶ 88; Resp. SMF ¶ 89.) Bloomquist was released on his own recognizance on November 29, 2001, and was not incarcerated with

---

[32]   Bloomquist purports to qualify this statement (Resp. SMF ¶ 79) but the cited exhibit (Docket No. 284, Ex. 10) does not support the articulated qualification.

[33]   Bloomquist hazards a qualification to this statement but his record citation is "See Plaintiff's Exhibit." (Resp. SMF ¶ 81.)

[34]   With respect to Paragraphs 82 through 85 Bloomquist's attempted responses to these statements all depend on an affidavit of his attorney identified as Exhibit 14 to his statement of additional facts that he has not filed with the court.  (Resp SMF ¶¶ 82-85.)

regard to the aggravated assault charges or the cultivation of marijuana charges after that date. (Defs.' SMF ¶ 89.)  Bloomquist considers that the fact that he had to pay a $20,000 bond means that he was not released on his own recognizance.  (Resp. SMF ¶ 90; Docket No. 284, Ex. 15.)[35]  Bloomquist was never held as a convicted inmate with regard to the assault or cultivation charges. (Defs.' SMF ¶ 90; Resp. SMF ¶ 91.)

Bloomquist has no information to suggest that Sheriff Dion, Captain Joyce, or Detective Down influenced the conditions placed on Bloomquist's bail.  (Defs.' SMF ¶ 91.)[36]  Bloomquist's bail was set by the Court. (Defs.' SMF ¶ 91; Resp. SMF ¶ 92.) Down's incident report reflected that Bloomquist was being arrested for aggravated assault and cultivation of marijuana. (Defs.' SMF ¶ 93; Down Aug. 4, 2004, Aff. ¶ 11 & Ex. 2.)[37] Bloomquist was charged by the District Attorney's office with twelve counts of assault and two counts of terrorizing. (Defs.' SMF ¶ 94; Resp. SMF ¶ 95.)  Several weeks later, Bloomquist was charged with one count of cultivation of marijuana. (Defs.' SMF ¶ 95; Resp. SMF ¶ 96.)   It was up to the District Attorney's office to decide what charges to move forward on.  (Defs.'s SMF ¶ 96; Resp. SMF ¶ 97.)

The Sheriff's Office released most of Bloomquist's weapons to Bloomquist's agent on or about February 7, 2002, after the Court permitted the return to occur and after

---

[35]    Bloomquist also states that on December 31, 2001, he was subjected to additional and bizarre bail conditions but there is no record support apropos this contention.

[36]    Bloomquist tries to qualify this but without a record citation.  (Resp. SMF ¶ 91.)

[37]    Bloomquist denies this statement but he seems to think that the fact that the incident report was filled out before he surrendered himself has some significance vis-à-vis what charges he was faced with. (Resp. SMF ¶ 93.) For record support Bloomquist cites to Pulkkinen's initial statement to the police (Down July 13, 2004, Aff, Ex. A) which seems inapposite to this question.  He claims that he was not told at the time of his surrender that he was charged with drug-related charges, but he does not cite to any record support, such as his affidavit, in support of this proposition.

the ATF notified the Sheriff's Office that the weapons could be returned. (Defs.' SMF ¶ 97.)[38]  The remaining three weapons were released to Bloomquist's agent after the ATF notified the Sheriff's Office that the weapons could be returned. (Defs.' SMF ¶ 98; Resp. SMF ¶ 99.)

Bloomquist has no information to suggest that Sheriff Dion, Captain Joyce or Detective Down took any steps to contact the Carroll County Sheriff's Office about picking up Bloomquist's weapons. (Defs.' SMF ¶ 99; Bloomquist Dep. at 133- 134.)[39] Sheriff Dion did nothing to impede the return of Bloomquist's property. (Defs.' SMF ¶ 100.)[40]

Captain Joyce reported Bloomquist's reported bizarre behavior to the ATF and requested that that office perform a psychological profile. (Defs.' SMF ¶ 101.)[41] Detective Down received queries from an officer of the Carroll County Sheriff's Office concerning Bloomquist, Scott Floccher and Susan Benfield and security precautions for a hearing that was upcoming in Carroll County Court. (Defs.' SMF ¶ 102.)[42]  According to the defendants, Detective Down relayed certain information he has received as part of his investigation so that the Carroll County deputy could make whatever safety precautions

---

[38]     Bloomquist qualifies this assertion arguing that the ATF played no role in notifying the Sheriff's Office that the weapons could be returned.  (Resp. SMF ¶ 98.)  However, his record citation is only to the Court Order (Docket No. 284, Ex. 16) which alone does not support the contention that Bloomquist makes.

[39]     Apparently Bloomquist still as no evidence on this score as his record citation is: "See Plaintiff's Exhibit."  (Resp. SMF ¶ 100.)

[40]     Bloomquist (Resp. SMF ¶ 101) cites to Exhibit 14 listed as the affidavit of Robert Andrews, Esq., as support for his additional statement of facts (Docket NO. 284) but he never filed that exhibit with the court.

[41]     Bloomquist admits that Joyce wrote the letter to the ATF, but argues strenuously that Joyce had no good faith basis to question Bloomquist's competency.  (Resp. SMF ¶ 102.)  He cites various reasons as to why Joyce should have known better – such as the fact that Pulkkinen's allegations of Bloomquist cross-dressing and pressuring of Pulkkinen to apply make-up were bizarre and even if true this behavior would not threaten public safety – but Bloomquist's only record support for these examples is the Joyce letter itself (Docket No. 264, Ex. G).

[42]     Bloomquist's attempt to qualify this statement fails but his only record citation is: "See Plaintiff's Exhibit."

17

he felt were necessary. (Defs. SMF ¶ 103.) Down did not intend for his comments to be used in court and did not testify at any Carroll County hearing. (Id. ¶ 104.)  Bloomquist has no information that Sheriff Dion or Captain Joyce had any contact with Carroll County concerning Bloomquist. (Id. ¶ 105.)

Bloomquist counters these statements by citing a memorandum by the Carroll County Sheriff's Office and a photocopy of an affidavit of Douglas D. Hendrick, Esq. that, quite irrelevantly, gives Hendrick's views as to why the information in the memorandum is inaccurate.  (Resp. SMF ¶¶ 103 & 104; Docket No. 264, Exs. I & J.)   He contends that the information in the memorandum was for the most part unrelated to legitimate law enforcement concerns vis-à-vis the New Hampshire court proceedings.[43]

Sheriff Dion did not tell the press that Bloomquist lost a student attorney position with the District Attorney's Office because of a background check done by the Bridgton Police Department. (Defs.' SMF ¶ 106.)[44]

The DA dismissed the aggravated assault charges after Pulkkinen stated that she did not wish to press charges. (Id. ¶ 107.)[45]  The DA dismissed the marijuana cultivation charges after evidence obtained from the Baldwin residence was excluded by the Maine

---

[43]      Bloomquist also argues that Down should have known that some of the information was inaccurate (Resp SMF ¶¶ 104 & 105) but the exhibits cited are inapposite.  He also maintains that he "has yet to receive further information that has been deliberately obliterated or removed from the records," and that there may well have been contact between Joyce and Dion and the New Hampshire authorities.  (Id. ¶ 106.)  Bloomquist has had ample time for discovery and this civil suit is well beyond the point that Bloomquist can proceed on unsubstantiated conjecture.

[44]      Bloomquist quibbles at length with his assertion but his record citation is to a tape recording and partial transcript of a telephone conversation between Pulkkinen and Booth.  (Resp. SMF ¶ 107; Docket No. 264 Exs. D & R.)

[45]      Bloomquist purports to deny this statement (Resp. SMF ¶ 108) but his record support are letters from his attorney in the fall of 2002 which are aimed at retrieving photographs of a woman in bondage (Docket No. 264, Ex. K).

District Court. (Id. ¶ 108; Resp. SMF ¶ 109.) Bloomquist's guilt or innocence with regard to all of these charges was never adjudicated. (Resp. SMF ¶ 109.)[46]

Bloomquist is unaware of any written policies of Cumberland County concerning discriminatory treatment of males in domestic violence situations. (Defs.' SMF ¶ 110.) Bloomquist's belief that a practice of discriminatory treatment against males in domestic violence situations is based upon his experience in this case and an alleged statement made by Anne Berlind, a Cumberland County Assistant District Attorney. (Id. ¶ 111). Bloomquist is not aware of any instances (other than what he alleges happened to him) of the Sheriff's Office deputies refusing to serve protection orders on behalf of males. (Id. ¶ 112.)  In fact, the Sheriff's Office does not have a custom, policy or practice of treating males differently from females with regard to enforcing, prosecuting, or investigating incidents of domestic violence. (Id. ¶ 113.)[47]

Bloomquist is unaware of any written policies of Cumberland County concerning discriminatory treatment of males and their Second Amendment rights. (Id. ¶ 114.) [48] The Sheriff's Office has no policy or practice to take weapons from citizens for no reason whatsoever. (Id. ¶ 115.)[49]

---

[46]     Bloomquist denies this statement on the grounds that it is misleading.  (Resp. SMF ¶ 110.)  He asserts that "there was never any probable cause to believe a crime had been committed or that Plaintiff had committed any crime of domestic violence or assault." (Id.)  However, he cites to what appears to be a copy of the front of the complaint against him which indicates that probable cause was found and that the state dismissed the assault and terrorizing charges "due to insufficient evidence and due to victim's request." (Docket No. 264, Ex. Q.)

[47]     Bloomquist qualifies this statement with a sweeping statement about a de facto policy of discrimination and an inherent bias towards males who abuse females on the part of police officers and the general public.  (Resp. SMF ¶¶ 111-114.)  However, Bloomquist provides no record citation for these claims, asserting only that the record speaks for itself.  However, there is no record on this score.

[48]     Again Bloomquist, without any record citation, asserts that there was a de facto policy that favored females over males apropos confiscating weapons to the detriment of  Second Amendment rights (Resp. SMF ¶ 115) and, again, he provides no evidentiary support for this contention.

[49]     Bloomquist asserts that he was present when other Sheriff's Department officers stated that Dion had a policy to take every weapon he can get no matter what.  (Resp. SMF ¶ 116.)  However, even if he could rely on his own affidavit statement to this affect to deny this paragraph, he cites to Paragraph 8 of his

Bloomquist was not prevented from filing lawsuits as a result of the defendants' conduct. (Id. ¶ 117.)[50]   Bloomquist was never arrested by the Sheriff's Office based on statements he made. (Id. ¶ 118.)  Bloomquist was never preemptively prevented from speaking out by the Cumberland County Defendants. (Id. ¶ 119.)  Bloomquist has no evidence of anyone at Cumberland County willfully destroying evidence. (Id. ¶ 120.)  Bloomquist qualifies this statement, suggesting: "The circumstantial evidence is such that it is clear that the CCSO Defendants are willfully destroying evidence and willfully removed the videotape to prevent Plaintiff from having it." (Resp. SMF ¶ 123.)  He cites to the police report narrative of Deputy Thorpe.  (Docket No. 284, Ex. 3.)  In this report Thorpe indicates that he assisted the evidence tech in filming during the search and made a video.  (Id.)

The Sheriff's Office does not have a custom, policy or practice of creating false criminal histories and creating false or nonexistent criminal investigations about defendants whom they know are innocent. (Id. ¶ 121.)[51]  It does not have a custom, policy or practice of violating individuals' First Amendment rights. (Id. ¶ 122.)[52]  It does not

---

affidavit which asserts only that Pulkkinen was afraid of police and did not want the police to become involved.  (Bloomquist Aff. ¶ 8.)

   The defendants assert that Bloomquist agrees that safety reasons can justify the confiscation of weapons even when those weapons are not evidence of a crime. (Defs.' ¶ SMF ¶ 116; Bloomquist Dep. at 85.)  However, I cannot see how this is in any way material to the legal questions before me.

[50]   Bloomquist denies this paragraph, arguing he was prevented from filing lawsuits and having them served.  (Resp. SMF. ¶ 118.)  His record support for his various assertions as to how these defendants impeded his litigation is a letter by Pulkkinen to Berlind dated March 29, 2002 (Docket No. 264, Ex. E) and pre-search photos of his log book (id. ¶ Ex. N).  These two exhibits fall far short of supporting any of Bloomquist's complaints in his answering paragraph.

[51]   Bloomquist denies this paragraph, going on at some length as to how the department has a de facto custom of creating false criminal histories, etcetera. (Resp. SMF ¶ 124.)  However, his record support for this denial is the Carroll County Sheriff's Office security memorandum (Docket No. 264, Ex. I) and a photocopy of an affidavit of his attorney, Douglas Hendrick, (Id. Ex. J).  These documents are not cognizable evidentiary support for the various grounds for denial outlined by Bloomquist.

[52]   Bloomquist retorts with a denial, arguing that the Sheriff's Office does have a policy and practice of violating First Amendment rights but proffers no record evidence to rebut the defendants' record citation. (Resp. SMF ¶ 125.)

have a custom, policy or practice of conducting unlawful searches and seizures. (Id. ¶ 123.)[53]  It does not have a custom, policy or practice of pursuing malicious prosecutions. (Id. ¶ 124.)[54]  It does not have a custom, policy or practice of providing less protection to male victims of domestic violence than to female victims. (Id. ¶ 125.)[55]  It does not have a custom, policy or practice of falsifying evidence or creating false criminal histories. (Id. ¶ 126.)[56]

With regard to the destruction of property and failure to secure the Baldwin residence, Bloomquist is relying upon events that allegedly took place on November 27, 2001, or during the early morning hours of November 28, 2001. (Defs.' SMF ¶ 127.)[57] Bloomquist's trespass claim is based upon the Sheriff's Office entry into the Baldwin residence on November 27, 2001. (Id. ¶ 128; Resp. SMF ¶ 131.) Bloomquist's emotional distress claims are based upon the same events underlying the other tort claims. (Defs.' SMF ¶ 129.)[58]

---

[53]      Bloomquist cites to the order by the state court suppressing the evidence gained in the search of his residence as evidence and arguing that the defendants should have known better in his case. (Resp. SMF ¶ 126; Docket No. 264, Ex. P.)  This falls far short of creating a material dispute about a custom or policy theory of recovery.

[54]      Yet again, on the sole basis of his case, Bloomquist argues that the defendants' had a custom and policy of malicious prosecution as demonstrated by their pursuit of charges against him even though, he alleges, Pulkkinen told them that he never used force against Pulkkinen without provocation. (Resp. SMF ¶ 127.) Not only does this not begin to create a dispute of fact material to a custom or policy theory of recovery, the evidence Bloomquist relies upon (Docket No. 264, Exs. D & R) is not admissible for the purposes that Bloomquist envisions.

[55]      And again, on the sole basis of the charges against him, Bloomquist argues that the defendants had a custom and policy of selective prosecution based on gender as demonstrated by their pursuit of charges against him even though, he alleges, Pulkkinen told them that he never used force against Pulkkinen without provocation. (Resp. SMF ¶ 128.) Not only does this not begin to create a dispute of fact material to a custom or policy theory of recover, the evidence Bloomquist relies upon (Docket No. 264, Exs. D & R) is not admissible for the purposes that Bloomquist envisions.

[56]      And, yet again, Bloomquist urges that the facts of his own case establish evidence of a custom and policy of falsifying evidence and creating fake histories for individuals they were "trying to get." (Resp. SMF ¶ 129; Socket No. 264 Exs. D, R & B.)

[57]      Bloomquist provides no record citation in his effort to qualify this statement. (Resp. SMF ¶ 130.)

[58]      Bloomquist qualifies this assertion by indicating that his emotional distress claim is based on the events underlying the other tort claims, as well as unspecified events that followed, and cites his affidavit

For the periods of January 1, 2001, through December 31, 2001, and January 1, 2002, through December 31, 2002, Cumberland County was a member of the Risk Management Pool. (Defs.' SMF ¶ 130; Resp. SMF ¶ 133.) The Member Coverage Certificates issued to Cumberland County for those time periods describe the coverage available to Cumberland County under the Risk Management Pool. (Defs.' SMF ¶ 131; Resp. SMF ¶ 134.) True and accurate copies of the Member Coverage Certificates are attached to Peter Crichton's Affidavit as Exhibits A and B, and the text of those Exhibits is incorporated herein. (Defs.' SMF ¶ 132; Resp. SMF ¶ 135.) Apart from the coverage afforded under the Risk Management Pool, the County did not have any liability insurance coverage for the calendar years 2001 and 2002. (Defs.' SMF ¶ 133; Resp. SMF ¶ 136.)

### *Recommended Disposition on Bloomquist's Claims against the County Defendants*

The County, Dion, Down, and Joyce have stayed out of the fray during an initial round of dispositive motions in this multi-defendant suit, so this is the first time these defendants have joined issues with Bloomquist,. They have identified twenty-four counts against them implicating federal rights: equal protection/non-discrimination, First Amendment, Second Amendment, Fourth Amendment, Sixth Amendment, Eighth Amendment, Fourteenth Amendment, a constitutional right to privacy, and 18 U.S.C. § 922. They also discern ten state law counts as being brought against them.

In his response to the defendants' motion Bloomquist does not argue that the defendants have in anyway mischaracterized -- in a manner unfavorable to him[59]-- the

---

without offering a paragraph reference. (Resp. SMF ¶ 132.) I am not sure what Bloomquist hoped to achieve by this qualification but he certainly gains nothing by it.

[59]     Bloomquist does state that in some instances the defendants have responded to counts that he did not intend or no longer intends to pursue vis-à-vis them.

extent to which the complaint pertains to them. Therefore, even if it is possible to view the complaint as stating yet more counts against these defendants I limit Bloomquist to those counts identified by the defendants in their summary judgment motion. With respect to the counts that the defendants identified as going against them to which Bloomquist has offered no defense to summary judgment, I will recommend below that the Court grant the defendants summary judgment in view of Bloomquist's silence.

With respect to the counts that charge the County itself with liability:

> In Monell v. N.Y. City Dept. of Social Servs., 436 U.S. 658 (1978), the Supreme Court established both the fact that "municipalities and other local government units [were] included among those persons to whom § 1983 applies," id. at 690, and the limits of such actions. Most importantly, Monell held that "a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691. Instead, municipal liability exists only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694. We have identified three different ways in which a municipality or other local governmental unit might violate § 1983:(1) through an express policy that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority." McTigue v. City of Chi., 60 F.3d 381, 382 (7th Cir.1995).

Calhoun v. Ramsey, 408 F.3d 375, 379-381 (7th Cir. 2005).

## A.    *Equal Protection/Non-discrimination- Counts One and Twenty-Nine*

Count One asserts that Cumberland County has a policy, practice, and custom of subjecting males to disparate and discriminatory treatment with respect to domestic violence matters. (Am. Compl. ¶ 217.) Count Twenty-nine alleges that Cumberland County has a policy or custom of providing less protection to male victims of domestic violence than to females. (Id. ¶ 412.)

Bloomquist goes on at some length in his opposition memorandum as to why he believes that these equal protection counts have merit.  (Opp'n Mem. Mot. Summ. J. at 13-20.)  However, to sustain a claim of this sort apropos a motion for summary judgment Bloomquist must generate a genuine dispute of fact material to the question of whether the County has a custom, policy, or practice that was the moving force behind the alleged constitutional violation.

Bloomquist makes it clear that he believes that the County has a "de facto," as opposed to an express, "policy, practice, and custom of discrimination against males in favor of females in Cumberland County."  (Id. at 20.)  "[A]n act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."  Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 404 (1997) (citing Monell v. Dep't Soc. Servs. City of N.Y., 436 U.S. 658,  690-691 (1978), in turn, citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-168 (1983)). To proceed on such a theory Bloomquist must produce,

> evidence that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident that Brown held cannot support municipal liability.

Calhoun, 408 F.3d at 380.

Assuming for the sake of argument that a County defendant violated Bloomquist's right to equal protection, he has not presented properly supported evidence that would get him by the standard for holding the County liable on these counts.   For instance, Bloomquist states in his opposition memorandum that he "learned and heard first hand

from Defendant Berlind that the DA's office has a policy, practice, and custom of enforcing domestic violence charges against males to the detriment of males and favoring the unverified statements of females over males." (Opp'n Mem. Mot. Summ. J. at 14.) Bloomquist's affidavit statement is inadmissible to prove the existence of such a policy and it is certainly not sufficient to create a genuine dispute of fact as to this claim. Otherwise Bloomquist faults Down for believing Pulkkinen, her attorney,[60] and Benfield rather than Bloomquist (id. at 14-16, 18-20); Joyce's decision to seek a psychological profile of Bloomquist based on this information from Pulkkinen, her attorney, and Benfield[61] (16-17); Down and Joyce's decision vis-à-vis audio tapes supplied by Bloomquist allegedly of Pulkkinen's abuse of Bloomquist (id. at 17-18);[62] and Dion's decision to serve the protective order on Bloomquist on November 27, 2001, even though he allegedly knew Bloomquist was not home (id. at 18).[63] Nothing in the record above furthers Bloomquist's claims pertaining to these two counts.

---

[60]   Apropos Pulkkinen's attorney, Bloomquist states,

the evidence clearly shows that Defendant Down was swayed by Plaintiff's ex-wife's attorney, Judith Wohl's, bizarre and lurid tales of sexual assault against the woman depicted in the photographs. The pictures in and among themselves are no indication of any sexual assault as the only one showing the woman's face, shows that she is smiling and clearly enjoying the events of the moment and not in any kind of pain, shock, surprise, fear, or anything to show she was an unwilling participant.

(id. at 16.)

[61]   Bloomquist cites to his efforts to get the DA's office and the Portland Police Department to press charges against Benfield and Floccher for criminal threatening and violating protection from harassment orders obtained by Bloomquist and Floccher's ex-wife. (Id. 19-20.) The most glaring problem with this argument as to the County defendants' liability is that they were not contacted by Bloomquist. Bloomquist also seems to overlook the fact that there is gender equity in not charging Floccher or Benfield and in not enforcing Bloomquist's or Floccher's ex-wife's protection orders.

[62]   Acknowledging that he did not press charges against Pulkkinen, Bloomquist "submits" that if a woman had produced such tapes showing a male was attacking her, etc.., " there is no question that the male person would have been prosecuted no matter what the complaint was made" to the authorities. (Id.)

[63]   Bloomquist believes that this decision "clearly shows the discriminatory intent and purpose of Defendants' bias towards males." (Id.)

It is patently clear that on the record before me Bloomquist has not created a genuine dispute of material fact as to his two counts charging the County with having an unwritten policy of discriminating against men involved in domestic violence incidents.

**B.**      **First Amendment -  Counts Fourteen and Fifteen**

In Count Fourteen of his amended complaint Bloomquist alleges that Dion, Down, and Joyce (as well as other defendants) deprived him of his First Amendment rights by:

> intentionally and maliciously bringing fourteen unwarranted criminal charges against Plaintiff in an effort to chill his ability, willingness, and credibility to continue to advocate on behalf of pro-second amendment groups; to bring a lawsuit for Plaintiff's unlawful termination of employment; to bring other lawsuits then pending against Cumberland County to bring exposure to information that Plaintiff learned of Defendant Anderson's cover-ups of serious misconduct by members of her staff, including but not limited to facilitating the sale of cocaine and directly lying to the trial judge in court.

(Am. Compl. ¶ 309.)

The First Circuit has indicated that in a First Amendment retaliation claim plaintiff must allege that his speech "was in fact chilled or intimidated" by the defendant's complained-of action.  Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir. 1989).  A mere allegation of harm is not enough, id.  "Where a chilling effect is speculative, indirect or too remote, finding an abridgment of First Amendment rights is unfounded."  Id. (citing United States v. Harriss, 347 U.S. 612, 626 (1954)).[64]

---

[64]      Other circuits have adopted a three-pronged test in which a plaintiff must prove "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."  Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002) (endorsing Carroll v. Pfeffer, 262 F.3d 847, 850 (8th Cir.2001), Smith v. Plati, 258 F.3d 1167, 1176 (10th Cir.2001) and Lucas v. Monroe County, 203 F.3d 964, 973 (6th Cir.2000)); accord Bennett v. Hendrix, 423 F.3d 1247, 1250 - 51 (11th Cir. 2005). The Eleventh Circuit indicated in a footnote that it was not clear to it that the First Circuit had adopted a subjective "actual chill" standard in Curley.  Id. at 1251 n. 4.

The defendants argue in their motion for summary judgment that Bloomquist must "show that any protected speech was in fact 'chilled'" by something Berlind did (County Mot. Summ. J. at 10-11). As with his equal protection claim, Bloomquist goes on at length complaining of the conduct of these and other defendants apropos their embroiling of Bloomquist in legal proceedings. (Opp'n Mem Mot. Summ. J. at 21-25.) With respect to chilling his speech he argues: "Defendants Down and B[a]rry's false statements that there was an ongoing sexual investigation and that Plaintiff was the suspect was all designed, timed, and intended to impede and chill Plaintiff's abilities to move forward with lawsuits against them." (Id. at 21.) "In fact," Bloomquist continues, he was "chilled by them and only filed his lawsuits at the last possible date and in one case, is still waiting to have them served, and in the current case did not dare have them have it served until he was fully sure the N.H. Protection from Stalking Order fraudulently obtained against him with the direct assistance of Defendant Down and others no longer in effect in Maine or New Hampshire." (Id. 21-22.) Bloomquist indicates that he delayed fling his (unidentified) lawsuits out of fear of retaliation by the Defendants. (Id. at 22.) As it relates to these defendants, Bloomquist states that he had already served notice on the Cumberland County Defendants about his lawsuit pertaining to the April 11, 2001, Bridgton Courtroom assault giving them incentive to retaliate against Bloomquist. (Id. at 23.) However, Bloomquist does not have record evidence of this lawsuit and its travel.[65]   And he does not articulate how his efforts to sue these defendants "was in fact chilled or intimidated" by their conduct vis-à-vis the Pulkkinen

---

[65]     The lawsuit pertaining to the Bridgton incident was removed to this court on June 20, 2002, (Civil No. 02-137-P-H), and concluded on June 20, 2003.

investigation.   In my view Bloomquist has not generated the material facts adequate to support Count Fourteen, let alone a statement of facts <u>supported by record evidence</u>.

In Count Fifteen Bloomquist alleges that "all the Defendants" deprived him of his right to travel and assemble "by their tortouos [sic] acts in obtaining a tainted New Hampshire Protection from Stalking Final Order against Plaintiff."  (Am. Compl. ¶¶ 316, 317.)  Bloomquist does not defend summary judgment on this count in his opposition memorandum (<u>see</u> Opp'n Mem. Mot. Summ. J. at 21-25) and the defendants have demonstrated their entitlement to judgment as a matter of law as to this count (<u>see</u> Mot. Summ. J. at 11.)

## C.     *Second Amendment – Counts Two and Sixteen*

In Count Two of his amended complaint Bloomquist alleges that Cumberland County has a policy, practice, and custom of depriving male citizens of their individual Second Amendment Rights without due process.  (Am. Compl. ¶ 224.)  In Count Sixteen he charges "each and every Defendant" with "unlawfully conspiring to deprive Plaintiff of his Second Amendment rights or to question Plaintiff's right to keep military weapons."  (<u>Id.</u> ¶ 323.)  He also asserts that Dion, Joyce and Down (as well as others) deprived him of his "'right to keep and bear arms'" during the search of his residence and by seizing his firearms.  (<u>Id.</u> ¶ 324.)

The defendants assert that both counts fail because the law in this circuit is that there is no individual Second Amendment right to bear arms.  (Mot. Summ. J. at 12 -14.)  Bloomquist retorts: "Recent court cases in the Federal juris prudence show that the right of the people meant the individual people, not the collective right."  (Opp'n Mem. Mot. Summ. J. at 26.)  However, he has not directed the court to any of these decisions.

It is true that the First Circuit's <u>Thomas v. Members of City Council of Portland</u>, relying on <u>United States v. Miller</u>, 307 U.S. 174, 178 (1939), supports the defendants' position. 730 F.2d 41, 42 (1st Cir. 1984). <u>See</u> <u>also</u> <u>Lewis v. United States</u>, 445 U.S. 55, 65 n.8 (1980); <u>but</u> <u>see</u> <u>Printz v. United States</u>, 521 U.S. 898, 932 & ns. 1, 2 (1997) (Thomas, J., concurring).   After reviewing these cases and the other authorities cited by the defendants, I conclude that with respect to Count Sixteen against the individual defendants, Dion, Down, and Joyce are entitled to summary judgment as they have asserted a qualified immunity defense (<u>see</u> Mot. Summ. J. at 7-8) and it is clear that -- if Bloomquist has a constitutionally protected individual right under the Second Amendment -- it is not a right that was (or is) clearly established.  <u>See</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002); <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001); <u>Savard v. Rhode Island</u>, 338 F.3d 23, 27 (1st Cir. 2003); <u>see</u> <u>also</u> <u>Rosseau v. Haugen</u>, 543  U.S. 194, 600-01 (2004) (Breyer, J, joined by Scalia, J. and Ginsburg, J., concurring) (observing that, while <u>Saucier v. Katz</u>, 533 U.S. 194 (2001) requires that lower courts decide the constitutional question before deciding the qualified immunity question, the Supreme Court should reconsider the issue because "a rigid 'order of battle' makes little administrative sense and can sometimes lead to a constitutional decision that is effectively insulated from review").  And, as to the County's liability under Count Two, as with his equal protection/anti-discrimination counts, Bloomquist has utterly failed to introduce record evidence to support a reasonable inference that there is a custom or policy. <u>See</u> <u>Brown</u>, 520 U.S. at 404;  <u>Calhoun</u>, 408 F.3d at 379-381.

**D.     Fourth Amendment – Counts Eighteen, Nineteen, Twenty, Twenty-One, Twenty Three, Twenty-Four, Twenty-Five, and Twenty-Six**

The facts material to Bloomquist's Fourth Amendment claims are that in Pulkkinen's interview with Down, she reported that she and Bloomquist lived at a residence on Sunrise View Road in Baldwin, Maine, that she owned "the Baldwin residence," and that Pulkkinen was, in fact, the record title holder.  Pulkkinen did tell Down that a basement room containing various weapons and ammunition and another room were locked and only Bloomquist had access to these rooms.  Pulkkinen did tell Down that she had gained access to the gun room and had taken photographs (and she provided the roll of film with the photos to Detective Down).

Pulkkinen, as owner of the Baldwin residence, had given the Sheriff's Office consent to search all parts of the residence and Down contends that he believed that she had the ability to authorize a search of all parts of the residence and property.  Pulkkinen completed a form on November 26, 2001, that evidenced her consent to the Sheriff's Office to search all parts of the Baldwin residence. And on November 27, 2001, Pulkkinen again gave the Sheriff's Office consent to search all parts of the residence. And Pulkkinen completed a form on November 27, 2001, that evidenced her consent to search all parts of the Baldwin residence.  Bloomquist does maintain that he had exclusive access to the two rooms in the basement and that Pulkkinen had no access.  And the state court did determine that the search of those rooms fell afoul of the Fourth Amendment.

Down and Officer Eric Marston found a boiler room in the basement of the Baldwin residence that was unlocked. The boiler room was the one Pulkkinen had stated that Bloomquist was using to grow marijuana.  Inside the boiler room, Down found twelve marijuana plants, material to grow marijuana, and apparatus to grow marijuana.

The twelve marijuana plants, material to grow marijuana, and apparatus to grow marijuana were cataloged by the officers and transported to the Sheriff's Office. The officers found a door behind a bookcase, as Pulkkinen had described. The door had a rope or cord attached to it on the right side of the door jamb near the top and appeared to be booby-trapped. The Maine State Police Bomb Unit disarmed the device, which turned out to be a novelty noisemaker; Bloomquist had rigged the door with a mechanism that would have made some sort of noise if the door was opened.

In his opposition memorandum Bloomquist makes clear that his Fourth Amendment claims,

> are not for the arrest from which no doubt probable cause would of existed simply based upon the statements, but from the unlawful search of the rooms exclusively controlled by Plaintiff and the unlawful seizure of Plaintiff's weapons found there which all happened well before any probable cause developed through Plaintiff's ex-wife's statements to believe he had assaulted his wife.

(Opp'n Mem. Mot. Summ. J. at 30.)[66]   It is also now clear that this claim runs against Down alone.

Understandably, Bloomquist believes that the order of the state court judge establishes that his Fourth Amendment rights were violated by the search of the two rooms in question. The order on that motion stated as relevant:

> The Defendant and his wife were involved in an ongoing domestic disturbance that resulted in involvement by the Cumberland County sheriff's Department, Deputy Dan Down[] arrived at the Defendant's residence where he met with defendant's wife who gave her consent to search the house except for two rooms in the basement. She told Deputy Down[] that the Defendant had exclusive control over those rooms and that she had no access to them. The rooms were normally locked, although Deputy [D]own[] was able to open the doors to the rooms when

---

[66]   He also maintains that these defendants had no legal right to hold the firearms after they were seized as the protection from abuse order was allegedly vacated mutually on December 13, 2001. (Id. at 30.) However, Bloomquist has provided no record support for that fact.

he found them closed.  Deputy [D]own took possession of evidence from those rooms.

Defendant's wife did not have authority to give consent to Deputy Down[] to search the two rooms that were in the exclusive control of the Defendant.  While she had been in the rooms in the past, she had agreed with the Defendant that he had the right to exclude her from those rooms and he in fact did so in ordinary circumstances.  The fact that some of the house utilities were located in the rooms, or the fact that the doors were either unlocked or not securely locked on the day of the search does not change the fact that Defendant's wife had no authority to give consent to search the two rooms.  United States v. Matlock, 415 U.S. 164 (1974); State v. Pinegar, 583 SW2d 217 (Mo. App. 1979).

No other exceptions to the requirement that the Deputy obtain a search warrant before searching the two rooms under Defendant's control apply in this case.  The Deputy was clearly told that the Defendant had exclusive control of the two rooms and cannot claim to have relied in good faith on the erroneously given consent of Defendant's wife who seemed to have authority to give consent. No exigent circumstance existed since the Deputy and others with him clearly had control of the house and could have excluded the Defendant for the time necessary to obtain a warrant without risk that any evidence would be destroyed.

(Order Mot. Suppress at 1, Docket No. 264, Ex. P.)

In making its determination as to whether Bloomquist can proceed to trial on this Fourth Amendment claim the court is not bound by the state court's finding as a matter of fact that Down was not reasonable in relying on his belief that Pulkkinen had consented to the search of the two rooms. See Bilida v. McCleod, 211 F.3d 166, 170 (1st Cir. 2000). The facts I consider are those in this summary judgment record, not the facts recited by the state court judge.

Although the state court's analysis turned on whether Pulkkinen had apparent authority to consent to the search of the two rooms, I conclude, based on this record, that Bloomquist has not created a genuine dispute of fact that Pulkkinen had actual authority to consent to the search of the entire residence, including the two rooms in question. There is no dispute that Pulkkinen was the record title owner of the property.  While she

did tell Down that the two rooms were locked and only Bloomquist normally had access
to these rooms this does not mean that she did not have *legal* authority to access these
rooms.  Indeed, as she told Down, she did access these rooms prior to her interactions
with the authorities.  And, there is no dispute that Pulkkinen demonstrated in her
communications with Down respecting the rooms containing the weapons and the
marijuana that she believed she could allow the officers access to these premises.
Pulkkinen's actual authority to consent to the search of these two rooms in these
circumstances is not unlike the authority of a battered spouse to consent to the search of
the prior marital home, even if the other spouse has changed the locks and the police have
to break down a door.  See United States v. Backus, 349 F.3d 1298 (11th Cir. 2003);
United States v. Gevedon, 214 F.3d 807, 810 -11 (7th Cir. 2000); United States v. Duran,
957 F.2d 499, 503 -05 (7th Cir. 1992). When analyzing this dispute in terms of whether
or not Pulkkinen had actual authority, it does not matter what Down did or did not
believe about her authority. [67]  If she had actual authority, there was no constitutional
violation when the police conducted the search.

----

[67]     If the Court determines that I am incorrect in this determination, it seems that the analysis would
have to shift to which side prevails under an apparent authority rubric.  A touchstone of this inquiry as to
whether Down is liable to Bloomquist for his determination that Pulkkinen had apparent authority to
consent to a search is Illinois v. Rodriguez, 497 U.S. 177, 183-89 (1990).   The Court reflected therein:
>    It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth
>    Amendment, what is generally demanded of the many factual determinations that must
>    regularly be made by agents of the government--whether the magistrate issuing a warrant,
>    the police officer executing a warrant, or the police officer conducting a search or seizure
>    under one of the exceptions to the warrant require ment--is not that they always be
>    correct, but that they always be reasonable.
>    ...
>    ....Whether the basis for such authority exists is the sort of recurring factual question to
>    which law enforcement officials must be expected to apply their judgment; and all the
>    Fourth Amendment requires is that they answer it reasonably. The Constitution is no
>    more violated when officers enter without a warrant because they reasonably (though
>    erroneously) believe that the person who has consented to their entry is a resident of the
>    premises, than it is violated when they enter without a warrant because they reasonably

With respect to Bloomquist's Fourth Amendment claims stemming from the New Hampshire proceedings, the defendants assert that Bloomquist has no competent evidence to support a conclusion that the Cumberland County Defendants did anything to influence – let alone in a false or fraudulent manner -- the New Hampshire Court proceedings.  (Mot. Summ. J. at 22.)  Bloomquist retorts that he has competent evidence that Down attempted to influence these proceedings by communicating with Jonathan Hebert of the New Hampshire Carroll County Sheriff's department when Down knew that Hebert was preparing for the hearing the following day.  (Opp'n Mem. Mot. Summ. J. at 34.)  He elaborates:

> The clear casual(sic) connection between the conduct of Defendant Down and the N.H. Stalking Orders is found in the two page so called court security document, previously detailed above and elsewhere, discovered by Plaintiff months after the hearing was over. *Pl.'s Exhibits I, J, Pl.s MSJ.* As stated previously above and elsewhere, that document contains numerous intentional, material, and malicious falsehoods about Plaintiff that had no direct relevance to Court security proceedings in N.H. In fact, Defendant Down (if Defendant Berlind's affidavit is to be believed relied) solely on the statements of Defendant Benfield that he had obtained in phone conversations with her, as detailed previously above, to make the completely false allegation that Plaintiff had struck her in the April 11, 2001 Bridgton Courtroom.
>
> Plaintiff also argues that whether Defendant Down knew or didn't know that his evidence would end up in a foreign court proceeding is irrelevant as the fact is that he knowingly provided the false information across State lines to another law enforcement agency whom he knew was involved with Plaintiff and he knew the information was false and maliciously fabricated. In fact this false and maliciously fabricated information was delivered to the N.H. Carroll County Court by Officer Jonathan Hebert who had received the information directly from Defendant Down and so stated in the report, and this information was used to bolster the perjured testimony of Defendant Benfield, as previously detailed above.
>
> Whether or not Defendant Down intended to influence the court or not, it is clear he intended to influence the N.H. Carroll County Sheriff's

---

(though erroneously) believe they are in pursuit of a violent felon who is about to escape. See <u>Archibald v. Mosel</u>, 677 F.2d 5 (CA1 1982).

<u>Id.</u> at 185-86.

> Department as well as other law enforcement agencies to become
> prejudiced towards Plaintiff by virtue of Defendant Down's completely
> and utterly false and maliciously fabricated accusations that Plaintiff was
> accused and charged with sexual assault.

(Id. at 35-36.)

Considering the properly supported facts set forth above material to the New Hampshire events and Bloomquist's argument, I conclude that Bloomquist simply does not have a viable Fourth Amendment claim against Down for his communications with Hebert.

Bloomquist also presses a malicious prosecution claim against the individual defendants which the defendants have addressed under the Fourth Amendment rubric of their motion. The United States Supreme Court has yet to determine whether or not a plaintiff can even bring a 42 U.S.C. § 1983 action for malicious prosecution premised on a Fourth Amendment violation. See Albright v. Oliver, 510 U.S. 266, 271 n.4 (1994) ("As noted by the Court of Appeals below, the extent to which a claim of malicious prosecution is actionable under § 1983 is one "on which there is an embarrassing diversity of judicial opinion." Most of the lower courts recognize some form of malicious prosecution action under § 1983. The disagreement among the courts concerns whether malicious prosecutions, standing alone, can violate the Constitution.") (internal citations omitted).

The First Circuit is on the fence; in Nieves v. McSweeney the First Circuit reflected:

> It is an open question whether the Constitution permits the assertion of a
> section 1983 claim for malicious prosecution on the basis of an alleged
> Fourth Amendment violation. As in previous cases, we will assume
> without deciding that malicious prosecution can, under some

circumstances, embody a violation of the Fourth Amendment and thus
ground a cause of action under section 1983.

241 F.3d 46, 54 (1st Cir. 2001) (internal citations omitted).[68] See also Castellano v.

Fragozo, 352 F.3d 939, 953 (5th Cir.2003) (en banc) ("[C]ausing charges to be filed

without probable cause will not without more violate the constitution. So defined, the

assertion of malicious prosecution states no constitutional claim.");  McCann v.

Mangialardi, 337 F.3d 782, 786 (7th Cir. 2003) (observing that the existence of a state

law tort remedy locks out a constitutional claim for malicious prosecution).

Given the state of First Circuit precedent on the question, I conclude that Dion,

Down, and Joyce are entitled to qualified immunity on Bloomquist's malicious

prosecution claims.  See Rodriguez-Mateo v. Fuentes-Agostini, No. 02-1662. 66

Fed.Appx. 212 (2003), 213 -14 (1st Cir. May 28. 2003) (unpublished decision) ("[W]e

have explicitly held, after the events that gave rise to this case, that '[i]t is an open

question whether the Constitution permits the assertion of a section 1983 claim for

malicious prosecution on the basis of an alleged Fourth Amendment violation.'  Such

uncertainty in the legal landscape entitles state actors to qualified immunity.")(internal

citation omitted); see also Brosseau v. Haugen, 543  U.S. 194, 600-01 (2004) (Breyer, J,

joined by Scalia, J. and Ginsburg, J., concurring) (observing that, while Saucier v. Katz,

533 U.S. 194 (2001) requires that lower courts decide the constitutional question before

deciding the qualified immunity question, the Supreme Court should reconsider the issue

---

[68]     Maine recognizes the tort of malicious prosecution and, therefore, there is no question that
Bloomquist cannot proceed with this count premised on the Fourteenth Amendment.  Id. at 53.  It is also
clear that he cannot base the claim on a substantive due process theory.  Id.

because "a rigid 'order of battle' makes little administrative sense and can sometimes lead to a constitutional decision that is effectively insulated from review").[69]

### Sixth and Eighth Amendment – Counts Thirty-Seven and Twenty-Two

Bloomquist has waived his response to the defendants' argument with respect to Count Thirty-seven of his amended complaint alleging a violation of his Sixth Amendment rights and Count Twenty-two alleging a violation of his Eighth Amendment Rights. (Opp'n Mem. Mot. Summ. J. at 36.)[70] As these are counts to which Bloomquist has offered no defense to the defendants' properly supported argument that they are entitled to summary judgment, I conclude that the Court should grant the defendants summary judgment as to these two counts.

### Fourteenth Amendment – Counts Three, Thirty, Thirty-One, Thirty-Two, and Thirty-Three

All five of the counts Bloomquist frames as being under the Fourteenth Amendment are premised on Bloomquist's allegations that:

> Defendant Down and others did violate Plaintiff's due process rights by knowingly, willingly, and maliciously disseminating false and fraudulent information to the N.H. Carroll County Sheriff's Department, to the BATF, to the Cumberland County DA's Office, and to others that the Plaintiff was convicted of a crime, that Plaintiff was a local sexual assault investigation, there is a sexual assault charge on his record, that Plaintiff had assaulted Defendant Benfield, and other false information, all of which Plaintiff has previously detailed above and elsewhere.

(Opp'n Mem. Mot. Summ. J. at 36.)

Bloomquist asks that the Court distinguish his Fourteenth Amendment claims from those involved in <u>Paul v. Davis</u>, 424 U.S. 693 (1976). A case that involved the

---

[69]     The extent to which Bloomquist has muddled this summary judgment record compounds the problem of deciding the question of whether or not there is a genuine dispute of material fact on the question of whether or not there has been a constitutional violation.

[70]     Bloomquist lists Count 12 as pertaining to Dion, Down, and Joyce, but that seems to be a typographical misstep.

police department's posting of the plaintiff's name and photo on a flyer of active

shoplifters which was disseminated to local merchants,  Davis held that this defamation

of the plaintiff standing alone did not form the basis for a Fourteenth Amendment claim,

id. at 694, because it did not "deprive him of any 'liberty' or 'property' interests protected

by the Due Process Clause."  Bloomquist asserts that his Fourteenth Amendment claims

are different because "it was a fabrication and creation of false criminal histories,

criminal charges, and criminal investigations by criminal investigators telling this to other

law enforcement officials both Federally and within the State and without the State... that

they were being entered into the system of internal files and inhouse files of law

enforcement and Federal agencies and that they would be used against Plaintiff either

legally or socially."  (Opp'n Mem. Mot. Summ. J. at 36-37.)   However, Bloomquist does

not specify where in the record above I can find a cognizable or comprehensible fact that

supports Bloomquist's conclusory contention that he was deprived of a liberty or property

interest.  Nor does he parse which alleged statements or communications led to the

alleged deprivations.[71]

---

[71]      At this juncture in these proceedings it is certainly incumbent upon Bloomquist to connect the dots
as to these Fourteenth Amendment claims that require this linkage.  I note that in Aversa v. United States
the First Circuit reflected on this burden in view of Siegert v. Gilley, 500 U.S. 226 (1991)'s teaching that
the link between the defendants defamation and the lost protected liberty or right must be direct:

> Paul v. Davis, 424 U.S. 693 (1976), the Court indicated that a claim for
> defamation could rise to a constitutional level if accompanied by a loss of employment,
> but left unclear whether that loss would have to result from some further action by the
> defendant in addition to the defamation itself. In Siegert v. Gilley, [500 U.S. 226 (1991)]
> the Court made clear that it would. Siegert resigned from his job as a psychologist at a
> federal hospital in order to avoid being terminated, then began working at an Army
> hospital. Because Army hospitals required "credentialing" by a committee, Siegert signed
> a request form asking the federal hospital to provide his new employer with information
> regarding his job performance and privileges. Gilley, Siegert's former supervisor, sent a
> letter in response, stating that he could not recommend Siegert for privileges as a
> psychologist, and that Siegert was inept, unethical and the most untrustworthy individual
> he had supervised in thirteen years. The committee denied Siegert credentials. Thereafter,
> Siegert was turned down for a position at another Army hospital and returned to work at
> the first Army hospital with provisional credentials. After his administrative appeals were
> denied, his federal employment was terminated altogether. Id. at 228-29. The Court found

***Constitutional Right to Privacy  - Counts Thirty-Five and Thirty-Six***

With respect to Count Thirty-five (as relevant to these defendants), Bloomquist alleges that Dion, Down, and Joyce deprived him of his "constitutional right to privacy by the release of private details of Plaintiff's lifestyle, alleged sexual acts, real estate value and location, arms connection value, and his secret hidden room, and the methods Plaintiff used to protect."  (Am. Compl. ¶ 461.)  As to Count Thirty-six (as relevant to these defendants), Bloomquist claims that Dion, Down, and Joyce, deprived him of "his constitutional right to privacy by making videotape(s) and still photos of Plaintiff's private arms room and refusing to provide Plaintiff with copies and continuing to display videotapes and photo to others."  (Id. ¶ 468.)

The facts pertinent to these claims, as culled from the above recitation of material facts, are limited.  (See Defs.' SMF ¶ 78, 79, 80, 101, 102, 103, 104, 105, 106; Resp SMF ¶ 80, 103, 104; Dion Aff. Ex. 1; Docket No. 264, Exs. I & J.)  Both sides to this dispute

---

that Gilley's defamatory statements and their consequences were not actionable as a deprivation of liberty, stating:

> The alleged defamation was not uttered incident to the termination of Siegert's employment by the hospital, since he voluntarily resigned from his position at the hospital, and the letter was written several weeks later. The statements contained in the letter would undoubtedly damage the reputation of one in his position, and impair his future employment prospects. But the plaintiff in Paul v. Davis similarly alleged serious impairment of his future employment opportunities as well as other harm. Most defamation plaintiffs attempt to show some sort of damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a Bivens action.

Id. at 234. Thus, what may have been left open by Davis was foreclosed by Siegert--in order to state a cognizable claim that defamation together with loss of employment worked a deprivation of a constitutionally-protected liberty interest, a plaintiff must allege that the loss of employment resulted from some further action by the defendant in addition to the defamation. Where it is the defendant who terminated the plaintiff, the further action is the termination. But where, as here, a third party discharges or refuses to hire the plaintiff solely as a result of the defendant's defamation, the plaintiff has not described a viable constitutional claim.
99 F.3d 1200, 1215 -16 (1st Cir. 1996)

are rather vague as to their conception of a constitutional right to privacy. Once again I note that the individual defendants to which these two counts pertain have advanced a claim that they are entitled to qualified immunity. (See Mot. Summ. J. at 7-8.)

In a recommended decision in Doe v. Magnusson, Div. No. 130-B-W, 2005 WL 758454 (D. Me. Mar. 21, 2005) I concluded that, "the question of whether or not inmates have a Fourteenth Amendment right to privacy that protects private medical information from disclosure (not justified by legitimate penological reasons) by governmental actors was not clearly established by June 3, 2003." While the information and context of disclosure were different in that case, that decision contained a lengthy summary of the status of the viability of a constitutional right to privacy. See id. at **3-11. The events involving these defendants preceded June 3, 2003, and, assuming that Bloomquist has stated a claim for a constitutional violation, I concluded, incorporating my discussion in Doe, that the defendants are entitled to qualified immunity as to these two counts. See Hope, 536 U.S. at 736; Saucier, 533 U.S. at 201; Savard, 338 F.3d at 27; see also Rosseau, 543 U.S. at 600-01 (Breyer, J, joined by Scalia, J. and Ginsburg, J., concurring).

### Rights Under 18 U.S.C. § 922 - Count Thirteen

In my recommended decision on Anne Berlind's motion for summary judgment (Docket No. 307) I concluded that Berlind was entitled to judgment on Count Thirteen because 18 U.S.C. § 922 does not create an individually enforceable right. The statute is entitled "Unlawful Acts." All but two -- subsections (t) and (y) -- of the (a) through (y) subsections contain the phrase "it shall be unlawful." While I could locate authority addressing who had standing to bring a constitutional challenge to provisions contained

in 18 U.S.C. § 922, I could locate no authority -- pro or con -- for the proposition that a

licensed arms dealer could proceed with a 42 U.S.C. § 1983 action on the grounds that 18

U.S.C. § 922 creates an individually enforceable right.  Accordingly, I conclude that

these defendants, like Berlind, are entitled to summary judgment on Count Thirteen of

Bloomquist's complaint.

**State Law Counts – Counts Thirty-Eight, Thirty-Nine, Forty, Forty-One, Forty-Two, Forty-Three, Forty-Four, Forty-Seven, Forty-Eight, and Fifty**

The defendants have identified the above listed ten counts as being counts that

sound in state tort law and as running against them.  As they state, these counts implicate

the provisions of the Maine Tort Claims Act, see 14 M.R.S.A. §§ 8101-8118, and assert

that the County, Dion, Down, and Joyce are each entitled to immunity under the

applicable immunity provisions of that act.  In responding to the defendants' argument –

which spans sixteen pages of their memorandum – Bloomquist states, only:

> Plaintiff disputes that he has not complied with the notice
> requirements of the Maine Tort Claims Act in any way. Plaintiff has
> complied with the notice requirements and submits with his response
> copies thereof.
>     Plaintiff argues that the tortuous acts complained of by Plaintiff
> clearly exceeded the discretionary immunity of Defendants as a matter of
> law and exceeds the scope of any discretion they could of possessed in
> their official capacity as police officers.

(Opp'n Mem. Mot. Summ. J. at 44.)

The defendants have made a properly supported argument as to why the County

and the individual defendants are entitled to immunity under the Maine Tort Claim Act.

(Mot. Summ. J. at 28-33.)  They have done the same apropos arguing the underlying

merits of the counts.  (Id. at 34-42.)  In addition they argue that most if not all of

Bloomquist's state tort claims are barred by the two-year statute of limitations.  (Id. at 33-

34.)  Bloomquist's conclusory protestation that the defendants exceeded the scope of their discretionary immunity is not sufficient to shield him from summary judgment on these ten state tort counts.

### Conclusion

For the reasons herein, I recommend that the Court **GRANT** summary judgment to Cumberland County, Mark Dion, Kevin Joyce, and Dan Down on all of William Bloomquist's counts against them in this action.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

January 9, 2006.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge